UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 CR 195 |
| BRIAN HOLLNAGEL, | ) | |
| BCI AIRCRAFT LEASING, INC., | ) | |
| CRAIG PAPAYANIS, | ) | |
| JASON R. HYATT, | ) | |
| WILLIAM HATAMYAR, | ) | |
| JEFFREY MEYER, | ) | |
| MARTIN COLLIER, and | ) | |
| ROBERT CARLSSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Brian Hollnagel, BCI Aircraft Leasing, Inc. ("BCI"), Craig Papayanis,

William Hatamyar, Martin Collier, and Robert Carlsson[1] have moved to sever certain counts and

defendants in the multi-count Superseding Indictment in this case under both Rules 8(b) and 14

of the Federal Rules of Criminal Procedure. Defendants argue that one trial involving all the

Defendants and the 21 counts as charged in the Superseding Indictment would create a serious

risk of depriving each Defendant of a fair trial. For the reasons discussed in detail below,

Defendant Hollnagel's and BCI's motion to sever is granted in part and denied in part,

Defendant Papayanis's Motion to sever is granted as to Counts Twenty and Twenty-One and

denied as to the other arguments, Defendant Hatamyar's motion to sever and for relief from

---

[1] Various Defendants have moved to join in the arguments made in support of severance
and the Court has granted their requests.

misjoinder is denied,  Defendant Collier's motion to sever is denied in part and denied in part without prejudice, and Defendant Carlsson's motion to sever is denied and denied in part without prejudice as to Counts 16 and 17.  The government must file its *Bruton* submission on or before October 17, 2011.  Defendants' response is due on or before October 31, 2011.  The Court hereby severs Counts Twenty and Twenty-One of the Superseding Indictment.

## BACKGROUND

On September 8, 2010, the grand jury returned a twenty-one count superseding indictment in this case, charging eight defendants with wire fraud, in violation of 18 U.S.C. § 1343 (counts one through eleven); false statements in connection with an application to obtain a line of credit, in violation of 18 U.S.C. § 1014 (count twelve); bribery or attempted bribery in an attempt to influence the business and transactions of Bridgeview Bank, in violation of 18 U.S.C. § 215(a)(1) (counts thirteen and fourteen); obstruction of justice, in violation of 18 U.S.C. § 1512 (counts fifteen through seventeen, and nineteen); perjury, in violation of 18 U.S.C. § 1623 (count eighteen); and tax violations, in violation of 26 U.S.C. § 7206(1) (counts twenty and twenty-one).  The sixty-five page superseding indictment also contains forfeiture allegations.

Specifically, Count One charges Defendant Hollnagel with engaging in a scheme to defraud with Brian Olds and others.  It alleges that from in or about 2004 until at least March 11, 2005, Defendant Hollnagel devised and participated in a scheme to defraud AAR Corp. ("AAR") with Brian Olds, a Group Vice President of AAR, through bribe payments to ensure, in part, AAR's purchase from BCI of commercial airplanes then under lease to US Airways.  Count Two charges Defendants Hollnagel, BCI Aircraft, Papayanis, Hyatt, Hatamyar, Meyer, and Collier with a long-term scheme to defraud investors and financial institutions of money and property

through, among other things, bribe payments to obtain loans, misrepresentations regarding investments, misappropriation of money raised for particular purposes, commingling of funds, and concealment efforts, including the creation and production of allegedly fraudulent court-ordered accountings and the deletion of data from hard drives that had been subpoenaed by the Securities and Exchange Commission ("SEC").  Count Two alleges a long-term fraudulent financing scheme to defraud investors, financial institutions, and others from 2000 to mid February 2009.

Counts Three through Eleven charge separate wire transactions in furtherance of the fraud scheme charged in Count Two.  These counts are summarized as follows:

| Count Number | Charge | Defendants Charged | Date/Contents of Wire Transaction |
|---|---|---|---|
| Two | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Meyer | **$1,200**<br><br>**December 1, 2005** |
| **Three** | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Meyer | **$1,100**<br><br>**February 2, 2006** |
| **Four** | Wire Fraud  violation of **18 USC 1343 § 2** | Hollnagel BCI Papayanis | **$294,500**<br><br>**September 28, 2005** |
| **Five** | Wire Fraud-violation **18 USC 1343 § 2** | Hollnagel BCI Papayanis | **$80,000**<br><br>**January 13, 2006** |
| **Six** | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Hyatt | **$500,000**<br><br>**October 25, 2005** |
| **Seven** | Wire Fraud -violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Hyatt | **$300,000**<br><br>**September 27, 2005** |
| **Eight** | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Collier | **Email Analysis of 2004-5 Investments & Analysis of 2004-6 Investments**<br><br>**September 6, 2007** |

| Nine | Wire Fraud-violating 18 USC 1343 § 2 | Hollnagel BCI Collier | **Email Amended Analysis of 2004-5 Investments** **September 17, 2007** |
|------|------|------|------|
| **Ten** | Wire Fraud-violating 18 USC 1343 § 2 | Hollnagel BCI Hatamyar | **$1,182,400.67** **July 8, 2005** |
| **Eleven** | Wire Fraud -violating 18 USC 1343 § 2 | Hollnagel BCI Hatamyar | **$67,599.33** **July 8, 2005** |

Count Twelve charges Defendant Hatamyar with knowingly making a false statement to Bridgeview Bank for the purpose of influencing the Bank to approve a line of credit for BCI, in violation of 18 U.S.C. § 1014.

Count Thirteen charges Defendants Hollnagel and BCI with corruptly giving, offering, and promising Defendant Hatamyar bribes, in order to influence and reward Hatamyar in connection with Bridgeview Bank's business and transactions, in violation of 18 U.S.C. § 215(a)(1) and 2. Count Fourteen charges Defendant Hatamyar with soliciting, demanding and agreeing to accept bribes from Defendants Hollnagel and BCI, in violation of 18 U.S.C. § 215(a)(2).

Count Fifteen of the Superseding Indictment charges Defendants Hollnagel, BCI Aircraft, and Collier with obstructing an SEC proceeding, in violation of 18 U.S.C. § 1512(c)(2). Similarly, Count Sixteen charges Defendants Hollnagel, BCI Aircraft, and Carlsson with obstructing an SEC examination of 21 Capital, in violation of the same statute. In Count Seventeen, Defendant Carlsson is charged with obstructing an SEC examination of 21 Capital on or about May 30, 2007.

Count Eighteen charges Defendant Collier with committing perjury on August 16, 2007 and February 19, 2009 while testifying under oath in an evidentiary hearing in connection with

an SEC proceeding in the United States District Court for the Northern District of Illinois, and while testifying at a deposition in the same SEC proceeding, in violation of 18 U.S.C. §1623(c).

