UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 CR 195 |
| BRIAN HOLLNAGEL, | ) | |
| BCI AIRCRAFT LEASING, INC., | ) | |
| CRAIG PAPAYANIS, | ) | |
| JASON R. HYATT, | ) | |
| WILLIAM HATAMYAR, | ) | |
| JEFFREY MEYER, | ) | |
| MARTIN COLLIER, and | ) | |
| ROBERT CARLSSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), Defendant Brian Hollnagel ("Hollnagel") and Defendant BCI Aircraft Leasing, Inc. ("BCI") have filed a motion to dismiss Counts Two through Eleven of the Superseding Indictment as duplicitous. Specifically, Hollnagel and BCI allege that these counts are duplicitous because they fail to charge Defendants with participating in one unitary scheme.[1] For the reasons discussed below, the Court denies the motion.

## BACKGROUND

On September 8, 2010, a grand jury returned a twenty-one count superseding indictment (the "Superseding Indictment") naming seven individual defendants – Brian Hollnagel, Craig

---

[1] Many of the co-defendants have joined in the motion.

Papayanis, Jason R. Hyatt, William Hatamyar, Jeffrey Meyer, Martin Collier, Robert Carlsson –

and one corporate defendant, BCI Aircraft Leasing, Inc. The Superseding Indictment charges

wire fraud, in violation of 18 U.S.C. § 1343 (counts one through eleven); false statements in

connection with an application to obtain a loan and a line of credit, in violation of 18 U.S.C. §

1014 (count twelve); bribery or attempted bribery in an attempt to influence the business and

transactions of Bridgeview Bank, in violation of 18 U.S.C. § 215(a)(1) (counts thirteen and

fourteen); obstruction of justice, in violation of 18 U.S.C. § 1512 (counts fifteen through

seventeen, and nineteen); and perjury, in violation of 18 U.S.C. § 1623 (count eighteen). The

sixty-five page Superseding Indictment also contains forfeiture allegations.

Defendants' motion pertains to Counts Two through Eleven of the Superseding

Indictment. Count Two charges Defendants Hollnagel, BCI Aircraft, Papayanis, Hyatt,

Hatamyar, Meyer, and Collier with a long-term scheme to defraud investors and financial

institutions of money and property through, among other things, bribe payments to obtain loans,

misrepresentations regarding investments, misappropriation of money raised for particular

purposes, commingling of funds, and concealment efforts, including the creation and production

of allegedly fraudulent court ordered accountings and the deletion of data from hard drives that

had been subpoenaed by the Securities and Exchange Commission ("SEC"). Count Two alleges

a long-term fraudulent financing scheme to defraud investors, financial institutions, and others

from 2000 to mid-February 2009.

Counts Two through Eleven charge separate wire transactions in furtherance of the fraud

scheme charged in Count Two. These counts are summarized as follows:

| Count Number | Charge | Defendants Charged | Date/Contents of Wire Transaction |
|---|---|---|---|
| II | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Meyer | **$1,200**<br><br>**December 1, 2005** |
| III | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Meyer | **$1,100**<br><br>**February 2, 2006** |
| IV | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis | **$294,500**<br><br>**September 28, 2005** |
| V | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis | **$80,000**<br><br>**January 13, 2006** |
| VI | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Hyatt | **$500,000**<br><br>**October 25, 2005** |
| VII | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Papayanis Hyatt | **$300,000**<br><br>**September 27, 2005** |
| VIII | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Collier | **Email Analysis of 2004-5 Investments & Analysis of 2004-6 Investments**<br><br>**September 6, 2007** |
| IX | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Collier | **Email Amended Analysis of 2004-5 Investments**<br><br>**September 17, 2007** |
| X | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Hatamyar | **$1,182,400.67**<br><br>**July 8, 2005** |
| XI | Wire Fraud-violating **18 USC 1343 § 2** | Hollnagel BCI Hatamyar | **$67,599.33**<br><br>**July 8, 2005** |

## I.        The Parties and Other Key Entities[2]

Defendant BCI was a privately owned Illinois corporation with an office originally in Naperville, Illinois and later, in Chicago, Illinois.  (R. 46, Superseding Indictment at 1, P1b.) BCI and its related limited liability companies were in the business of buying, selling, and leasing commercial airplanes.  (*Id.*)  BCI financed its operations through loans from financial institutions and also through offering and selling investment interests in limited liability companies (the "Investment LLCs") which it managed.  (*Id.* at 7, P2ai.)  While the terms of each Investment LLC varied, generally BCI offered prospective investors an investment interest in a particular Investment LLC.  BCI led prospective investors to believe they indirectly would acquire beneficial ownership of a specific commercial aircraft on lease to a specific commercial airline, which eventually would be released, refinanced, and/or sold.  (*Id.* at 7, P2aii.)  Generally, the terms of such an agreement would be that: 1) the prospective investor would invest along with BCI in the acquisition of the aircraft(s); 2) the amount of money raised by each Investment LLC would be restricted to a specified amount; 3) the investor's funds would be utilized to purchase beneficial ownership of specific aircraft(s); 4) the investor would receive monthly returns from BCI from the revenues it generated from leasing the aircraft(s); and 5) the investors in the Investment LLC would receive 50% of the net profits from the eventual resale of the aircraft(s).  (*Id.* at 8, P2aii.)  Defendant Hollnagel was the owner, president, and chief executive officer of BCI.  (*Id.* at 1, P1a.)

