UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 10 CR 195 |
| BRIAN HOLLNAGEL, | ) |
| BCI AIRCRAFT LEASING, INC., | ) |
| CRAIG PAPAYANIS, | ) |
| JASON R. HYATT, | ) |
| WILLIAM HATAMYAR, | ) |
| JEFFREY MEYER, | ) |
| MARTIN COLLIER, and | ) |
| ROBERT CARLSSON, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Brain Hollnagel, BCI Aircraft Leasing, Inc, and Craig Papayanis have moved the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and to suppress certain evidence obtained during the execution of a search warrant. For the reasons discussed in detail below, Defendants' motion is denied.

### BACKGROUND

On September 8, 2010, a federal grand jury returned a twenty-one count Superseding Indictment charging Defendants Brian Hollnagel, BCI Aircraft Leasing, Inc. ("BCI"), Craig Papayanis, and others with engaging in a fraudulent financing scheme that deprived investors, financial institutions and others of money and property. As described in the Superseding Indictment, Defendant Hollnagel owned BCI and served as its president and chief executive officer. BCI was a privately-owned Illinois corporation that obtained funds from individual and

institutional investors to create limited liability corporations ("LLCs") for the purpose of purchasing, selling, and leasing commercial aircraft. In return for their investments, the investors would receive a monthly distribution from the LLC, as well as a share of any profits the LLC received if it sold its aircraft. Defendant Papayanis held various positions at BCI, including managing director and chief financial officer.

The allegations in the Superseding Indictment set forth an elaborate scheme by which Defendant BCI, by and through its officers and others, defrauded financial institutions and individual investors in order to secure funds, fraudulently misrepresented the LLCs' finances to investors, and withheld profits that should have been allocated to the LLCs' investors following the sale of aircraft, retaining them instead for their own benefit. The Superseding Indictment specifically alleges that Defendants (i) deprived investors of profits they should have received following the sale of the commercial aircraft affiliated with their investments, and (ii) lied to investors following those sales about "reinvesting" their investment capital into other commercial aircraft purchases when, in fact, they did no such thing.

The Superseding Indictment alleges that Defendant Papayanis was a vice president at Coast Business Credit where he acted "as the loan officer on term loans and a line of credit made to BCI totaling over $40 million." While employed at Coast Business Credit, BCI and Hollnagel allegedly bribed Papayanis by offering him employment at BCI. This bribe allegedly was in exchange for Papayanis's assistance to help BCI and Hollnagel obtain the line of credit from Coast Business Credit. Shortly after Papayanis provided BCI and Hollnagel assistance in obtaining their line of credit, Papayanis began working for BCI.

On April 3, 2007, Special Agent Nicholas Zagotta (the "Affiant") of the Internal Revenue

Service – Criminal Investigation Division ("IRS-CID") submitted an Application and Affidavit for Search Warrant (the "Affidavit") to United States Magistrate Judge Morton Denlow. The Search Warrant sought permission to search the premises known as 330 North Wabash Avenue, Suite 2801 in Chicago, Illinois. This location is BCI's business office space.

Defendants argue that the information presented to the Magistrate Judge in support of the search warrant was either incorrect or materially misleading and incomplete, and that the Affiant had information that would have made the application/affidavit both correct and complete. Defendants contend that if the Affiant had included this information, probable cause would not have existed to issue the search warrant "of the scope involved here." Defendants ask the Court for a *Franks* hearing.