Count Nineteen charges Defendant Hyatt with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). In connection with the SEC proceeding, subpoenas were served on Defendant Hyatt and Hyatt Johnson Capital seeking certain information, including electronically stored information on certain computers. Count Nineteen charges Defendant Hyatt with altering, destroying and mutilating the subpoenaed contents of two computers, with the intent to impair the integrity and availability of the data stored on the computers.

Counts Twenty and Twenty-One charge Defendant Hollnagel with filing false tax returns, in violation of 26 U.S.C. § 7206(1). Count Twenty pertains to Hollnagel's amended tax return for the calendar year 2005, and Count Twenty-One is connected to his personal tax return for the calendar year 2006.

## I.       The Parties and Other Key Entities

The Superseding Indictment alleges the following facts:

Defendant BCI was a privately owned Illinois corporation with an office originally in Naperville, Illinois and subsequently, in Chicago, Illinois. (R. 46, Superseding Indictment at 1, P1b.) BCI and its related limited liability companies were in the business of buying, selling and leasing commercial airplanes. (*Id.*) BCI financed its operations through loans from various financial institutions and also through offering and selling investment interests in limited liability companies (the "Investment LLCs") which it managed. (*Id.* at 7, P2ai.) While the terms of each Investment LLC varied, generally BCI offered prospective investors an investment interest in a particular Investment LLC. BCI led prospective investors to believe that they indirectly would

acquire beneficial ownership of a specific commercial aircraft on lease to a specific commercial airline, which eventually would be released, refinanced, and/or sold. (*Id.* at 7, P2aii.) Typically, the terms of such an agreement would be that: 1) the prospective investor would invest along with BCI in the acquisition of the aircraft(s); 2) the amount of money raised by each Investment LLC would be restricted to a specified amount; 3) the investor's funds would be utilized to purchase beneficial ownership of specific aircraft(s); 4) the investor would receive monthly returns from BCI from the revenues it generated from leasing the aircraft(s); and 5) the investors in the Investment LLC would receive 50% of the net profits from the eventual resale of the aircraft(s). (*Id.* at 8, P2aii.) Defendant Hollnagel was the owner, president, and chief executive officer of BCI. (*Id.* at 1, P1a.)

Coast Business Credit was a commercial lender and a division of the former Southern Pacific Bank. (*Id*. at 8, P2c.) Coast Business Credit was fraudulently induced to provide Defendant BCI a line of credit in excess of $40 million. (*Id.*)

Defendant Papayanis was a vice president at Coast Business Credit. In his role as vice president, Papayanis acted "as the loan officer on term loans and a line of credit made to BCI totaling over $40 million." (*Id.* at 8, P2c.) While employed at Coast Business Credit, BCI and Hollnagel bribed Papayanis by offering him employment at BCI. (*Id.* at 19-20, P17.) This bribe was in exchange for Papayanis's assistance to help BCI and Hollnagel obtain the line of credit from Coast Business Credit. Shortly after Papayanis provided BCI and Hollnagel assistance in obtaining their line of credit, Papayanis began working for BCI, holding a variety of positions including both managing director and chief financial officer. (*Id.* at 8, P2c.)

Defendant William Hatamyar was the President of AirBanker, a division of Bridgeview Bank Group (collectively referred to as "Bridgeview Bank"). In the late spring or early summer of 2005, Hollnagel and BCI paid bribes to Hatamyar in exchange for Hatamyar's assistance in leveraging his position at Bridgeview Bank to assist Hollnagel and BCI in obtaining a $15-$25 million line of credit from Bridgeview Bank. (*Id.* at 21, P20.) While employed at Bridgeview Bank, Hatamyar acted as the loan officer on term loans and a line of credit made to BCI, which amounted to over $30 million. (*Id.* at 9, P2e.) In addition to his role at Bridgeview Bank, Hatamyar also operated Trinity Capital, Inc., a financial lender to distressed companies. (*Id.* at 9, P2e.) A portion of the bribe Hollnagel and BCI paid to Hatamyar included a line of credit and fixed inventory loan of $1.25 million which directly benefitted Hatamyar and Trinity Capital, Inc. (*Id.* at 21, P20.) Hollnagel and BCI also bribed Hatamyar with a Mercedes Benz. (*Id.*)

Defendant Jeffrey Meyer was BCI's controller from in or about 2003 to approximately the spring of 2006. (*Id.* at 9, P2f.) On or about July 8, 2005, Meyer caused approximately $1.25 million—part of the bribe payment to Hatamyar—to be wired to bank accounts pursuant to Hatamyar's directions. (*Id.* at 22, P23.)

Defendant Martin Collier held multiple positions at BCI, including chief financial officer. (*Id.* at 9, P2g.) Collier concealed or attempted to conceal from investors and financial institutions the true state of BCI's finances by instructing BCI's auditors to audit financial statements that combined all of the Investment LLCs with BCI. (*Id.* at 23, P26.)

Hyatt Johnson Capital was a privately held company with its principal place of business located in Downers Grove, Illinois. (*Id.* at 9, P2h.) Among other things, Hyatt Johnson Capital was in the business of offering and selling over $20 million in investments in the BCI Investment

LLCs. (*Id.* at 9, P2h.) Hollnagel, BCI, and Papayanis falsely represented to Hyatt Johnson Capital and its customers that funds invested through Hyatt Johnson Capital would be invested in Investment LLCs to which only BCI and Hyatt Johnson Capital customers would be privy. Hollnagel, BCI, and Papyanis, however, knew that all Defendants were raising money from other investors for the same Investment LLCs and that Defendants intended to misappropriate these funds. (*Id.* at 18, P13.)