AAR Corporation and its related companies (collectively referred to as "AAR") was a publicly held company headquartered in Wood Dale, Illinois.  (*Id.* at 2, P1c.)  AAR was "a

---

[2] This section is based on the allegations in the Superseding Indictment.

provider of products and services to the aerospace and government defense industries." (*Id.*) A portion of AAR's business included the sale and leasing of commercial aircrafts. AAR's stock was listed on the New York Stock Exchange. (*Id.*)

Brian Olds[3] ("Olds") was an officer and employee of AAR. (*Id.* at 2, P1c.) In 2004, AAR promoted Olds to Group Vice President of AAR's Aircraft Group. In this position, Olds was responsible for the purchase and sale of commercial airplanes by AAR. (*Id.*) Beginning in or about 2004 until at least March 11, 2005, Defendant Hollnagel devised and participated in a scheme to defraud AAR with Olds, through bribe payments to ensure, in part, AAR's purchase from BCI of commercial airplanes then under lease to US Airways. (*Id.* at 2, P2-3.) Specifically, Defendant Hollnagel paid Olds approximately $250,000 in exchange for Olds's agreement to use his position as Vice President to ensure AAR's purchase of two commercial airplanes then under lease to US Airways from Defendant BCI. (*Id.* at 2-3, P3.)

Coast Business Credit was a commercial lender and a division of the former Southern Pacific Bank. (*Id.* at 8, P2c.) Coast Business Credit was fraudulently induced to provide Defendant BCI a line of credit in excess of $40 million. (*Id.*)

Defendant Craig Papayanis ("Papayanis") was a Vice President at Coast Business Credit. In his role as Vice President, Papayanis acted "as the loan officer on term loans and a line of credit made to BCI totaling over $40 million." (*Id.* at 8, P2c.) While employed at Coast Business Credit, BCI and Hollnagel bribed Papayanis by offering him employment at BCI. (*Id.* at 19-20, P17.) This bribe was in exchange for Papayanis's assistance in obtaining the line of credit for BCI and Hollnagel from Coast Business Credit. Shortly after Papayanis provided BCI

---

[3] On August 23, 2010, Brian Olds pled guilty in this case pursuant to a written plea agreement with the government. (R. 45.) Olds pled guilty to counts one and four of the original indictment.

and Hollnagel assistance in obtaining their line of credit, Papayanis began working for BCI, holding a variety of positions including both managing director and chief financial officer. (*Id.* at 8, P2c.)

Defendant William Hatamyar ("Hatamyar") was the President of AirBanker, a division of Bridgeview Bank Group (collectively referred to as "Bridgeview Bank"). In the late spring or early summer of 2005, Hollnagel and BCI paid bribes to Hatamyar in exchange for Hatamyar's assistance in leveraging his position at Bridgeview Bank to aid Hollnagel and BCI in obtaining a $15-$25 million line of credit from Bridgeview Bank. (*Id.* at 21, P20.) While employed at Bridgeview Bank, Hatamyar acted as the loan officer on term loans and a line of credit made to BCI, which amounted to over $30 million. (*Id.* at 9, P2e.) In addition to his role at Bridgeview Bank, Hatamyar also operated Trinity Capital, Inc., a financial lender to distressed companies. (*Id.*) A portion of the bribe Hollnagel and BCI paid to Hatamyar included a line of credit and fixed inventory loan of $1.25 million which directly benefitted Hatamyar and Trinity Capital, Inc. (*Id.* at 21, P20.) Hollnagel and BCI also bribed Hatamyar with a Mercedes Benz. (*Id.*)

Defendant Jeffrey Meyer ("Meyer") was BCI's controller from in or about 2003 until approximately the spring of 2006. (*Id.* at 9, P2f.) On or about July 8, 2005, Meyer caused approximately $1.25 million—part of Hatamyar's bribes—to be wired to bank accounts pursuant to Hatamyar's directions. (*Id.* at 22, P23.)

Defendant Martin Collier ("Collier") held multiple positions at BCI, including Chief Financial Officer. (*Id.* at 9, P2g.) Collier concealed or attempted to conceal from investors and financial institutions the true state of BCI's finances by instructing BCI's auditors to audit financial statements that combined all of the Investment LLCs with BCI. (*Id.* at 23, P26.)

Hyatt Johnson Capital was a privately held company with its principal place of business located in Downers Grove, Illinois. (*Id.* at 9, P2h.) Among other things, Hyatt Johnson Capital was in the business of offering and selling over $20 million in investments in the BCI Investment LLCs. (*Id.* at 9, P2h.) Hollnagel, BCI, and Papayanis falsely represented to Hyatt Johnson Capital and its customers that funds invested through Hyatt Johnson Capital would be invested in Investment LLCs to which only BCI and Hyatt Johnson Capital customers would be privy. Hollnagel, BCI, and Papayanis, however, knew that all Defendants were raising money from other investors for the same Investment LLCs and that Defendants intended to misappropriate these funds. (*Id.* at 18, P13.)

Defendant Jason R. Hyatt ("Hyatt") was a manager and owner of Hyatt Johnson Capital, LLC. (*Id.* at 8, P2d.) Defendant Hyatt is accused of aiding in the scheme to defraud by falsely representing to Hyatt Johnson Capital customers that BCI agreed to pay Hyatt Johnson Capital an organizational fee totaling approximately 5.5% of the funds invested in the Investment LLCs through Hyatt Johnson Capital. (*Id.* at 25, P29.) Despite these representations, Defendant Hyatt knew that in exchange for his cooperation and assistance in the scheme, Hollnagel and BCI agreed to pay Hyatt directly commissions totaling approximately 10% of the funds invested in the Investment LLCs. Of those proceeds, Hyatt paid 5.5% to Hyatt Johnson Capital, while keeping the remainder for his own personal enrichment. (*Id.*)

## II.      Scheme to Defraud

The charges set forth in the Superseding Indictment pertain to two separate schemes to defraud. Count One charges Defendant Hollnagel with engaging in a scheme to defraud with Brian Olds and others. It alleges that from in or about 2004 until at least March 11, 2005,

Defendant Hollnagel devised and participated in a scheme to defraud AAR with Olds, a Group Vice President of AAR, through bribe payments to ensure, in part, AAR's purchase from BCI of commercial airplanes then under lease to US Airways.