**LEGAL STANDARD**

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that intentionally or recklessly submitting false statements in an affidavit submitted in support of a search warrant violates the Fourth Amendment. The affidavit, however, has a "presumption of validity." *Id.* at 171. In order to obtain a *Franks* hearing, Defendants must establish that the Affiant knowingly, intentionally, or with reckless disregard for the truth made a false statement in the affidavit submitted in support of the warrant, and that the false statement is necessary to the finding of probable cause. *Id. See also United States v. Rickmon*, __ F.3d __, 2011 WL 3862747 at *4 (7th Cir. Sept. 1, 2011). A hearing is also warranted if the affiant intentionally or recklessly *omitted* material information from the affidavit in support of the search warrant. *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008). The omitted facts "must be 'material' to the probable cause determination." *United States v. Norris*, 640 F.3d 295,

302 (7th Cir. 2011). *See also United States v. McDuffy*, 636 F.3d 361, 363 (7th Cir. 2011) ("an omitted detail is material only if its inclusion would upset a finding of probable cause"). As the Seventh Circuit has made clear, the "standard is not whether the affidavit contains a false statement, but whether the affiant knew or should have known that a statement was false." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009), citing *United States v. Jones*, 208 F.3d 603 (7th Cir. 2000).

When a confidential informant provides the basis for information in the supporting affidavit for a search warrant, "[i]t is not enough to show that an informant lied to the government officer, who then included those lies in the complaint." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009), citing *United States v. McAllister,* 18 F.3d 1412, 1417 (7th Cir. 1994). "Instead, the evidence must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *Johnson*, 580 F.3d at 670, citing *Jones,* 208 F.3d at 607; *United States v. Williams,* 737 F.2d 594 (7th Cir. 1984). Furthermore, "conclusory, self-serving statements are not enough to obtain a *Franks* hearing." *Id.* at 671. Defendants' burden in meeting this standard is "substantial," and "*Franks* hearings are rarely required." *Johnson*, 580 F.3d at 670, citing *United States v. Maro,* 272 F.3d 817, 821 (7th Cir. 2001). In meeting their burden, Defendants "must offer direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had obvious reasons for omitting or falsifying facts." *United States v. Benabe*, 2011 WL 3624961 at *11 (7th Cir. Aug. 18, 2011), citing *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003).

The Seventh Circuit has also held that defendants cannot meet the high standard of a *Franks* hearing by arguing that the police could have done more work on a case. *Johnson*, 580 F.3d at 671, citing *United States v. Swanson,* 210 F.3d 788, 791 (7th Cir. 2000). "Even if the police's failure to corroborate the informant's claims was negligent, 'a little negligence-actually even a lot of negligence-does not the need for a *Franks* hearing make.'" *Id*.

## ANALYSIS

### I. The Affidavit

On April 3, 2007, Special Agent Zagotta executed his Affidavit in support of the search of BCI's premises before the Magistrate Judge. His 21 page affidavit represented that the IRS-CID and the Federal Bureau of Investigation ("FBI") were investigating Defendants Hollnagel and BCI. Based on the investigation, his affidavit represented that probable cause existed to believe that Defendant Hollnagel had committed violations of 8 U.S.C. §§ 1341, 1343, 1346 and 2, and 26 U.S.C. § 7206(1). He further noted that the affidavit was "submitted for the limited purpose of establishing probable cause to support the search warrant" and did not include details of all aspects of the investigation. (R. 181-1, Affidavit ¶ 4.) Part of the information in the affidavit was based on interviews of Cooperating Witness-1 ("CW-1"), BCI's former Senior Vice President of Finance, who worked at BCI from approximately February 2006 to December 2006. CW-1 began cooperating with the government in October 2006. Some of the information also came from Investor One whose family member had invested in BCI Prime Investment 2004-05. (*Id.* at ¶ 36.) BCI Prime Investment 2004-05 was an LLC formed in 2004 for the purpose of acquiring an aircraft. (*Id.* at ¶ 33.) In addition, the affidavit contained information obtained by law enforcement agents involved in the investigation who had conducted interviews and

5

reviewed extensive documentation, including BCI's website, tax records, and court documentation.

Based on his review of the evidence and his training and experience, Agent Zagotta represented that probable cause existed "to believe that Hollnagel, through BCI, is involved in a scheme to defraud investors and BCI of money, property and their intangible right to Hollnagel's honest services as evidenced by the BCI [Prime] 2004-05 investment, the note issued by Investor One and Hollnagel's personal use of corporate assets. Moreover, there is probable cause to believe that Hollnagel has committed tax fraud by, among other things, grossly under-reporting his income in tax years 1999, 2000 and 2001." (*Id.* at ¶ 72.)