Defendant Jason R. Hyatt was a manager and owner of Hyatt Johnson Capital, LLC. (*Id.* at 8, P2d.) Defendant Hyatt is accused of aiding in the scheme to defraud by falsely representing to Hyatt Johnson Capital customers that BCI agreed to pay Hyatt Johnson Capital an organizational fee totaling approximately 5.5% of the funds invested in the Investment LLCs through Hyatt Johnson Capital. (*Id.* at 25, P29.) Despite these representations, Defendant Hyatt knew that in exchange for his cooperation and assistance in the scheme, Hollnagel and BCI agreed to pay Hyatt commissions totaling approximately 10% of the funds invested in the Investment LLCs. Of those proceeds, Hyatt paid 5.5% to Hyatt Johnson Capital, while keeping the remainder for his own personal enrichment. (*Id.*)

## LEGAL STANDARD

Defendants ask the Court to sever various counts and various Defendants from the Superseding Indictment. Specifically, Defendants Hollnagel and BCI have moved the Court to sever Counts 1; 2 through 5; 6, 7 and 19; 8, 9, 15 and 18; 16 and 17; 10 through 14; and 20 and 21. Defendant Papayanis moves for severance of 1) Count One from the other counts of the Superseding Indictment; 2) Counts 20 and 21 from the other counts; 3) Counts 8, 9, 15, and 18 from the other counts; 4) severing Papayanis from Counts Ten through Fourteen; 5) severing

Papayanis from Counts Two (including ¶ 33), 6, 7, and 19; 6) severing Papayanis from Counts Sixteen and Seventeen; and 7) severing Papayanis from Counts Two (¶¶ 10(g), 26, 30-32, 34), Eight, and Nine.  Defendant William Hatamyar moves to sever the trial of Counts Ten, Eleven, Twelve and Fourteen from the remaining Counts and Defendants charged in the Superseding Indictment.  Defendant Collier moves to sever his trial on Counts 8, 9, 15, and 18.  Finally, Defendant Carlsson asks the Court to sever Counts 16 and 17 of the Superseding Indictment.  As the government notes, Defendants ask the Court to sever the Superseding Indictment into ten separate trials.

## I.    Rule 8(b)

Rule 8 of the Federal Rules of Criminal Procedure provides the legal standard for joinder of counts and defendants in an indictment.[2]  Rule 8(b) – entitled "Joinder of Defendants" – provides that:

> [An indictment] may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  The Seventh Circuit has "construed this rule broadly to allow liberal joinder in order to enhance judicial efficiency."  *United States v. Stillo*, 57 F.3d 553, 556 (7th Cir. 1995) (further noting, however, that "[t]he government cannot bootstrap multiple defendants with similar but unconnected offenses into a single indictment by combining Rules 8(a) and 8(b)

---

[2] The Seventh Circuit has noted that "[w]hen two or more defendants are charged in a single indictment, Rule 8(b) governments joinder of defendants and offenses."  *United States v. Ross*, 510 F.3d 702, 710 n.2 (7th Cir. 2007).  It has not decided the precise question of whether Rule 8(a) can apply in a multi-defendant case.  *Id.* at 710.  *See also United States v. States*, __ F.3d __, 2011 WL 2857263 (7th Cir. July 19, 2011).  Because Defendants have moved for severance under Rule 8(b), the Court need not decide that issue.

and the existence of overlapping defendants"). Such a broad construction avoids "costly, duplicative trials." *States,* __ F.3d __, __ 2011 WL 2857263 at * 6 (citations and quotations omitted). The Seventh Circuit has held that "Rule 8(b) is satisfied when the defendants are charged with crimes that well up out of the same series of such acts, but they need not be the same crimes." *United States v. Williams*, 553 F.3d 1073, 1078 (7th Cir. 2009), citing *United States v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007). The "'same series of acts or transactions' means acts or transactions that are pursuant to a common plan or common scheme." *United States v. Lanas,* 324 F.3d 894, 899 (7th Cir. 2003), quoting *United States v. Todosijevic*, 161 F.3d 479, 484 (7th Cir. 1998). In analyzing motions under Rule 8, the Court looks to the face of the indictment in determining whether joinder is proper. *See United States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008); *Warner*, 498 F.3d at 699.

## II.     Rule 14(a)

Rule 14(a) provides that it it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. Fed. R. Crim P. 14(a). The Seventh Circuit has identified several situations in which a severance under Rule 14 may be appropriate, including: 1) defenses antagonistic to the point of being irreconcilable and mutually exclusive; 2) massive and complex evidence making it almost impossible for the jury to separate evidence as it is related to each defendant when determining each defendant's guilt or innocence; 3) a co-defendant's statement inculpating the moving defendant; and 4) a gross disparity in the weight of the evidence against the defendants. *See, e.g.*, *Stillo*, 57 F.3d at 557, *cert. denied*, 516 U.S. 945,

116 S.Ct. 383, 133 L.Ed. 2d 306 (1995). The Court must balance the cost of separate trials with the possible prejudice from a joint trial. *United States v. Calabrese*, 572 F.3d 362, 367-68 (7th Cir. 2009). *See also United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988); *United States v. Percival*, 756 F.2d 600, 610 (7th Cir. 1985) ("In considering a motion for severance, the trial judge should give deference to the strong public interest in having persons jointly indicted tried together."). Severance is appropriate only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed. 2d 317 (1993). *See United States v. Smith*, 308 F.3d 726, 736 (7th Cir. 2002). Defendant bears the burden of showing actual prejudice resulting from joinder. "'Actual prejudice' does not exist just because 'separate trials would have given a defendant a better opportunity for an acquittal.' Rather the defendant must have been 'deprived of his right to a fair trial.'" *Warner*, 498 F.3d at 700. *See also United States v. Souffront*, 338 F.3d 809, 831 (7th Cir. 2003) ("[I]t is insufficient that separate trials would have given a defendant a better opportunity for an acquittal.").

As the Seventh Circuit has noted, "[t]he preference is for a joint trial of defendants who were indicted together." *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006), citing *Zafiro,* 506 U.S. at 537. Furthermore, "[i]n all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *United States v. McClurge,* 311 F.3d 866, 871 (7th Cir. 2002), quoting *United States v. Blassingame,* 197 F.3d 271, 286 (7th Cir. 1999).

**ANALYSIS**

Defendants ask the Court to sever various counts and various Defendants from the Superseding Indictment pursuant to Rules 8(b) and 14. Defendants argue that many of the counts are misjoined in the Superseding Indictment because they do not arise from the same series of acts or transactions, but rather are completely separate and distinct acts or transactions. Defendants further assert that the risk of prejudice by proceeding to trial on all 21 counts against the eight Defendants "is particularly acute here, where the evidence is complex, there are multiple defendants with different degrees of involvement in different aspects of the conduct charged as criminal and where the jury will have difficulty considering evidence only as it relates to particular defendants and particular charges." (R. 169 at 3.)

## I. Severance of Count One is Not Appropriate

Count One alleges that Defendant Hollnagel engaged in a scheme to defraud AAR and its shareholders of money and property in connection with BCI's purchase and sale of various aircraft to and from AAR. Defendants seek to sever this count and proceed with a separate trial regarding it. Defendants have not meet their burden of establishing misjoinder or prejudice regarding Count One.