Count Two alleges a long-term fraudulent financing scheme to defraud investors, financial institutions, and others from 2000 to mid-February 2009. The allegations in Count Two of the Superseding Indictment are summarized as follows:

Count Two alleges that Defendants Hollnagel, BCI, Papayanis, Hyatt, Hatamyar, Meyer, and Collier (collectively "Defendants") devised and intended to devise a long-term fraudulent financing scheme to defraud investors, financial institutions, and others from 2000 to mid-February 2009. (*Id.* at 10, P3.) As a result of the scheme, Defendants obtained money and property from investors and financial institutions through materially false pretenses, representations, promises, and by means of material omissions. (*Id.*) Defendants utilized the money and property fraudulently obtained to finance BCI and to enrich themselves. Through this fraudulent scheme, Defendants obtained over $50 million. (*Id.* at 11, P4.)

Specifically, Defendants' scheme to defraud included making misrepresentations to prospective and current investors in the Investment LLCs about the expected returns on investments, the source of funds utilized to pay the returns to investors, the use of the funds received from investors, the status of the investors' investments, and the ownership interests that the Investment LLCs had in particular aircrafts. (*Id.* at 10-11, P4.) Defendants' scheme also involved using bribes and other payments to obtain loans, lines of credit, and competitive pricing advantages for BCI. Defendants caused misrepresentations to be made to financial lenders regarding the membership in the Investment LLCs and BCI's ownership interest in them. (*Id.* at

11, P4.) Additionally, Defendants attempted to conceal their scheme to defraud by 1) providing false testimony in connection with an investigation by the SEC; 2) misleading BCI's investors and outside auditors; and 3) creating fraudulent accounting records. (*Id.*)

### A.    Offer and Sale of Membership Interests

Hollnagel, BCI, and Papayanis falsely represented to current and prospective investors in the Investment LLCs that the investors' funds would be utilized entirely for the purposes of acquiring ownership interests in aircrafts.   Hollnagel, BCI, and Papayanis knew that the investors' funds exceeded the sums needed to acquire those aircrafts.  Rather than use the investors' funds for acquisition purposes, Hollnagel, BCI, and Papayanis misappropriated them. (*Id.* at 11-12, P5.)  Moreover, investors were led to believe that their funds would be used to acquire ownership interests in a particular aircraft, when in reality such interests were never acquired, yet Hollnagel, BCI, Papayanis, and Meyer never returned the funds.  (*Id.* at 13, P7.)  In addition, Hollnagel, BCI, and Papayanis diluted the value of the investors' interests in the Investment LLCs without the investors' knowledge by telling investors that the money raised through the Investment LLCs would be limited to a certain amount, when in fact, Hollnagel, BCI, and Papayanis knew that the amount of money raised exceeded the specified amounts.  (*Id.* at 12, P6.)

In addition to the false representations regarding investors' acquisitions of ownership interests, Hollnagel, BCI, and Papayanis intentionally concealed from current and prospective investors that BCI was prohibited from selling any ownership interests without receiving approval from the lenders who were the actual financers of the aircrafts.  BCI never sought such approval.  (*Id.* at 14, P9.)  In December 2004, for example, Hollnagel and BCI sold two aircrafts

on lease to US Airways for a total of approximately $15.4 million. This sale yielded approximately $4 million in profits for BCI. (*Id.* at 15, P10a.) While Hollnagel and BCI represented to investors that any profits from the sale of an aircraft would be distributed among investors, Hollnagel and BCI misappropriated the $4 million in profits for other purposes. (*Id.*) Additionally, in 2005, Hollnagel, BCI, Papayanis, and Meyer created and distributed to investors IRS Schedules for the year 2004. (*Id.* at 16, P10c.) Such IRS Schedules failed to disclose a profitable sale of the aircraft associated with an investment. (*Id.*)

To add to the false representations made to investors, Hollnagel, BCI, and Papayanis falsely represented to Hyatt Johnson Capital and its customers that funds obtained through Hyatt Johnson Capital would be invested in the Investment LLCs to which only BCI and Hyatt Johnson Capital customers had investment interests. Hollnagel, BCI, and Papayanis knew that Defendants were raising money from other investors for the same Investment LLCs and that Defendants intended to misappropriate those funds. (*Id.* at 18, P13.) In or about July 2007, for example, Hollnagel, BCI, and Hyatt fraudulently converted over $20 million invested in the Investment LLCs by Hyatt Johnson Capital customers. (*Id.*)

**B.    Commingled Bank Accounts**

In order to further the scheme to defraud set forth in Count Two, Hollnagel, BCI, Papayanis, and Meyer commingled investors' money in BCI's bank account in order to create the impression that BCI had more money for its operations than it actually did. (*Id.* at 18, P15.)