The Affidavit explained that BCI is a privately-held company in the business of buying commercial aircraft, leasing the aircraft to airlines and then selling the aircraft. Hollnagel founded BCI and serves as its president and chief executive officer. (*Id.* at ¶ 5.) Further, BCI funds the purchase of aircraft, in part, through private investors and bank loans. It establishes an LLC to own each of the aircraft and investors invest in the individual LLCs. (*Id.* at ¶19.) Each LLC has an operating agreement and is managed by BCI. (*Id.* at ¶19.) "With respect to these private investors, BCI promises a fixed rate of return on each investment during the lease period – typically 10% to 15% depending on the specific investment – and a specified share of any profit earned on the sale of the aircraft." (*Id.* at ¶ 5.)

According to the Affidavit, the "investigation has revealed that BCI has negative monthly and annual cash flow. To hide its financial problems and sustain BCI's business, BCI improperly uses (a) investors' capital contributions to pay its operating expenses; and (b) proceeds from one or more investment to pay investors in unrelated investments." (*Id.* at ¶ 6.)

In addition, Agent Zagotta averred that "in 2004, with respect to one particular BCI aircraft, Hollnagel defrauded investors of their money, property and intangible right to Hollnagel's honest services by selling the aircraft for a substantial profit but not informing the investors of the sale. In this way, Hollnagel was able to keep the profits for BCI and himself." (*Id.* at ¶ 7.) The Affiant further averred that Hollnagel was involved in various tax frauds, including failing to declare income on certain personal tax returns.

## II.     Defendants have Failed to Establish that A *Franks* Hearing is Warranted

In their initial motions, Defendants rely heavily on a group of documents that Defendants now acknowledge were not in the possession of the government or Agent Zagotta when Agent Zagotta executed the affidavit in support of the search warrant. Specifically, the thrust of Defendants' argument was premised on the information contained in certain documents with the bates stamp label "DMI-BCI." The government, however, did not have possession of these documents prior to the execution of the search warrant or the search of BCI's headquarters. (R 207, E2, Affidavit of Thomas Berwick.) Defendants do not contest this fact. Accordingly, Defendants' *Franks* hearing arguments based on these documents fail.

Defendants nonetheless continue to maintain that the Affiant intentionally or recklessly misrepresented the following to the Magistrate Judge: 1) BCI's financial condition; 2) the terms of the LLC Agreement and BCI's duties to its investors; and 3) that probable cause existed to believe that Hollnagel engaged in criminal tax violations.

### A.     Financial Condition

Defendants argue that the Affidavit misled the Magistrate Judge as to the accurate financial condition of BCI. The majority of Defendants' argument rests on the documents with

7

the bates stamp label "DMI-BCI" that were not provided to the government until *after* the submission of the Affidavit. Accordingly, this argument fails for the reasons discussed above.

Defendants additionally contend that the government did not corroborate the information about BCI's financial condition. The government, however, has confirmed that CW-1 – who worked at BCI and provided a substantial amount of information regarding BCI's financial condition – was reliable and corroborated by the evidence. *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010). Furthermore, circumstantial evidence corroborated CW-1's claims regarding BCI's financial condition. Investor One's family, for example, informed law enforcement that Hollnagel refused to return Investor One's money until after Hollnagel became aware of the federal criminal investigation, and that BCI had failed to timely repay Investor One's $350,000 Jet Global loan. This corroboration is inconsistent with Defendants' burden of establishing that the Affiant intentionally or recklessly misrepresented BCI's financial condition to the Magistrate Judge.