### A. Count One is Properly Joined Under Rule 8(b)

Defendants contend that the Court should sever Count One because it does not involve the same series of acts or transactions as the other offenses charged in the Superseding Indictment and is thus misjoined.[3] The Court disagrees. In reviewing the face of the indictment,

---

[3] Defendants assert that the "Court has already noted that the Olds scheme is separate from the remainder of the frauds charged in the indictment." (R. 230 at 2.) Defendants' attempt to stretch the Court's identification of Count One as charging a separate scheme from Count Two

Count One aries out of the same acts or transactions giving rise to the fraudulent scheme alleged in Count Two. Count One alleges that beginning no later than 2004 and continuing until at least March 11, 2005, Defendant Hollnagel defrauded AAR of money and property by bribing one of its officers – Brian Olds[4] – in order to ensure AAR's purchase from BCI of two commercial airplanes then under lease to US Airways and to ensure that AAR would sell to BCI three commercial airplanes that AAR had leased to Continental Airlines. The allegations of the scheme to defraud charged in Count One are expressly incorporated into Count Two. (R. 46 at 7) ("The Grand Jury realleges and incorporates by reference paragraphs 2 through 14 of Count One of this indictment s though fully set forth herein."). In addition, Count Two of the Superseding Indictment alleges that the conduct that formed the basis of the scheme in Count One was also part of the fraudulent financing scheme alleged in Count Two. (R. 46 at ¶ 28.) Given this overlap, it is clear from the Superseding Indictment that the alleged schemes in Counts One and Two arise out of the same series of acts or transactions and thus are properly joined under Rule 8(b).

### B. Severance of Count One is Not Warranted

Rule 14 does not require severance of Count One. Defendants generally argue that they face of a risk of an unfair trial given the complexity of the charged schemes. They further assert that the Court should sever Count One because the overlap in the evidence between Count One and the other counts is minimal and thus trying the counts together will needlessly lengthen and

---

into a ruling that the Court should sever these Counts fails.

[4] On August 23, 2010, Brian Olds pled guilty in this case pursuant to a written plea agreement with the government. (R. 45.) Olds pled guilty to counts one and four of the original indictment.

complicate the trial. As a result, Defendants argue, the risk of an unfair trial is heightened because it will increase the difficulty of "the jury's task of compartmentalizing the evidence that is admissible against some but not other defendants." (R. 169 at 10.) Defendants, however, have not established that there is a serious risk that a joint trial will compromise any of their specific trial rights or prevent the jury from making a reliable judgment about guilt or innocence.

Defendants' assertion that little overlap exists between the evidence on Count One and that on Count Two is belied by the allegations in the Superseding Indictment. As noted above, Count Two specifically incorporates the scheme allegations from Count One, thus there will be a complete overlap on this aspect of the case. Given the substantial overlap in evidence on Counts One and Two, Count One is properly joined.

Furthermore, the Court will instruct the jury to consider each count of the Superseding Indictment separately and each Defendant on trial separately, and the Court presumes that the jury follows its instructions. *States*, __ F.3d at ___ , 2011 WL 2857263 at *7. The Court will also give limiting instructions when requested and where appropriate, where certain evidence is admissible for a limited purpose. *See Warner*, 498 F.3d at 701-02. As the Seventh Circuit has made clear, "there is a strong interest in trying defendants who have been jointly indicted in a single trial." *Blassingame*, 197 F.3d at 285), *cert. denied* 529 U.S. 1138, 120 S.Ct. 2024. *See also United States v. Shorter*, 54 F.3d 1248, 1257 (7th Cir. 1995); *United States v. Magna*, 118 F.3d 1173, 1186 (7th Cir. 1997), *cert. denied*, 522 U.S. 1139, 118 S.Ct. 1104, 140 L.Ed.2d 158 (1997). Joint trials generally "provide[ ] the best perspective on the evidence as a whole" and thus "increase[ ] the likelihood of a correct outcome." *United States v. Buljubasic*, 808 F.2d

1260, 1263 (7th Cir. 1987). Moreover, joint trials "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts," which are both vital to the criminal justice system. *Zafiro*, 506 U.S. at 537 (citing *Richardson v. Marsh*, 481 U.S. 200, 209-10, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)).

## II.     Counts Two through Eleven Are Properly Joined in the Superseding Indictment

Count Two charges Defendants Hollnagel, BCI, Papayanis, Hyatt, Hatamyar, Meyer, and Collier with a scheme to defraud investors and financial institutions. Counts Three through Eleven each charge a separate wire communication in furtherance of the scheme to defraud in Count Two. Defendants argues that the Court should sever the counts according to the "different schemes" as follows: counts two through five; counts six, seven and nineteen; counts eight, nine, fifteen, and eighteen; counts sixteen and seventeen; and counts ten through fourteen. In other words, Defendants ask for numerous trials on these counts.

Defendants first seek severance based on the arguments raised in their motions to dismiss the counts as duplicitous and incorporate these arguments by reference into their motions to sever. The Court will address these issues in a separate ruling on Defendants' motions to dismiss certain counts as duplicitous.

Defendants further assert that Rule 14 requires severance of these counts given the "prejudice to the defendants of being tried together for this large number charges"[sic]. (R. 169 at 11.) Each wire at issue in Counts Two through Eleven was allegedly made in furtherance of the same scheme to defraud. As such, the government would introduce the same scheme evidence in connection with each wire charge. Given the substantial overlap in evidence, separate trials would require many of the same witnesses to testify about the exact same facts.

This undermines Defendants' argument of prejudice. *See Lanas*, 324 F.3d at 900 ("defendants' claim of prejudice is further undercut by the fact that much of the evidence admitted at their joint trial would have been admissible against them in separate trials as well").

Collier's Rule 14 arguments similarly fail. As noted above, Counts 8 and 9 expressly incorporate the scheme charged in Count 2 of the Superseding Indictment. Defendant Hatamyar also asserts that he will suffer prejudice because he is "alleged to have committed one false statement to a financial institution on July 7, 2005 (Count 12), two wire fraud violations on July 8, 2005 (Counts 10 and 11) and one bank bribery beginning sometime in June, 2005 and completed by or about October 6, 2005 (Count 14) all as part of the same criminal scheme as described in Count 2, paragraphs 20 through 25 and 27." (R. 183 at 2.) He argues that the other extensive criminal conduct alleged in the Superseding Indictment "can only result in undue and unfair spillover prejudice against Mr. Hatamyar, and make it extremely difficult for a jury to sort out the evidence as it relates to Mr. Hatamyar's alleged conduct from a mass of evidence that can only be admitted as relevant to some of his co-defendants with whom he had no relationship whatsoever." (*Id.* at 3-4.) Hatamyar's general allegations of prejudice fail in light of the substantial overlap in evidence given that these wire fraud counts are all in furtherance of the scheme charged in Count Two.