**C.    Loans and Lines of Credit**

In furtherance of the same scheme to defraud, Hollnagel, BCI, and Papayanis obtained over $7 million in loans from various financial institutions through false representations. (*Id.* at

10

19, P16.)  Specifically, Hollnagel, BCI, and Papayanis represented to financial institutions that BCI was the sole owner of the Investment LLCs and thus, the sole beneficiary of the aircrafts pertaining to the loans.  Hollnagel, BCI, and Papayanis, however, knew that other investors possessed ownership interests in the same aircrafts.  (*Id.*)

### 1.        Bridgeview Bank

In July 2004, Hollnagel, BCI, and Papayanis falsely represented to Bridgeview Bank that BCI owned 100% of the investment interest in BCI Investment 2004-5, LLC, which, in turn, owned 100% of the investment interest in BCI 2004-5, LLC – a company that was alleged to be the sole beneficiary of a commercial aircraft.  (*Id.* at 19, P16.)  Despite their representations, Hollnagel, BCI, and Papayanis knew that all Defendants had raised funds from other investors and would continue to raise funds for investment interests in BCI 2004-5, LLC.  (*Id.*)

Moreover, in the late spring or early summer of 2005, BCI and Hollnagel paid bribes to Defendant Hatamyar, the president of a division at Bridgeview Bank, in exchange for his assistance in helping Hollnagel and BCI obtain a $15-$25 million line of credit from Bridgeview Bank.  (*Id.* at 21, P20.)  In connection with the bribes, in or about June 2005, Hollnagel and BCI created BCI Discounting LLC, a loan and factoring company that Hatamyar would operate.  (*Id.* at 21, P21.)  Hatamyar intentionally concealed from Bridgeview Bank the bribes he received from Hollnagel and BCI, and concealed his involvement with BCI Discounting.  (*Id.* at 21-22, P22.)

On or about July 7, 2005, Bridgeview Bank's loan committee convened to discuss a proposed $25 million line of credit to BCI.  (*Id.* at 22, P23-24.)  During this meeting, Hatamyar submitted BCI's loan application and fraudulently represented to Bridgeview Bank that he had

no financial interest in BCI.  (*Id.* at 22, P24.)  On the same day, Hollnagel directed Defendant

Meyer to wire the $1.25 million bribe to Hatamyar in exchange for Hatamyar's fraudulent

submissions to the Bridgeview Bank loan committee.  (*Id.* at 22, P23.)  On or about July 8, 2005,

Meyer caused two wires totaling $1.25 million to be sent to bank accounts pursuant to

Hatamyar's instructions.  (*Id.* at 22, P23.)  After Bridgeview Bank's loan committee approved

the $25 million line of credit for BCI, Hollnagel and BCI also provided Hatamyar a Mercedes

Benz convertible.  (*Id.*)

### 2.     Coast Business Credit

After accepting Hollnagel and BCI's bribe of employment at BCI, on or about January

2000, Defendant Papayanis intentionally concealed from his then-employer, Coast Business

Credit, that he had accepted a position at BCI.  (*Id.* at 20, P18.)  Hollnagel, BCI, and Papayanis

agreed that Papayanis would commence his employment at BCI after the closing of a credit

facility BCI sought from Coast Business Credit.  After reaching this agreement, Papayanis used

his position at Coast Business Credit to assist BCI to obtain loans and lines of credit from Coast

Business Credit totaling in excess of $40 million.  (*Id.*)

### D.     Fraudulent Audited Financial Statements

In furtherance of the scheme to defraud set forth in Count Two, Hollnagel, BCI,

Papayanis, and Collier concealed from investors, prospective investors, and financial institutions

the true state of BCI's financing.  (*Id.* at 23, P26.)  Hollnagel, BCI, Papayanis, and Collier

effectively concealed the financial state of BCI by providing fraudulent records to BCI's outside

auditors and by directing outside auditors to audit financial statements that combined all of the

Investment LLCs and BCI.  (*Id.* at 23, P26-27a-c.)  Hollnagel, BCI, Papayanis, and Collier also

concealed Hatamyar's involvement with BCI Discounting to auditors, and on July 15, 2005, Hatamyar fraudulently represented to auditors that Bridgeview Bank agreed to waive loan violations made by BCI, when in fact Bridgeview Bank was unaware that such loan violations existed. (*Id.* at 23, 27d-e.)

### E. The SEC Proceeding

On August 13, 2007, the SEC filed a civil injunctive complaint alleging that Hollnagel and BCI obtained at least $82 million from investors through the fraudulent offer and sale of the Investment LLCs. *SEC v. Hollnagel et al.*, No. 07 CV 4538 (N.D. Ill. 2007). During this proceeding, Hollnagel, BCI, and Collier prepared and provided the SEC fraudulent records and false representations. (R. 46, Superseding Indictment at 26, P31-32.) On August, 16, 2007, for example, Collier falsely testified under oath that an aircraft had been substituted into BCI 2004-5 and BCI 2004-6, when in fact, no such substitutions had occurred. (*Id.* at 26, P 30.) As another example, in March 2008, Defendant Hyatt deleted data from two of his computers, knowing that on or about August 31, 2007, the SEC had subpoenaed Hyatt and Hyatt Johnson Capital "seeking, among other things, any and all electronically stored information" relating to the offer, sale, or repurchase of interests in Hyatt Johnson Capital or BCI or any communications with investors who held investments at BCI. (*Id.* at 27, P33.) Such representations and actions were all in furtherance of Defendants' scheme to defraud investors, financial institutions, and others.

### LEGAL STANDARD

Defendants Hollnagel and BCI ask the Court to dismiss Counts Two through Eleven of the Superseding Indictment. Hollnagel and BCI urge dismissal of Counts Two through Eleven

as duplicitous pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).[4] Rule 12(b)(3)(B) provides that "a motion alleging a defect in the indictment or information" must be raised before trial. Fed. R. Crim. P. 12(b)(3)(B). The rule does, however, permit courts to hear claims at any time while a case is pending that allege an indictment's failure to invoke the court's jurisdiction, or an indictment's failure to state an offense. *Id.*; *see also United States v. Hosseini*, 506 F. Supp. 2d 269, 270 (N.D. Ill. 2007). When considering a motion to dismiss that challenges the sufficiency of an indictment, courts focus on the allegations of the indictment, and must view all allegations as true and in the light most favorable to the government. *See United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009); *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). When viewed in this light, an indictment is sufficient if it satisfies three constitutionally-mandated requirements. *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). First, the indictment "must adequately state all of the elements of the crime charged; second, it must inform the defendant of the nature of the charges so that he may prepare a defense; and finally, the indictment must allow the defendant to plead the judgment as a bar to any future prosecution for the same offense." *Id.*, citing *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

"Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586, quoting *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006). When faced with a motion to dismiss an indictment, the Seventh Circuit instructs courts to look at the contents of the indictment in its entirety and on a practical basis "rather than in a hypertechnical manner."