### B. The LLC Agreement

Each LLC that BCI managed had an operating agreement that set forth the terms of its operation. The Affidavit sets forth facts to support the assertion that Defendants breached the duties they owed to their investors regarding aircraft sales and the proceeds from those sales. Defendants argue that the Affidavit ignores or misstates material terms of the LLC agreement that contradict the explanation provided to the Magistrate Judge.

First, Defendants contend that the Affidavit misrepresents that the LLC Subscription Agreement required Defendants to invest the investors' capital contributions in a specified aircraft. In support of this argument, Defendants refer to a specific provision of the Subscription

8

Agreement. The Affidavit, however, specifically quotes the provision that Defendants reference: "the Subscription Agreement provides that the net proceeds from [an] offering shall be used for investment in one or more acquiring entities, certain limited rights to and obligations arising from certain cash distributions and residual asset values of one or more Aircraft or substituted Aircraft meeting the Targeted Aircraft Profile.... subject to a lease to a commercial carrier." (R. 181-1, Affidavit ¶ 32(a)). Given that the Affidavit disclosed the very provision upon which Defendants rely, the Court would be hard pressed to conclude that the Affiant intentionally or recklessly mischaracterized this provision. Furthermore, based on the submissions from both sides, it is clear that this is a factual issue for the jury.

Second, Defendants challenge the Affidavit's assertion that the operating agreement did not permit BCI to "violate its fiduciary duties to the LLC by using capital contributions or profits to make interest-free loans to BCI or by potentially exposing the LLC to legal liability incurred by BCI or other BCI LLCs through the commingling/intermingling of corporate assets." (*Id.* ¶ 32(a).) Defendants complain that "generalities about 'fiduciary duty' and theoretical risk do not override the actual terms of the operating agreement, which gave BCI as manager broad authority to determine how to handle the assets and funds of the LLC." (R. 181, Mem. in Support, at 19.) Defendants cite various provisions from the BCI Prime Investment 2004-5 LLC operating agreement in support of their argument that BCI had broad authority to determine how to handle the assets and funds of the LLC. Even if BCI had broad authority, the provisions cited by Defendants do not suggest that BCI could also violate its fiduciary duties. Furthermore, Defendants' arguments based on the broad language in the operating agreement do not suffice to

9

meet their heavy burden. Indeed, the parties' differing interpretations of the facts are best left for the jury.

Third, the Affidavit notes that the LLC Agreement provided that "the LLC is required to establish (a) 'Capital Accounts' for each investor; and (b) separate profit and loss accounts for each 'Leveraged Lease Transaction.' Specifically, § 11.2 provides that the LLC is required to 'establish and maintain [at the LLC's expense] Capital Accounts in accordance with § 704(b) of the [Internal Revenue] Code for each investor. Moreover, § 11.3 provides that the LLC is required to 'establish and maintain separate profit and loss accounts for each Leveraged Lease Transaction, the results of which [are to be] closed out to the Capital Accounts of the [investors] whose [investments] are allocated by [BCI] to each Leveraged Lease Transaction.'" (R. 181-1, Affidavit ¶ 23.) Defendants argue that this assertion is misleading because Capital Accounts under § 704(b) of the IRS Code are separate and distinct from "bank accounts," and that it thus falsely suggests that there was some contractual requirement to set up separate bank accounts for each LLC which BCI failed to satisfy. As the government points out, however, the Affidavit correctly quotes Sections 11.2 and 11.3 of the LLC Agreement. The parties are free to argue their separate interpretations of these provisions at trial.

Defendants further argue that paragraph 23 of the Affidavit failed to disclose to the Magistrate Judge that Defendants had disclosed to their auditors that they commingled accounts and that their auditors had accepted it. Defendants, however, rely on documents which the government did not have when the Affiant executed the Affidavit. As such, this argument cannot support Defendants' high burden of establishing that the Affiant intentionally or recklessly misled the Magistrate Judge.