As stated above, the Court fully intends to instruct the jury that it must consider each count of the Superseding Indictment separately and the evidence relating to each count separately from the other counts in the Superseding Indictment. Additionally, the Court will instruct the jury that its decision on one charge should not influence its decision on any other charge. The Court will further instruct the jury that it must consider each Defendant and the

evidence concerning that Defendant separately.  These instructions will provide an "adequate safeguard against evidentiary spillover and cumulation of evidence."  *United States v. Ervin*, 540 F.3d 623 (7th Cir. 2008).  *See also Warner*, 498 F.3d at 700-01 ("limiting instructions ... often will suffice to cure any risk of prejudice.") (citations and quotations omitted).  Defendants have not provided any basis to believe the jury would disregard these instructions.

## III.    Counts Twelve through Fourteen

Counts Twelve through Fourteen pertain to BCI's dealings with the Bridgeview Bank Group, including AirBanker, a division of the Bridgeview Bank.  Defendant Hatamyar was the president of AirBanker who acted as the loan officer on term loans and a line of credit made to BCI with a cumulative total in excess of $30 million.  Count 12 charges Defendant Hatamyar with knowingly making a false statement – namely, that he did not have a financial interest with BCI – to Bridgeview Bank for the purposing of influencing the Bank to approve a line of credit for BCI.  Count 13 charges Defendants Hollnagel and BCI Aircraft with corruptly giving, offering and promising Defendant Hatamyar bribes, in order to influence and reward Hatamyar in connection with Bridgeview Bank's business and transactions.  The bribes included a revolving line of credit made at Hatamyar's direction to an Oklahoma company and a convertible Mercedes Benz.  Count 14 charges Defendant Hatamyar with soliciting, demanding and agreeing to accept these bribes from Defendants Hollnagel and BCI.

Defendant Hatamyar argues that the Court should sever these counts because he is not alleged to have any involvement in the other charges in the Superseding Indictment and it will be "extremely difficult for a jury to sort out the evidence as it relates to Mr. Hatamyar's alleged conduct from a mass of evidence that can only be admitted as relevant to some of his co-

defendants with whom he had not relationship whatsoever."  (R. 183 at 3-4.)  He is essentially

making a prejudicial spill-over argument.  In order to establish prejudice due to prejudicial spill-

over, a defendant must rebut these two presumptions: 1) a jury will capably sort through the

evidence presented at trial; and 2) a jury will follow the Court's instructions to consider each

count and each defendant separately.  *United States v. Lopez*, 6 F.3d 1281, 1286 (7th Cir. 1993);

*United States v. Diaz,* 876 F.2d 1344, 1358 (7th Cir. 1989) ("relevant inquiry is whether it is

within the jury's capacity to follow the trial court's limiting instructions requiring separate

consideration for each defendant and the evidence admitted against [him]").  Indeed, "[m]ere

speculation of 'spillover guilt' is not enough to rebut these twin presumptions."  *Lopez,* 6 F.3d at

1286.  It is well-established that "juries are presumed capable of sorting through the evidence

and considering the cause of each defendant separately."  *Id.*, quoting *United States v. Williams,*

858 F.2d 1218, 1225 (7th Cir. 1988); *see also Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct.

158, 165, 99 L.Ed. 101 (1954) ("[t]o say that the jury might [be] confused amounts to nothing

more than an unfounded speculation that jurors [disregard] clear instructions of the court . . . .

[o]ur theory of trial relies upon the ability of a jury to follow instructions").  Here, Defendant

Hatamyar has not overcome these presumptions because he fails to identify any specific spillover

evidence that warrants severance of these counts.  Furthermore, Count 10 of the Superseding

Indictment charges Hatamyar with a wire fraud in furtherance of the fraud scheme charged in

Count 2, and Count 2 contains numerous allegations regarding his involvement in the overall

scheme to defraud.  Defendant Hatamyar has not introduced any evidence regarding this scheme

that will "only be admitted as relevant to some of his co-defendants" and not to Hatamyar.  "In

all but the most unusual circumstances, the risk of prejudice arising from a joint trial is

outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all." *United States v. Spagnola*, 632 F.3d 981, 987 (7th Cir. 2011) (citations and quotations omitted). Hatamyar has not raised an unusual circumstance.

## IV. Defendant Collier's Advice of Counsel Argument is Too Speculative to Warrant Severance

Defendant Collier also contends that the Court should sever counts Eight, Nine, Fifteen, and Eighteen because he intends to claim advice of counsel as to each count against him. He claims that "much of the materials and information used to prepare in 2007 the court-ordered schedules for the 2007 SEC action and to prepare for his 2007 testimony and Rule 30(b)(6) testimony in 2009 in that action was based upon information obtained from and/or reviewed by legal counsel familiar with events and occurrences and the business of BCI prior to Collier's employment by BCI in June 2007." (R 162 at 9.) Collier asserts that his advice of counsel defense will require the testimony of counsel for BCI and Hollnagel, whom Collier claims provided him with certain information on which his testimony and the accounting schedules he prepared were grounded. Although Collier initially represented that his defense might require testimony from BCI's and Hollnagel's trial counsel, he subsequently represented that he does not anticipate calling Ms. Junghans as a trial witness to demonstrate his advice of counsel defense.

Collier argues that Defendants BCI and Hollnagel may assert the attorney-client privilege as to any privileged communications between counsel and BCI and/or Hollnagel, including any communications upon which Collier intends to base his defense of advice of counsel. If they assert the privilege, Collier claims that the Court will have to determine "whether and under what circumstances the attorney-client privilege must give way to [Collier's] Sixth Amendment right to present a defense where a privilege, if recognized, would exclude exculpatory evidence."

As the Seventh Circuit has noted "[a]dvice of counsel is not a free-standing defense, though a lawyer's fully informed opinion that certain conduct is lawful (followed by conduct strictly in compliance with that opinion) can negate the mental state required for some crimes, including fraud." *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008), quoting *United States v. Roti*, 484 F.3d 934, 935 (7th Cir. 2007). In order to rely on this advice of counsel theory, Defendant Collier must establish the following elements:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*Van Allen*, 524 F.3d at 823. "It isn't possible to make out an advice-of-counsel defense without producing the actual advice from an actual lawyer." *SEC v. McNamee*, 481 F.3d 451, 456 (7th 2007).

Collier has not made an offer of proof or presented any evidence that he can establish the elements of advice of counsel. Without more, his claim is too speculative to sever the counts against him. He must, at a minimum, provide evidence that he can meet his burden if the case proceeds to trial. Otherwise, a defendant could easily claim an advice of counsel "defense" in order to obtain a severance where such a "defense" is not warranted. Furthermore, Collier has not established that Defendants BCI and Hollnagel will assert the attorney client privilege in response to any claim of advice of counsel by Collier or that severance of the counts against him would cure the assertion of their privilege.