---

[4] Defendants also seek to have these counts severed pursuant to Rule 8(b) because they are duplicitous. The Court previously denied Defendants' motion to sever. (R. 264.) Because Counts Two through Eleven are not duplicitous, the Court declines to sever them on this ground.

*United States v. McLeczynsky*, 296 F.3d 634, 636 (7th Cir. 2002), quoting *Smith*, 230 F.3d at

305. An indictment, or portion thereof, may be dismissed if the allegations are insufficient to

state a violation of a governing statute. *See United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir.

1988).

## ANALYSIS

Defendants Hollnagel and BCI argue that Counts Two through Eleven are duplicitous

because they do not allege one unitary scheme, but rather allege multiple schemes in one count.

Specifically, they contend that Count Two alleges at least eight separate schemes, spanned over a

ten year time period, namely a scheme to defraud BCI's investors, to defraud Hyatt Johnson

Capital's investors, to defraud Coast Business Credit in 2000, to defraud Bridgeview Bank in

2004, to otherwise defraud Bridgeview Bank in 2005, for BCI to obstruct an SEC proceeding,

for Hyatt to obstruct the same proceeding, and to defraud AAR Corporation. They further argue

that Count Two charges one co-defendant who was acting for his own benefit and not for any

common purpose with other Defendants. Defendants maintain that the "risks associated with

trial on a duplicitous indictment are magnified in this case because the composite 'scheme'

alleged in Counts Two through Eleven is the vehicle that joins multiple defendants and multiple

complex schemes together for trial." (R. 176 at 7.)

"An indictment is duplicitous if it charges two or more offenses in a single count."

*United States v. Haynes*, 582 F.3d 686, 703 (7th Cir. 2009), quoting *United States v. Pansier*,

576 F.3d 726, 734 (7th Cir. 2009). "Duplicity is the joining of two or more offenses in a single

count." *United States v. Hughes*, 310 F.3d 557, 560 (7th Cir. 2002), quoting *United States v.*

*Marshall*, 75 F.3d 1097, 1111 (7th Cir. 1996); *see also United States v. Davis*, 471 F.3d 783, 790

(7th Cir. 2006) (explaining, "an indictment that charges more than one offense in a single count is duplicitous"). An indictment, however, is "not duplicitous if it charges a single offense carried out through many different means." *Davis*, 471 F.3d at 790; *see also Worthington v. United States*, 64 F.2d 936, 938-39 (7th Cir. 1933).

"Duplicity creates a risk that the jury might return a less than unanimous guilty verdict, potentially exposes the defendant to prejudice at trial and sentencing, and in some cases subjects the defendant to double jeopardy." *Pansier*, 576 F.3d at 734. *See also Davis*, 471 F.3d at 790 ("The dangers of a duplicitous indictment are that the defendant may not understand the charges against him, might be convicted by less than a unanimous jury, may be prejudiced by evidentiary rulings at trial, or may be subjected to Double Jeopardy."). Indeed, the "overall vice of duplicity is that the jury cannot in a general verdict render its findings on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both." *Hughes*, 310 F.3d at 560, quoting *United States v. Buchmeier*, 255 F.3d 415, 425 (7th Cir. 2001). Duplicitous indictments also have the potential to prejudice defendants. *See Davis*, 471 F.3d at 790.

## I.     Counts Two through Eleven are Not Duplicitous

Defendant Hollnagel and Defendant BCI contend that the Superseding Indictment is duplicitous on several grounds. They argue that: 1) Count Two of the Superseding Indictment does not set forth a single scheme to defraud but rather "describes at least eight entirely different types of conduct," thereby setting forth multiple schemes to defraud; 2) Counts Two through Eleven are duplicitous because of the lack of cooperation among all Defendants and the lack of knowledge and participation from all Defendants; 3) some of the counts are time barred; 4) paragraph 28 of the Superseding Indictment must be stricken as multiplicitous and surplusage;

and 5) jury instructions are inadequate to cure the alleged defects of the Superseding Indictment. The Court will address each of these arguments in turn.

### A.    Count Two Charges One Scheme to Defraud

Counts Two through Eleven each charge various Defendants with wire fraud[5] in violation of 28 U.S.C. §1343.  Hollnagel and BCI allege that Count Two of the Superseding Indictment sets forth eight separate schemes to defraud.  The Court disagrees.

"[A]n indictment is not duplicitous if it charges a single offense carried out through many different means."  *Davis*, 471 F.3d at 790.  Schemes to defraud are "often multi-faceted and therefore the various means used in committing the offense may be joined without duplicity." *United States v. Zeidman*, 540 F.2d 314, 318 (7th Cir. 1976), citing *United States v. Bush*, 522 F.2d 641, 646 (7th Cir. 1975).  "As its ordinary meaning suggests, 'scheme to defraud' describes a broad range of conduct . . ."  *United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992).

In *United States v. Zeidman*, the Seventh Circuit rejected a defendant's challenge of duplicity where the defendant alleged that an indictment which charged thirteen counts of mail fraud was duplicitous because it charged separate and distinct schemes to defraud separate victims.  *Zeidman*, 540 F.2d at 316-17.  Moreover, in *Zeidman*, the Seventh Circuit held the indictment to be properly charged because the frauds were performed by the same parties and had a "sufficiently close nexus with one another" to be "fairly characterized as one scheme."  *Id.* at 317, citing *United States v. Palladino*, 475 F.2d 65, 74-75 (1st Cir. 1973.)