10

### C. BCI Prime Investment 2004-5 LLC and Investor One

The Affidavit addresses various issues with BCI Prime Investment 2004-05, LLC, an LLC that Defendant formed in 2004 for the purpose of acquiring an aircraft. The Affiant noted that CW-1 had provided him with a copy of a Limited Liability Company Agreement and a Subscription and Signature Page to the Limited Liability Company Agreement for this particular LLC. The Affidavit represented that the terms in these documents were "terms of a typical BCI LLC operating agreement and subscription agreement." (R. 181-1, Affidavit ¶ 22.) Moreover, Investor One and Investor One's family member invested a total of $690,000 in BCI Prime Investment 2004-05 LLC, and Investor One was interviewed prior to the submission of the Affidavit regarding the investment.

> Defendants challenge the following assertion in the Affidavit:
>
> [I]n 2004, with respect to one particular BCI aircraft, Hollnagel defrauded investors of their money, property and intangible right to Hollnagel's honest services by selling the aircraft for a substantial profit but not informing investors of the sale. In this way, Hollnagel was able to keep the profits for BCI and himself. (R. 181-1, Affidavit ¶ 7.)

Defendants argue that this assertion misrepresents the nature of the LLC investment. First, they contend that the Affidavit materially omitted that BCI, as the Manager of the LLC, had two years to wind up the affairs of the LLC. According to Defendants, this omission was "material to the Affidavit's representation that Mr. Hollnagel had wrongfully told Investor One that her investment in BCI Prime Investment 2004-05 had not expired." To the contrary, the Affidavit does not represent that Mr. Hollnagel "wrongfully" told Investor One that the BCI Prime Investment 2004-05 had not expired. Instead, it states that Defendant Hollnagel told Investor One "that the investment term had not expired." (*Id.* ¶ 44.)

11

Next, Defendants challenge "Investor One's claims that she should have received cash equal to the profit amount reflected on BCI's K-1s," and the Affidavit failed to disclose a letter from BCI Prime Investment 2004-05 to the IRS that acknowledged errors in Investor One's K-1 and reported that the errors would be corrected. (R. 181, Mem. at 22.) As an initial matter, the Affidavit does not represent that Investor One claims that she should have received cash equal to the profits from the sale. Instead, the Affidavit provides that "in or about summer 2006, Investor 1 and Investor 1's mother received notification from the IRS that Investor 1 and Investor 1's mother's 2004 federal income tax returns failed to report income earned from Investor 1 and Investor 1's mother's interest in BCI 2004-05. The notification indicated that in 2004, BCI 2004-05 had filed K-1 Schedules that reflected the income at issue." (R. 181-1, Affidavit ¶ 43.) Investor One thereafter "spoke to Hollnagel ... about the K-1 issue. Hollnagel stated that the K-1 Schedules had been issued in error, and BCI was working to get them reversed. Hollnagel stated that BCI accounting problems had caused a delay in getting the forms corrected. Investor 1 told Hollnagel that Investor 1 wanted BCI to return Investor 1's investment. Hollnagel refused to return the money stating that the investment term had not expired." (*Id.* ¶ 44.) When Investor One again spoke to Hollnagel about the K-1 issue, "Hollnagel told Investor 1 that the 2004-05 Aircraft had been sold and that BCI reinvested the money in another aircraft. Hollnagel stated that as a result, there was no money to distribute from the sale." (*Id.* ¶ 45.) The Affiant then noted that given the "information provided by CW-1, Hollnagel's representation to Investor 1 regarding reinvesting the proceeds of the sale of the 2004-5 Aircraft was false. According to CW-1, after the 2004-5 Aircraft was sold, BCI kept the proceeds of the sale." (*Id.* ¶ 46.) After IRS-CID agents spoke with Investor One, Hollnagel repaid Investor One and Investor One's

12

family member's capital contributions with respect to the BCI 2004-5 investment. They did not, however, receive any profits. (*Id.* ¶¶ 47, 50.)