## V.        Counts Sixteen and Seventeen

Counts Sixteen and Seventeen charge Defendant Carlsson with obstructing an SEC investigation.  Count 16 also charges Defendants Hollnagel and BCI.  These counts are the only ones in which Carlsson is charged.  The SEC investigation at issue in Count 16 took place between April 25, 2006 and May 4, 2006.  The SEC investigation at issue in Count 17 took place on or about May 7, 2007.

Defendants argue that these counts are misjoined with the others and that severance is appropriate under Rule 14 given the "gross disparity of evidence and the inevitable resulting spillover effect" given that he is only charged in two of twenty-one counts.  Carlsson further asserts that severance is also warranted under *Bruton v. Untied States*, 391 U.S. 123 (1968).

### A.        Rule 8(b)

Counts Sixteen and Seventeen are properly joined with the other counts in the Superseding Indictment.  Both counts pertain to the SEC's investigation of 21 Capital Group, Inc., a securities broker-dealer registered with the SEC.  Count 16 alleges that Carlsson was a licensed securities broker who raised money for BCI from outside investors.  At various points, Carlsson 1) worked as managing director for BCI; 2) was the chief executive officer of BCI Capital Management, an unregistered broker-dealer and affiliate of BCI whose primary business was to raise outside capital for BCI; and 3) owned 21 Capital Group, Inc. (R. 46 at ¶2a.) Between 1999 and August 2007, BCI paid Carlsson over $2 million in commissions in connection with over $20 million in funds he raised from investors to invest in Defendant BCI. (*Id.* ¶ 2b).  Defendant BCI began paying for 21 Capital's business expenses beginning in

approximately August 2003. The Superseding Indictment alleges that the SEC began an examination of 21 Capital and Defendant Carlsson from approximately April 25, 2006 through May 4, 2006. During that examination, the Superseding Indictment alleges that Defendants Hollnagel, BCI, and Carlsson corruptly obstructed and attempted to obstruct the SEC's examination by 1) falsely representing to the SEC examiners that an $80,000 payment received by 21 Capital from BCI was a consulting fee related to an aircraft lease transaction and a BCI initial public offering rather than as a commission payment to Defendant Carlsson for money he had raised from investors to invest in BCI; and 2) falsely representing in a letter provided to the SEC examiners that Defendant BCI waived the rent payments owed to it by Carlsson and 21 Capital because BCI had office space that it was not using, rather than disclosing that 21 Capital had entered into a lease agreement with BCI and that BCI was paying for 21 Capital's business expenses, including its rent.

Similarly, Count 17 alleges that Defendant Carlsson corruptly obstructed the SEC investigation of 21 Capital and Carlsson by falsely representing 1) that his job with BCI was simply to introduce potential investors to Hollnagel and not to sell shares of BCI's investment offerings; and 2) that BCI did not pay him commissions on the offer and sale of his investments but rather a consulting fee.

Although Count 2 does not allege that Carlsson engaged in the underlying fraud scheme, this fact alone does not resolve the ultimate issue of whether Counts 16 and 17 arise from the same series of acts or transactions as the fraudulent financing scheme in Count 2. Based on the allegations in the Superseding Indictment, they do. Count 2, and Counts 16 and 17, pertain to efforts to fraudulently obtain financing for BCI and then conceal the fraudulent nature of these

efforts.  The charged obstructive conduct alleged in Counts 16 and 17 allegedly arose out of efforts to conceal the true nature of the relationship between Carlsson and Defendants Hollnagel and BCI, namely, Carlsson's efforts to conceal that he was raising money for BCI through an unregistered broker-dealer and a broker-dealer secretly financed by BCI.  The Superseding Indictment properly joins these counts.

### B.        Severance is Not Warranted Under Rule 14

Carlsson next claims that Rule 14 requires severance of these counts given the extensive amount of evidence that the government will introduce as to the other Defendants and counts, compared to that against Carlsson in Counts Sixteen and Seventeen.  As the government notes, however, there is an overlap in evidence given the nature of the charges.  It will introduce evidence regarding BCI's business, the types of investment offerings, Carlsson's relationship with BCI and its investors, and some of the investments at issue.  Carlsson even admits that evidence regarding two complicated investments that Carlsson promoted – the BCI Prime 2004-05, LLC and BCI Prime Investment 2004-06, LLC – will be admissible regarding all of these counts.  The Court will also give the appropriate instructions to the jury.  Given that Defendant Carlsson is not charged in Count Two, the overall fraudulent scheme, he is free to propose any additional instructions beyond the ones already identified by the Court.

### C.        Defendant Carlsson's *Bruton* Concerns are Premature

Defendant Carlsson next contends that the Court should sever the counts against him under *Bruton v. United States*, 391 U.S. 123 (1968) because Defendant Hollnagel has made numerous statements in prior testimony regarding the issues at the heart of Counts 16 and 17.  If the government seeks to introduce these Hollnagel statements, Defendant Carlsson argues that

the evidence "may include statements which are materially adverse to Carlsson, yet inadmissible against him." (R. 156 at 15.) Furthermore, Carlsson argues that *Bruton* would preclude him from introducing any of Hollnagel's prior statements that are favorable to Carlsson's defense, thereby violating his Constitutional rights.

Carlsson has identified two instances in which Defendant Hollnagel testified under oath regarding the matters at issue in Counts 16 and 17. First, on July 17, 2007, Hollnagel testified in an evidentiary hearing before the SEC in *In the Matter of BCI Aircraft Leasing, Inc., File No. C-07288.* During that testimony, Carlsson represents that Hollnagel testified about Carlsson, including Carlsson's role with BCI, the services he provided to BCI, and the fees that BCI paid him. Hollnagel also testified, according to Carlsson, about BCI's waiver of 21 Capital's rent and the precise reasons that BCI waived the rent. Second, Hollnagel also testified under oath on August 4, 2009 at a discovery deposition taken in *SEC v. Hollnagel, et al*, 07 CV 4538. Carlsson asserts that during this deposition, Hollnagel again testified about Carlsson and BCI's payments of 21 Capital's rent and the reasons for such payments. In addition, Hollnagel testified at that deposition about the characterization of payments to Carlsson as consulting fees versus commissions. Carlsson argues that the admission of Hollnagel's testimony from July 17, 2007 and August 4, 2009 would violate the Supreme Court's ruling in *Bruton*.