---

[5] In order to convict a defendant for wire fraud the government must prove: "(1) that the defendant participated in a scheme to defraud; (2) with the intent to defraud; (3) and used interstate wire communications in furtherance of the fraud."  *United States v. Green*, __ F.3d __, 2011 WL 3444435 (7th Cir. Aug. 9, 2011).

The Superseding Indictment in the instant case is comparable to the indictment in *Zeidman*. Here, the same parties–Defendants Hollnagel, BCI, Papayanis, Hyatt, Hatamyar, Meyer, and Collier–engaged in a scheme to defraud current and prospective investors and financial institutions. (R. 46, Superseding Indictment at 2-28.) Like the defendants in *Zeidman*, Defendants here all possessed the same goal—to obtain financing for BCI and to enrich themselves. Furthermore, the counts simply charge that Defendants carried out their scheme to defraud through various means, namely, misrepresentations and misappropriations, bribes, and concealment. As such, the scheme is properly charged as one count. *See Davis*, 471 F.3d at 790-91 (no duplicity where indictment charging health care fraud scheme "sets out an ongoing and continuous course of conduct accomplished through three different methods that were repeated on numerous (likely daily) occasions over several years"); *United States v. Berardi*, 675 F.2d 894, 897-98 (7th Cir. 1982); *Zeidman*, 540 F.2d at 317-18.

Hollnagel and BCI rely on a number of non-binding cases in an attempt to illustrate the duplicitous nature of the Superseding Indictment, including *United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988). Defendants allege that the indictment in *Gordon* parallels the Superseding Indictment here. While in *Gordon*, the Ninth Circuit held an indictment to be duplicitous because a single count charged two conspiracies—one to defraud the United States and one to obstruct a grand jury investigation—in this case, the Superseding Indictment does not charge any Defendant with conspiracy. *Gordon*, 844 F.2d at 1401. The Seventh Circuit has reiterated that "[t]he joint agreement that is essential to a defendant's liability for the crime of conspiracy is not a prerequisite to a conviction for mail fraud." *United States v. Adeniji*, 221 F.3d 1020, 1026-27 (7th Cir. 1999); *United States v. Read*, 658 F.2d 1225, 1240 (7th Cir. 1981); *accord United*

*States v. Bibby*, 752 F.2d 1116, 1124 (6th Cir. 1985). Moreover, while "a conspiracy requires the existence of an agreement among the alleged co-conspirators the federal mail [and wire] fraud statute[s] require[s] only that the co-schemers participate in a common scheme." *United States v. Camiel*, 689 F.2d 31, 36 (3d Cir. 1982), citing *Read*, 658 F.2d 1225. As such, Defendants' reliance on *Gordon* is misplaced. Defendants' reliance on *Kotteakos v. United States*, 328 U.S. 750 (1946), *United States v. Marlinga*, 04-80372, 2005 WL 513494 (E.D. Mich. Feb. 28, 2005), and *United States v. Hardy*, 762 F. Supp. 1403 (D. Haw. 1991), is misplaced for the same reasons.

Defendants next direct this Court to *United States v. Stigler*, 413 F.3d 588 (7th Cir. 2005), and *Camiel* as support for the proposition that the Superseding Indictment is duplicitous. Defendants' reliance on these cases similarly fails. In both *Stigler* and *Camiel*, the issue before the court was variance, not duplicity. *Stigler*, 413 F.3d at 588-92; *Camiel*, 689 F.2d at 31-37. A variance exists when "the facts proved by the government at trial differ from that alleged in the indictment." *Stigler*, 413 F.3d at 588-92, citing *United States v. Miller*, 471 U.S. 130 (1985). These cases are inapplicable to the duplicity issue before the Court.

### B.    Agreement and Cooperation Required for a Scheme to Defraud

Defendants additionally argue that the Superseding Indictment is duplicitous because Defendant Hyatt "had no desire to and did not share with BCI his dealings with investors." (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 14.) Defendants attempt to support this argument by, among other things, providing the Court an e-mail correspondence between Defendant Hyatt and BCI's in-house counsel. (*Id.* at 14.) Defendants assert that because the e-mail contains

expletives directed at BCI's counsel and because it reveals Hyatt's frustrations towards BCI, Hyatt cannot be included in the same scheme to defraud as BCI. (*Id.*)

Defendants' argument raises factual issues that are not appropriate for the Court to resolve. *United States v. Black*, 469 F. Supp. 2d 513, 535 (N.D. Ill. 2006). Moreover, Count Two alleges that Defendants, including Hyatt, possessed a common goal—fraudulently obtaining financing for BCI and enriching both BCI and themselves. It alleges that Defendants had the common goal of concealing their fraud. Additionally, the e-mail Defendants use to illustrate the alleged hostility between Defendant Hyatt and the rest of the Defendants is an e-mail directed at BCI's in-house counsel, a party who is not named in the Superseding Indictment and is not alleged to have participated in the common scheme. Finally, Defendant Hyatt allegedly received bribes from Hollnagel and BCI in the form of commissions in exchange for his assistance in making false representations to Hyatt Johnson Capital customers, further illustrating his agreement and cooperation in the alleged scheme to defraud. As such, Defendants' arguments fail.