Defendants challenge the government's omission of a January 9, 2007 letter from BCI Prime Investment 2004-5 to the IRS that acknowledged errors in Investor One's K-1 and reported that it would correct the errors. The government acknowledges that it did not disclose this letter in the Affidavit. While the more prudent approach would have been to disclose this letter to the Magistrate Judge, the failure to do so does not satisfy Defendants' burden because the thrust of this section of the Affidavit is not about misrepresentations to the IRS. In fact, the Affidavit notes that the IRS was pursuing the shareholder's failure to declare the K-1 income on their personal income tax returns, not the LLC. Further, the Affidavit discloses that Hollnagel told Investor One that "the K-1 Schedules had been issued in error, and BCI was working to get them reversed." (*Id.* ¶ 44.) That is precisely what the letter to the IRS explained:

> The 2004 IRS Form K-1 which the Company issued to [its investors] contained certain errors that resulted in the erroneous tax filing and, ultimately, the IRS notice. The Company intends to correct these errors.

(R. 242-10, Letter to IRS.) The substance, therefore, was disclosed, including the fact that BCI "was working to get them reversed." Furthermore, this section of the Affidavit pertains to Hollnagel's alleged misrepresentations to Investor One and Investor One's family member about their investment in BCI Prime Investment 2004-5 LLC and Hollnagel's alleged misrepresentations regarding the profit from the sale of the 2004-5 aircraft. The section discusses evidence regarding BCI's misuse of the profits and Hollnagel's attempts to delay repayment, not tax issues.

Finally, BCI and Hollnagel challenge the Affidavit's assertions regarding Investor One's participation in a loan transaction involving Jet Global, a joint venture between BCI and Global Aircraft Solutions. The Affidavit avers that Investor One loaned $350,000 to Jet Global that BCI deposited into a BCI bank account instead of a Jet Global account. BCI thereafter made the monthly interest payments to Investor One. When the loan came due in August 2006, Investor One did not receive repayment of the loan. Accordingly to the Affidavit, Defendant Hollnagel asked Investor One to extend the note for six months and "Investor 1 agreed to extend the note because Investor 1 did not believe that Investor 1 had any other option." (R. 181-1, Affidavit ¶ 16.) Ultimately, "Hollnagel caused BCI to pay to Investor 1 the amount due and owing on the loan." (*Id.* ¶ 17.) Defendants argue that Investor One had been provided a promissory note and collateral for the loan by the joint venture, and that Investor One was paid in full. As described, the Affidavit disclosed that Investor One had a note on the loan and that Investor One received full payment on the loan. Although the Affidavit does not disclose that Investor One received collateral for the loan, Defendants do not explain the significance of this omission. Indeed, it does not give rise to a substantial showing that the Affiant intentionally or recklessly misled the Magistrate Judge.

### D. Tax Violations

Although the Court severed the tax violations and thus need not address this issue at this stage, in the interest of completeness, the Court will address Defendants' tax-related arguments now. Defendants argue that even if the government has established that Hollnagel's personal income tax returns for the years 1999 through 2001 were incorrect, there is no evidence that they were willfully false. Defendants further assert that the affidavit "presented no information

whatsoever tending to show that Mr. Hollnagel knew or believed those returns were false when he filed them, and his subsequent 'refusal' to amend them is not a crime." (R. 242, Reply at 14.) Rather than setting forth any facts to support that the Affiant knowingly, intentionally, or with reckless disregard for the truth made a false statement or omitted material information from the affidavit, Defendants are merely challenging whether the facts as alleged in the Affidavit provided a sufficient basis for a probable cause determination as to the tax crimes. This assertion does not provide a basis for a *Franks* hearing.

## II.     The Warrant Did Not Lack Sufficient Particularity

The warrant authorizing the search of BCI's headquarters in Chicago, Illinois permitted seizure of nine specific categories of items. Defendants contend that the warrant lacked sufficient particularity because the categories are so broad that they are rendered meaningless. The Court disagrees.