In *Bruton* the Supreme Court "'recognized a narrow exception" to the principle that defendants should be tried together. *United States v. Hernandez*, 330 F.3d 964, 972 (7th Cir. 2003) (quoting *Richardson*, 481 U.S. at 206-07, 107 S.Ct. 1702). In *Bruton*, the government introduced the confession of a co-defendant that expressly implicated the defendant in a crime. *Bruton*, 391 U.S. at 124, 88 S.Ct. at 1621. Even though the trial judge instructed the jury to

consider the statement only as evidence against the co-defendant, the Supreme Court found that the statement violated the defendant's right under the Confrontation Clause to cross-examine witnesses. *Id.* at 137, 88 S.Ct. at 1628. As the *Bruton* Court explained:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented . . . where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination.

*Id.* at 135-36, 88 S.Ct. at 1628; *see also Gray v. Maryland*, 523 U.S. 185, 192, 118 S.Ct. 1151, 1155 (1998).

Almost twenty years later, the Supreme Court held in *Richardson* that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson,* 481 U.S. at 211, 107 S.Ct. at 1709. In other words, "[w]hen redaction is coupled with a limiting instruction to the jury that it may not consider the evidence against anyone other than the confessing defendant, a defendant's Confrontation Clause rights are sufficiently protected." *United States v. Ward*, 377 F.3d 671, 676-77 (7th Cir. 2005); *see also United States v. Sutton*, 337 F.3d 792, 799 (7th Cir. 2003) (holding that "a redaction that replaces co-defendant names with neutral pronouns such that there is no obvious reference to the co-defendants will, along with limiting instructions, suffice to protect co-defendants' Confrontation Clause rights").

Merely "replac[ing] a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave[s] statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." *Gray*, 523 U.S. at 192, 118 S.Ct. at 1155. This, the Supreme Court has found, is because "a jury will often react similarly to an unredacted confession and a confession redacted in this way, for the jury will often realize that the confession refers specifically to the defendant," "even when the [government] does not blatantly link the defendant to the deleted name." *Id.* at 193, 118 S.Ct. at 1155.

Following the Supreme Court's decisions in *Bruton*, *Richardson*, and *Gray*, the Seventh Circuit has concluded that a defendant's "redacted confession may be admitted as long as the redaction does not obviously refer to the co-defendants." *Hernandez*, 330 F.3d at 973. "If the confession incriminates the defendant only 'when linked with evidence introduced later at trial,' then a limiting instruction confining the jury's consideration of the statement to the confessing co-defendant likely will suffice to protect the defendant's rights." *United States v. Mansoori*, 304 F.3d 635, 663 (7th Cir. 2002) (quoting *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707-08); *see also United States v. Stockheimer*, 157 F.3d 1082, 1086-87 (7th Cir. 1998); *United States v. Gio*, 7 F.3d 1279, 1287 (7th Cir. 1993).

Simply replacing the non-confessing defendant's name with a neutral pronoun or phrase, however, may not be enough to save a confession from a *Bruton* challenge. After all, "[a] name is itself just one among many means of identification." *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001). While it may not be easy to decide whether a replacement term violates *Bruton* by obviously referring to a codefendant, "one-to-one correspondence between the

inserted terms and the co-defendants at issue makes the reference more obvious and thus more problematic." *Hernandez*, 330 F.3d at 973. Ultimately, "[t]he use of replacement words that fail to 'avoid a one-to-one correspondence between the confession and easily identified figures sitting at the defense table' violates *Bruton*." *Sutton*, 337 F.3d at 799; *see also United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1998).

Here, the government represents that it has yet to determine which of the Hollnagel statements, if any, it will seek to admit at trial. The government further argues that it can cure any *Bruton* issues by redacting Hollnagel's statements to exclude any references to Carlsson, and by having the Court give a proper limiting instruction to the jury. The government has not, however, submitted any proposed redactions or identified which portions of Hollnagel's prior testimony it might seek to admit at trial.

In addition, although Carlsson notes that he may seek to introduce some of Hollnagel's testimony from these two matters, he has not identified any such testimony or explained how he could get around the hearsay rules regarding these out of court statements. Accordingly, the Court cannot determine whether the Hollnagel testimony runs afoul of *Bruton*. The government must inform the Court whether it intends to use any of Hollnagel's prior testimony at trial and, if so, it must submit the version of Defendant Hollnagel's testimony that it seeks to use at trial by October 17, 2011. If Defendant Carlsson has any objections to the statements, he must file them by October 31, 2011. Defendant Carlsson may renew his motion for severance at this time, if appropriate.

**VI.    Papayanis's General Assertions of Prejudicial Spill-Over Are Insufficient to Require Severance**

Papayanis generally argues that he is only charged in Counts Two through Seven of the Superseding Indictment and thus the Court should sever him from the remaining counts given the risk of prejudice from a joint trial. Papayanis's general assertions, however, do not rebut the presumption that the jury will capably sort through the evidence presented at trial and the jury will follow the Court's instructions to consider each count and each defendant separately. *See Lopez*, 6 F.3d at 1286. Defendant has not articulated how he will suffer prejudice or why the jury will not follow the instructions. Without more, Defendant Papayanis's assertions are mere speculation and insufficient to rebut these presumptions.

**VI.    The Court Severs the Tax Charges in Counts Twenty and Twenty-One Pursuant to Rule 14**

Defendant Hollnagel asserts that the tax counts in Counts Twenty and Twenty-One are misjoined because they do not arise from the same act or transaction of the same series of acts or transactions as the other charged offenses. Hollnagel contends that the Superseding Indictment does not allege that the income he failed to disclose for the calendar years 2005 and 2006 derived from the criminal conduct alleged in the Superseding Indictment or that the filing was part of the overall charged scheme. He additionally argues that severance is further warranted under Rule 14 in order to present exculpatory testimony from co-defendant Collier. Because the Court grants Defendant Hollnagel's request to sever the tax counts charged in Counts Twenty and Twenty-One under Rule 14, the Court need not address Hollnagel's misjoinder arguments regarding these counts.

Regarding Rule 14, Defendant Hollnagel specifically argues that Defendant Collier was BCI's chief financial officer and he assisted in the preparation of the 2006 tax return at issue and the amended 2005 tax return. Collier has submitted an affidavit regarding his role in preparing these returns. (R. 169-4, Affidavit of Martin Collier.) Defendant Hollnagel argues that Defendant Collier's affidavit demonstrates that Collier's testimony on these counts would be exculpatory as to Hollnagel and would bear directly on the elements of the offense. Given his status as a criminal defendant, Defendant Collier will not testify on Hollnagel's behalf if Counts Twenty and Twenty-One proceed to trial with the criminal counts in which Defendant Collier is charged. Because Defendant Collier has represented that he will testify regarding his role in preparing the returns if Counts Twenty and Twenty-One go forward in a separate trial, Defendant Hollnagel argues that the Court must sever these tax counts in order to allow him to present Collier's testimony at trial. The Court agrees.