## C. Knowledge and Participation Required for a Scheme to Defraud

Defendants also argue that the Superseding Indictment is duplicitous because the scheme to defraud involves different participants, victims, goals, and means. (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 10.) As noted above, the fact that an indictment sets forth a number of ways or means to further a single scheme to defraud does not, in and of itself, render the indictment duplicitous. *Worthington*, 64 F.2d at 938; *see also United States v.Crummer*, 151 F.2d 958, 964 (10th Cir. 1945). The Superseding Indictment here sets forth multiple means utilized by multiple Defendants to achieve the common goal of fraudulently obtaining and

retaining financing for Defendant BCI and obtaining funds for the individual Defendants' personal enrichment. Defendants argue that because the Superseding Indictment does not assert that each of the Defendants participated in each of the misrepresentations and transactions, the Superseding Indictment must allege separate schemes and therefore fails for duplicity. Each co-schemer or participant, however, need not know about the existence and activities of the other co-schemers. *See United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974) (holding a single scheme to defraud existed when "each defendant knowingly participated and either mailed or caused the mailing charged in the indictment against him or her"); *see also Adeniji*, 221 F.3d at 1026-27 (finding indictment to be proper and not duplicitous because the "evidence established a single scheme to defraud Motorola irrespective of whether or not Adediran and Allismith knew exactly what the other was doing"). Co-schemers "are jointly responsible for one another's acts in furtherance of the scheme." *United States v. Jackson*, 546 F.3d 801, 816 (7th Cir. 2008). *See also Wilson*, 506 F.3d at 1257 (once an "agreement to a scheme has been adequately established, any party to the agreement is responsible for the acts and declarations of another party in furtherance of the common scheme, whether or not he knew of or agreed to any specific mailing") (citations omitted); *Zeidman*, 540 F.2d at 316-18 (rejecting defendants' challenge to an indictment and finding a single scheme to defraud where the scheme to defraud affected multiple victims).

> **D.**     **Count Two Falls Within the Statute of Limitations**

Next, Defendants Hollnagel and BCI argue that the Court should dismiss a portion of the Superseding Indictment as time-barred. Specifically, BCI and Hollnagel challenge the allegations in Count Two that in or about January 2000, Hollnagel bribed Papayanis while he

was still employed with Coast Business Credit in the form of employment at BCI.  (R. 46, Superseding Indictment at 20.)  Hollnagel and BCI argue that because the charge of bank bribery carries a 10-year statute of limitations, such a substantive charge would be time barred, and thus, the government circumvented the statute of limitations by "lumping it [the bribe] into the purported wire fraud scheme."  (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 16-17.) Defendants concede that the Government has not charged Hollnagel and Papayanis with bank bribery.  Nevertheless, they cite a plethora of case law regarding bank bribery and the point at which the statute of limitations begins to run for such an offense.

"In a mail fraud case, the statute of limitations runs from the date of the mailings" and expires after five years.  *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992), citing *United States v. Eckhardt*, 843 F.2d 989, 993 (7th Cir. 1981); *see also United States v. McGowan*, 590 F.3d 446, 456 (7th Cir. 2009) ("the statute of limitations for wire fraud is five years"); 18 U.S.C. § 3282.  Additionally, "the fact that the scheme, and acts committed in furtherance of it, may have extended over a period in part barred by the statute of limitations does not mean that they are irrelevant in determining whether mailings occurring within the statutory period were in furtherance of a scheme to defraud."  *United States v. Wellman*, 830 F.2d 1453, 1464 (7th Cir. 1987) (upholding the trial court's use of evidence that was time barred but relevant to establishing a scheme to defraud with regard to mail fraud), citing *Read*, 658 F.2d at 1240.

Count Two of the Superseding Indictment charges Hollnagel, BCI, Papayanis, and Meyer with violating Section 1343 by fraudulently transmitting $1,200 through an interstate wire transfer which occurred on December 1, 2005.  (R. 46, Superseding Indictment at 28.)  The

Superseding Indictment was filed on September 8, 2010.  (*Id.* at 1.)  As a result, Count Two of the Superseding Indictment is not barred by the statute of limitations.

### E.     Multiplicity & Surplusage

Defendants Hollnagel and BCI have also moved to strike paragraph 28 of Count Two of the Superseding Indictment.  Hollnagel and BCI argue that this portion of the Superseding Indictment should be stricken because it is multiplicitous and because it is surplusage.  (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 19.)  Finding neither argument persuasive, the Court refuses to strike paragraph 28 on such grounds.

### 1.     Multiplicity

"Multiplicity is the charging of a single offense in separate counts of an indictment." *United States v. Starks*, 472 F.3d 466, 468-69 (7th Cir. 2006), citing *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995).  The dangers posed by a multiplicitous indictment include the threat of violating the Double Jeopardy Clause of the Fifth Amendment and the potential to expose a defendant to receiving multiple punishments for the same offense.  *Starks*, 472 F.3d at 469; *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002).  The traditional test to determine whether or not an indictment is multiplicitous is to determine "whether each count requires proof of a fact which the other does not.  If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity."  *United States v. Gonzalez*, 933 F.2d 417, 424 (7th Cir. 1991).  In the context of mail and wire fraud, when separate counts charge separate mailings or separate wire transfers they are not multiplicitous, as each count requires proof of a different fact—that is, the specific mailings or wire transfers.  *See United States Kirby*, 587 F.2d 876, 882 (7th Cir. 1978) ("Because

23

they involve different mailings, they stated separate offenses and were also not multiplicitous with each other."); *see also United States v. Aldridge,* 484 F.2d 655, 660 (7th Cir. 1973) ("As to mail fraud counts, it is settled that the gravamen of the offense is the use of the mails and that each such use of the mails constitutes a separate offense.").

Hollnagel and BCI allege that paragraph 28 is multiplicitous because "the government has charged Defendants Hollnagel and BCI in two separate wire fraud schemes for the same conduct: allegedly defrauding AAR Corporation in the sale and purchase of aircraft in 2004 and 2005." (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 24.) Defendants argue that because Count Two alleges no new or additional facts beyond those which were alleged in Count One, and because paragraph 28 incorporates the allegations set forth in Count One, it must be dismissed. (*Id.*) The Court disagrees.

Count One of the Superseding Indictment charges Defendant Hollnagel with a wire fraud that occurred on March 11, 2005. (R. 46, Superseding Indictment at 6.) Count Two of the Indictment charges Defendants Hollnagel, BCI, Papayanis, and Meyer with a wire fraud that occurred on December 1, 2005. (*Id.* at 27-28.) Because each Count charges a separate wire, each Count will require a different proof of fact—the date on which the wire occurred—and therefore cannot fail for multiplicity. *See Gonzalez*, 933 F.2d at 424; *see also Kirby*, 587 F.2d at 882; *Starks*, 472 F.3d at 469; *Conley*, 291 F.3d at 470.

###   2.    Surplusage

Defendants alternatively ask the Court to strike paragraph 28 as surplusage. (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 24.) Defendants argue that the scheme allegations set

forth in paragraph 28 are tangentially related to Count Two and are thus irrelevant. The Court disagrees.

Federal Rule of Criminal Procedure 7(d) governs motions to "strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). The Advisory Committee Notes to subdivision (d) explain that the "rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d), Advisory Committee Note. A district court may strike "immaterial, irrelevant, or prejudicial" language from an indictment, *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993), "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *See United States v. Levine*, No. 05 CR 691, 2005 WL 3597707, at *2 (N.D. Ill., Dec. 29, 2005). "[L]egally relevant information is not surplusage and due to the exacting standard, motions to strike information as surplusage are rarely granted." *Black*, 469 F. Supp. 2d at 518 (quoting *United States v. Bucey*, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988)).

Hollnagel and BCI seek to strike paragraph 28 and the allegations regarding the Defendants' effort to defraud Coast Business Credit. (R. 231, Defs.' Reply In Support of Mtn. to Dismiss Counts II-XI at 15.) They argue that this allegation is repetitive and that it is "reflective of an indictment that impermissibly charged every possible form of alleged fraud in a single count." (*Id.*) In support, Hollnagel and BCI rely on the non-binding opinion in *United States v. Xiong*, No. 07 CR 112, 2007 WL 2703859 (E.D. Wisc. Sept. 14, 2007).

In *Xiong*, the court partially granted the defendants' motion to strike portions of an indictment which included allegations of a Women, Infant, and Children Program ("WIC") fraud

in a count which charged conspiracy to commit arson and wire fraud. *Id.* The court reasoned that because the WIC fraud occurred on February 6, 1997, and the allegations of the conspiracies set forth in the indictment were alleged to have begun in 2005, the WIC fraud was neither relevant nor material to the conspiracy to commit to arson and mail fraud. *Id.* As a result, the court concluded that the allegations of the WIC fraud were prejudicial and inflammatory and struck them as surplusage from the indictment. *Id.*

Here, the allegations which Hollnagel and BCI challenge occurred between 2004 and 2005. This time frame falls within the middle of the charged scheme to defraud. Additionally, the allegations in paragraph 28 pertain to Defendants' overall goal of fraudulently obtaining financing for BCI for their personal enrichment. Indeed, Hollnagel and BCI concede that these allegations could support "the claim that there was an effort to defraud Coast [Business Credit]." (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 24.) Accordingly, the Court denies the request to strike paragraph 28.

## II.     The Jury Instructions Will Address Defendants' Potential Concerns

Finally, Defendants Hollnagel and BCI argue that jury instructions are insufficient to cure the alleged defects of the Superseding Indictment. (R. 231, Defs.' Reply in Support of Mtn. to Dismiss Counts II-XI at 11.) Hollnagel and BCI assert that crafting jury instructions to deal with the possibility that the jury could convict some Defendants of conduct not charged "would be to invite error and could well require vacating any resulting conviction." (R. 176, Defs.' Mtn. to Dismiss Counts II-XI at 17.)

Appropriate jury instructions can adequately address Defendants' concerns here. *Starks*, 472 F.3d at 466; *see also United States v. Lloyd*, 462 F.3d 510, 514-15 (6th Cir. 2006) (rejecting

a defendant's claim of duplicity because jury instructions effectively clarified any doubt regarding the separate standards of participation). Indeed, limited jury instructions often are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Turner*, 93 F.3d 276, 284 (7th Cir. 1996), quoting *Berardi*, 675 F.2d at 901.

The Court intends to instruct the jury that it must consider each Count of the Superseding Indictment separately and the evidence relating to each Count separately from the other Counts in the Superseding Indictment. Additionally, the Court will instruct the jury that its decision on one charge should not influence its decision on any other charge. The Court presumes that the jury will follow its instructions. *See United States v. Mallet*, 496 F.3d 798, 802 (7th Cir. 2007) (stating that absent evidence to the contrary the courts presume that the jury follows the court's instruction). The Court will further instruct the jury that it must consider each Defendant and the evidence concerning that Defendant separately. These instructions will provide an "adequate safeguard against evidentiary spillover and cumulation of evidence." *United States v. Ervin*, 540 F.3d 623 (7th Cir. 2008). *See also United States v. Warner*, 498 F.3d 666, 700-01 (7th Cir. 2007) ("Limiting instructions ... often will suffice to cure any risk of prejudice[.]") (citations and quotations omitted). Defendants have not provided any basis to believe the jury would disregard these instructions.

Additionally, this Court has previously set forth jury instruction deadlines for both the Defendants and the Government. The Court invites all parties to submit proposed jury instructions that accurately state the applicable law relevant to proving the charges alleged in the Superseding Indictment. The Court will give careful consideration to all parties' proposed jury

instructions, particularly in light of the number of Defendants involved and the complexity of the issues in this case.

## CONCLUSION

For these reasons, the Court denies Defendant Hollnagel and Defendant BCI's motion to dismiss Counts Two through Eleven of the Superseding Indictment.

**Dated:** August 19, 2011

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**