"The Fourth Amendment requires that a warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging through one's belongings." *United States v. Mann*, 592 F.3d 779, 783 (7th Cir. 2010). "This requirement precludes the issuance of a warrant that permits a general, exploratory rummaging in a person's belongings, and thereby ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable clause." *United States v. Vitek Supply Corp.*, 114 F.3d 476, 480-81 (7th Cir. 1998) (citations and quotations omitted). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480

15

U.S. 79, 84 (1987). In order to meet this requirement, "a warrant must describe the objects of the search with reasonable specificity, but need not be elaborately detailed." *Vitek Supply*, 114 F.3d at 481 (quotations omitted). "[A] warrant must explicate the items to be seized only as precisely as the circumstances and the nature of the alleged crime permit." *Id*. at 481. "If detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." *United States v. Hall,* 142 F.3d 988, 996 (7th Cir. 1998).

Here, the warrant did not authorize law enforcement to broadly seize evidence of a crime or evidence of a violation of a broadly-worded criminal statute. *See United States v. Stefonek*, 179 F.3d 1030, 1032-33 (7th Cir. 1999) (the description "evidence of crime" does not satisfy the Fourth Amendment's particularity requirement). The list contained nine specific categories of items related to the frauds at issue. The categories were specific enough to enable the law enforcement agents who executed the search warrant to identify with reasonable certainty the items to be seized. *See Vitek*, 144 F.3d at 481. This is especially true here, where based on the evidence in the affidavit in support of the search warrant, evidence of the fraud is not likely to be confined to a single type of document. *See id*. ("specificity is even more difficult [when] evidence of the crimes can be found in almost every type of business document conceivable") (citations and quotations omitted).

Defendants' reliance on *United States v. Stefonek* and *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995) is unavailing. In *Stefonek*, the Seventh Circuit held that the search warrant did not satisfy the Fourth Amendment's particularity requirement where the warrant provided for the seizure of "evidence of the crime." *Stefonek*, 179 F.3d at 1033. In contrast, the warrant in this case listed nine separate categories of evidence.

In *Kow*, the Ninth Circuit invalidated a search warrant as unconstitutionally broad. The *Kow* court noted that the supporting law enforcement affidavit did not support the broad scope of documents covered by the warrant because the affidavit focused heavily on acts of violence that were not connected to the categories of documents identified in the search warrant. In addition, the Ninth Circuit noted that the affidavit did not establish that the business subject to the search was "permeated with fraud." Here, the Affidavit establishes probable cause to believe that Defendants were engaged in an extensive, widespread scheme to defraud their investors and others.

Defendants also point out that the government did not limit the scope of the nine categories of documents to a particular time frame. While it would have been preferable for the government to include a time frame, given the ten year breath of the alleged scheme, the government's failure to do so is not fatal.

Even if the warrant was not particularized enough, the seized evidence is nonetheless admissible because the officers relied on the warrant in good faith. *Jones v. Wilhelm*, 425 F.3d 455, 464 (7th Cir. 2005) ("Even if a warrant is ultimately found to be unsupported by probable cause or lacking in particularity, searches conducted pursuant to the warrant may be valid under the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 82 L.Ed.2d 677.... (1984)." "An officer's decision to obtain a warrant is prima facie evidence that he was acting in good faith." *United States v. Bell*, 585 F.3d 1045, 1052 (7th Cir. 2009). "A defendant may rebut this evidence by demonstrating that the issuing judge failed to perform his neutral and detached function and served as a rubber stamp for the police; that the officer was dishonest or reckless in preparing the affidavit; or that the affidavit was so lacking in probable

cause that no officer could have reasonably relied on it." *Id*. (citing *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008)). Defendants have not met this burden.

## CONCLUSION

Defendants have failed to meet the high standard necessary to entitle them to a *Franks* hearing. Defendants' motion is denied.

Dated: September 20, 2011

                                    **ENTERED**

                                    _____
                                    **AMY J. ST. EVE**
                                    **United States District Court Judge**