In assessing whether to sever certain counts where a defendant seeks a severance based on the argument that one of his co-defendants will provide exculpatory testimony, courts consider:

> (1) whether the co-defendant's testimony would be exculpatory; (2) whether the codefendant would in fact testify; and (3) whether the testimony would bear on defendant's case.

*United States v. Magana*, 118 F.3d 1173, 1190 (7th Cir. 1997) (citations and quotations omitted). *See also United States v. Melton*, 689 F.2d 679, 686 (7th Cir. 1982).

In his affidavit, Defendant Collier states that he is a certified public accountant who worked at BCI since June 2007. (R. 169-4, Collier Affidavit at ¶ 1.) According to Collier's affidavit, in October 2007, he prepared Hollnagel's personal tax return for the calendar year

2006. Collier avers that when preparing Hollnagel's personal tax return he "was aware that during 2006 Mr. Hollnagel had used funds that originated in BCI for the acquisition of property in Colorado, and considered that transaction when [he] prepared the return." (*Id.* at ¶ 3.) Furthermore, Collier states: "Mr. Hollnagel instructed that his tax return should be correct and accurate, and I would not have prepared the return and returned it to him if I did not believe it to be correct and accurate." (*Id.*) Defendant Collier also had, at Hollnagel's direction, Hollnagel's outside attorney – Paula Junghans – review and approve Hollnagel's personal return for the calendar year 2006. (*Id.*)

In addition, Collier states that he worked closely with an outside accounting firm in 2008 to prepare BCI's and Mr. Hollnagel's tax returns. (*Id.* at ¶ 5.) While working on these, "it was determined that Mr. Hollnagel's original 2005 tax return did not include a Schedule C for BCI Jets, a single member LLC, and that it should have included that schedule." (*Id.*) As a result, Collier avers that he provided the outside accountants with information from BCI Jets' books which they subsequently included on a Schedule C on an amended income tax return. (*Id.*) His affidavit further provides that Mr. Hollnagel only instructed Collier that the "amended return should be prepared correctly," and that Collier thought it was true and correct when it was submitted. (*Id.*)

Collier also states under penalty of perjury that "[i]f called as a witness by Mr. Hollnagel to testify at a separate trial on Counts Twenty and Twenty-One, I would testify to the matters averred herein." (*Id.* at ¶ 6.)

In order to convict a defendant of filing a false return under 26 U.S. § 7206(1), the government must establish beyond a reasonable doubt the following four elements:

> (1) the defendant made or caused to be made a federal income tax return that she verified was true; (2) the return was false as to a material matter; (3) the defendant signed the return willfully and knowing it was false; and (4) the return contained a written declaration that it was made under penalty of perjury.

*United States v. Hills*, 618 F.3d 619, 638 (7th Cir. 2010), citing *United States v. Oqqoian*, 678 F.3d 671, 673 (7th Cir. 1982). *See also United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998). Contrary to the government's assertion, Collier's proffered testimony goes directly to the element of willfulness. Under Section 7206, "willfulness" is defined as "a voluntary, intentional violation of a known legal duty." *Hills*, 618 F.3d at 639, quoting *Cheek v. United States*, 498 U.S. 192, 200 (1991). As the Seventh Circuit has made clear, "[i]t is a valid defense to a charge of filing a false return if a defendant provides full information regarding his taxable income and expenses to an accountant qualified to prepare federal tax returns, and that the defendant adopts and files the return as prepared without having reason to believe that it is incorrect." *United States v. Perez*, 612 F.3d 879, 887-88 (7th Cir. 2010), quoting *United States v. Whyte*, 699 F.3d 375, 379 (7th Cir. 1983). Defendant Collier will provide testimony in support of this defense if the counts are severed. Through Collier's affidavit, Defendant Hollnagel has established that Collier would testify that he prepared the return at issue in Count 21, considered the transaction referred to in Count Twenty, believed the return was true and correct when filed, and consulted with an outside attorney who reviewed and approved the return. Similarly, with respect to Count Twenty, Collier has represented through his affidavit that he worked with an outside accountant on the preparation of the amended 2005 return at issue, he provided the outside accountants with information from BCI Jets' books which they subsequently included on a Schedule C on an amended income tax return, the outside accountant signed the amended return as the preparer,

and Hollnagel only instructed Collier that the "amended return should be prepared correctly." He will further testify that he thought the return was true and correct when filed.

The government argues that Defendant Hollnagel has not met his burden under *Melton*, in part, because Collier has been charged with perjury and obstruction. Such credibility matters, however, are for the jury, not the Court. *See United States v. Dalhouse*, 534 F.3d 803, 807 (7th Cir. 2008) (credibility issues for the jury, not the court). Furthermore, the government's contention that Collier's proposed testimony would not be exculpatory because it does not negate his willfulness asks the Court to accept the government's theory of the case and to make factual determinations. These issues are also for the jury, and the government is free to present them at trial.

The government further argues that Defendant Hollnagel "cannot credibly claim that he knows for certain that he will call defendant Collier as a witness." (R. 213 at 24.) The government claims that the Court may try the tax counts before the joint trial in this case, thereby making it unlikely that Collier will testify at the tax trial knowing that he still faces criminal charges. Given the Court's current trial schedule, the January 2012 joint trial will proceed before the trial on the tax counts, thereby mooting this argument. In addition, Defendant Hollnagel has submitted a sworn affidavit from Collier that he "would testify" at a separate trial on the tax counts and Hollnagel has represented to the Court through his attorneys that they intend to call Collier at such a trial. Defendant Hollnagel has met his burden.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant Hollnagel's and BCI's motion to sever. It is granted as to Counts Twenty and Twenty-One and the Court hereby severs these counts. The trial on Counts Twenty and Twenty-One will take place after the January 17, 2012 scheduled trial in this case. The Court grants Defendant Papayanis's Motion to sever Counts Twenty and Twenty-One, and denies the remainder of his motion. The Court denies Defendant Hatamyar's motion to sever and for relief from misjoinder is denied. Finally, the Court denies in part and denies in part without prejudice Defendant Collier's motion to sever and Defendant Carlsson's motion to sever. The government must submit its *Bruton* submission as to Counts 16 and 17, consistent with this Opinion, on or before October 17, 2011. Defendant's response is due on or before October 31, 2011. Defendant Collier's submission regarding his advice of counsel defense is also due on October 17, 2011 and the government's response is due on or before October 31, 2011. The Court will address Defendants' other concerns through appropriate jury instructions at trial.

Dated: August 5, 2011

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge