**U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 CR 195 |
| BRIAN HOLLNAGEL, | ) | |
| BCI AIRCRAFT LEASING, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Brian Hollnagel and BCI Aircraft Leasing, Inc. have moved for a judgment of acquittal (R. 467) and for a new trial (R. 498, 531) on Counts One, Two, Three, Four, Five, Six, and Twelve of the Second Superseding Indictment. For the reasons explained below, the Court denies Defendants' motion for judgment of acquittal. The Court also denies Defendants' motion for a new trial.

## BACKGROUND

### I. General Background

The government charged Defendants Brian Hollnagel ("Hollnagel" or "Defendant") and BCI Aircraft Leasing, Inc. ("BCI") (collectively, "Defendants") in the Second Superseding Indictment "with having engaged in a long-term scheme to defraud investors, lenders, and others of money and property by engaging in a fraudulent scheme to obtain financing and enrich themselves." (R. 545, Resp. at 6.) Specifically, the Second Superseding Indictment charged Defendants with six counts of wire fraud and two counts of obstruction of justice. The charges

arose from loans and investments Defendants obtained in conjunction with BCI's business of buying, selling and leasing commercial airplanes. Mr. Hollnagel was the owner, president and chief executive officer of BCI. Co-Defendant Craig Papayanis held various positions at BCI, including managing director and chief financial officer.

The government submitted a redacted renumbered indictment based on the Second Superseding Indictment (the "Renumbered Indictment") for the jury to use during its deliberations. (R. 480.) Count One of the Renumbered Indictment charged Mr. Hollnagel with participating in a scheme to defraud AAR Corp., a corporation involved in the sale and leasing of commercial aircraft, in part based on payments Mr. Hollngal gave to an AAR Corp. employee, Brian Olds, to help facilitate aircraft deals between BCI and AAR Corp. Count Two of the Renumbered Indictment charged Mr. Hollnagel and BCI with participating in a scheme to defraud investors, financial institutions, and others. Counts Three through Six of the Renumbered Indictment charged Defendants with wire fraud based on wires used in furtherance of the scheme charged in Count Two. Count Seven of the Renumbered Indictment charged Defendants with obstruction of justice based on documents which Defendants submitted to the SEC containing false statements relating to Defendants' investments. Count Eight of the Renumbered Indictment charged Defendants with obstruction of justice based on false statements Defendants made to the SEC regarding payments made to Robert Carlsson, a licensed securities broker.

## II. Procedural History

On January 18, 2012, the Court conducted jury selection and proceeded to trial in this case. The trial lasted for approximately seven weeks. During the course of the trial, the

government called twenty-two witnesses and admitted over six hundred exhibits into evidence. Specifically, the government called the following witnesses: Gary Turlington, Dean Olds, Barrey Davis, Joseph Sammons, Jim Cullen, Rob Carlsson, Frank Czajka, John Taflan, John Strokirk, Frank Meyer, Thomas Berwick, Jay Johnson, John Poulton, T.D. Butzbaugh, John VanDerMeulen, Dean Matt, James Erwin, David Storch, Robert Denninger, Peter Haleas, William Conagh, and Nicole Bilicki.

On February 24, 2012, at the close of the government's case-in-chief, Defendants Brian Hollnagel and BCI moved for a judgment under Rule 29 of the Federal Rules of Criminal Procedure. (R. 467.) The Court took their motion under advisement and continued the trial. (R. 468.) Defendants called five witnesses: Lois Cavero, William Sakamoto, Quentin Brasie, Gary Turlington, and Thomas Berwick.

On March 14, 2012, following almost two weeks of deliberations, the jury returned a verdict of guilty as to Defendant Hollnagel on Count One, and verdicts of guilty as to Defendants Hollnagel and BCI on Counts Two, Three, Four, Five, Six and Seven of the Renumbered Indictment.[1] The Court entered a judgment of guilty against those Defendants in accordance with the jury verdict. The jury was unable to return a unanimous verdict as to Defendants Hollnagel and BCI on Count Eight of the Renumbered Indictment,[2] nor was the jury able to return a unanimous verdict as to Co-Defendant Craig Papayanis on Counts Two, Three,

---

[1] Count Seven of the Renumbered Indictment corresponds to Count Twelve of the Second Superseding Indictment. The other counts remain the same.

[2] Count Eight corresponds to Count Thirteen of the Second Superseding Indictment.

and Four of the Renumbered Indictment.[3]  The Court declared a mistrial as to those counts.

On August 1, 2012, Defendants filed a supplemental memorandum in support of their motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (R. 530.)  That same day, Defendants filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (R. 531.)  Defendants' motion for a new trial incorporates and exclusively relies upon the arguments that Defendants make in their motion for a judgment of acquittal.  The Court, therefore, considers both motions simultaneously.

## LEGAL STANDARD

### I.      Motion for Judgment of Acquittal – Rule 29

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a). When, as here, a defendant makes a Rule 29(a) motion at the close of the government's case, and the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden."  *U.S. v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also U.S. v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *U.S. v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *U.S. v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *U.S. v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009).  The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational

---

[3] Counts Two, Three, Four, Five and Six correspond to the same numbered counts in the Second Superseding Indictment.

trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d at 546

(quoting *U.S. v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also U.S. v. Eller*, 670 F.3d 762,

765 (7th Cir. 2012); *U.S. v. Dood*y, 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is

"whether evidence exists from which any rational trier of fact could have found the essential

elements of a crime beyond a reasonable doubt").  In other words, a court will "set aside a jury's

guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from

which a jury could have returned a conviction." *U.S. v. Presbitero*, 569 F.3d 691, 704 (7th Cir.

2009) (quoting *U.S. v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at

546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or

second-guess the trier of fact's credibility determinations." *U.S. v. Arthur*, 582 F.3d 713, 717

(7th Cir. 2009); *see also U.S. v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009).  This strict standard

is a recognition that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d

at 547.  The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal
> conviction must be not simply to determine whether the jury was properly instructed, but
> to determine whether the record evidence could reasonably support a finding of guilt
> beyond a reasonable doubt.  But this inquiry does not require a court to ask itself whether
> it believes that the evidence at the trial established guilt beyond a reasonable doubt.
> Instead, the relevant question is whether, after viewing the evidence in the light most
> favorable to the prosecution, any rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61

L. Ed. 2d 560 (1979)).

## II.     Motion for a New Trial – Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a); *see also U.S. v. Smith*, 674 F.3d 722 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *U.S. v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005).  "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'"  *U.S. v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *U.S. v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

"'A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'"  *Eberhart*, 388 F.3d at 1048 (quoting *U.S. v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)).  The court may grant a new trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the interest of justice.'"  *U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded.  Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); *see also U.S. v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).  Put another way, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'"  *U.S. v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)).

## ANALYSIS

**I.      Judgment of Acquittal Is Not Appropriate On Count One[4]**

Count One charged Defendant Hollnagel with devising, and intending to devise, "a scheme to defraud AAR and its shareholders of money and property by means of materially false and fraudulent pretenses, representations, and promises, and by material omissions," in violation of 18 U.S.C. §§ 2 and 1343.  To establish wire fraud under Section 1343, the government had to prove that (1) Defendant Hollnagel participated in a scheme to defraud; (2) Defendant Hollnagel had the intent to defraud; and (3) Defendant Hollnagel used interstate wires in furtherance of the fraud.  *U.S. v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012).  Specifically, Count One charged that Mr. Hollnagel wired $250,000 to Mr. Olds – from Fifth Third Bank to Bank One – on March 11, 2005 in furtherance of the scheme.

Mr. Hollnagel argues that the jury erred in convicting him on Count One for three reasons: (1) the government did not prove the intent element; (2) the government, at most, proved an uncharged honest services fraud, rather than fraud to deprive AAR of money or property; and (3) the government did not link Mr. Hollnagel to any material omission or misrepresentation to AAR or establish that he had a duty to disclose to AAR payments given to AAR's employee, Brian Olds.  (R. 530, Supp. Mem. at 8.)  Viewing the evidence in the light most favorable to the government, however, the evidence supported the jury's verdict on Count One.

---

[4] Hereafter, unless otherwise noted, count numbers correspond with the Renumbered Indictment.

**A. The Evidence Supported a Finding That Defendant Hollnagel Intended to Deprive AAR of Money and Property**

"[I]ntent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Sheneman,* 682 F.3d at 629 (citing *U.S. v. Howard,* 619 F.3d 723, 727 (7th Cir. 2010); *U.S. v. Britton,* 289 F.3d 976, 981 (7th Cir. 2002)). "The intent to defraud may be proven by circumstantial evidence and inferences drawn from the scheme itself." *U.S. v. Jackson*, 540 F.3d 578, 594 (7th Cir. 2008). The evidence at trial supported the jury's finding that Defendant Hollnagel intended to defraud AAR by paying Mr. Olds – an AAR employee – to close deals between Defendant Hollnagel and AAR, to benefit Defendants at the sake of AAR.

In 2004, BCI sold two aircraft (the "US Airways Planes") to AAR Corporation in a joint venture with Goldman Sachs, and in 2005, BCI purchased three aircraft from AAR (the "Continental Planes"). Brian Olds worked for AAR in 2004 and 2005. In 2004, Mr. Hollnagel contacted Mr. Olds and offered to sell the two US Airways Planes to AAR. Mr. Olds testified that he informed Mr. Hollnagel that AAR would pay BCI $7.7 million per aircraft ($15.4 million total), as that met AAR's "economic hurdles." (Trial Tr. 322:1-12, 324:1-2.) According to Mr. Olds, Mr. Hollnagel offered to pay him personally $125,000 per US Airways Plane if the deal closed. (Trial Tr. 320:3-35, 543:1-3.) In December 2004, AAR purchased the two US Airways Planes from BCI for a total of $15.4 million. (Gx Olds 17[5]; Gx Olds 18; Trial Tr. 334:13-15, 335:23-336:1.) Similarly in late 2004, Mr. Hollnagel called Mr. Olds regarding the sale of the three Continental Planes. (Trial Tr. 342:9-343:5.) Mr. Olds, who pled guilty and was coopering with the government, testified that Mr. Hollnagel again offered him money, specifically $60,000

---

[5] The Court will refer to exhibits based on the labels which the parties used during trial.

per aircraft, to shepherd the deals through to completion. (Trial. Tr. 343:18-22, 543:7-8.) After AAR approved the sale to BCI of the Continental Planes in February 2005, Mr. Hollnagel paid Mr. Olds as promised.[6] (Trial Tr. 352:4-356:2, 542:15-20.)

At trial, the government argued that Mr. Olds intended to deprive AAR of money because Mr. Hollnagel paid money to Mr. Olds rather than factoring that amount into the purchase price of the planes he had bought from and sold to AAR. In other words, Mr. Olds took money off the negotiation table to AAR's detriment. Here, Defendant Hollnagel argues that the government presented "no evidence, aside from unfounded assumptions, that the money paid to Mr. Olds would have ever been paid to AAR on the two transactions." (Supp. Mem. at 8.) The Court disagrees.

The Court instructed the jury that it could make reasonable inferences based on the evidence. (Trial Tr. at 7970.) The jury could reasonably have inferred that Mr. Hollnagel's payments to Mr. Olds deprived AAR of money or property because even Mr. Olds testified that there was "room in the negotiation" for a better price, namely "the money that was paid to [him], at a minimum." (Trial Tr. 325:18-25.) Mr. Old's testimony that Mr. Hollnagel did not seem willing to put more money into the deal (Trial Tr. 547:8-11) does not undercut this inference by the jury because (1) Mr. Olds did not know what Mr. Hollnagel would have done and (2) Mr. Hollnagel may not have wanted to put more money in the deal merely because he was already paying Mr. Olds.

_____

[6] Mr. Hollnagel's wire transfer in the amount of $250,000 from Fifth Third Bank to Bank One, to pay Mr. Olds regarding the two US Airways Planes, constituted the interstate wire transmitted in furtherance of the scheme to defraud charged in Count One. (Gx Olds 23.)

Additionally, the testimony of AAR's Chairman David Storch supported the conclusion that Mr. Hollnagel deprived AAR of money. Mr. Storch testified, for example, that he would have expected Defendants to have paid to AAR, at a minimum, the $180,000 which Mr. Hollnagel covertly gave to Mr. Olds after AAR sold the Continental Planes to BCI. (Trial. Tr. 5448:12-5449:7.) He also testified that the $250,000 that Mr. Hollnagel paid Mr. Olds regarding the US Airways Planes transaction should have gone to AAR, specifically to its joint venture with Goldman Sachs. (Trial Tr. 5449:8-12.) Mr. Storch further testified that he would not have approved the transactions if he had known that Mr. Hollnagel promised to pay Mr. Olds upon their comlpetion. (Trial Tr. 5448:6-15.)

Furthermore, although Defendant Hollnagel wanted the jury to believe that he paid Mr. Olds because of a friendly relationship whereby Mr. Olds helped the younger Mr. Hollnagel understand the aircraft industry, the jury could have reasonably inferred a fraudulent intent rather than accepting this innocuous alternative theory. (Supp. Mem. at 8-9 (citing Trial Tr. 238:10-239:17).) Indeed, the evidence showed that Mr. Olds kept Mr. Hollnagel up-to-date on AAR's internal, confidential communications regarding the Continental Planes transaction. Specifically, Mr. Olds forwarded an email from Chairman Storch to Mr. Hollnagel where Mr. Storch was questioning whether to complete the Continental Planes sale to BCI. (Gx Olds 22; Trial Tr. 350:1-12.) In the text of his email to Mr. Hollnagel, Mr. Olds said "Damage control is now required. I will discuss with Tim and David. However, I sense a real problem here I am not sure just how to process yet. Give me a call. Brian." (Gx Olds 22; Trial Tr. 350:15-19.) Mr. Hollnagel forwarded this email to BCI's CFO Craig Papayanis and instructed him to delete the email afer he read it. (Gx Olds 22.) The jury reasonably could have inferred from this

communication with Mr. Olds, and Mr. Hollnagel's attempt to hide it by telling Mr. Papayanis to delete the email, that Mr. Hollnagel had an illicit intent to manipulate AAR in the transactions.

The jury also heard evidence that Mr. Olds sent Mr. Hollnagel confidential information regarding a joint venture between AAR and Goldman Sachs, in part, according to Mr. Olds, to let Mr. Hollnagel know what he was doing. (Trial Tr. 483:14-24, 484:6-9.) Mr. Olds also provided Mr. Hollnagel with other confidential information, about unrelated aircraft and transactions, beginning at least in 1998. (Trial Tr. 229-34.) Based on Mr. Olds' willingness to share AAR's internal and confidential information, the jury may have inferred that the nature of Mr. Hollnagel's and Mr. Olds' relationship was not merely one based on mentoring and camaraderie as Defendants assert. (Supp. Mem. at 18 (citing Trial Tr: 238:16-24).) Indeed, the jury reasonably could have concluded that Mr. Hollnagel and Mr. Olds were acting to AAR's detriment, or, at a minimum, without AAR's best interests in mind. These reasonable inferences support a conclusion that, per Mr. Hollnagel's request, Mr. Olds "shepherded" the deal to Mr. Hollnagel's benefit. Indeed, Mr. Hollnagel found Mr. Olds' "shepherding" services worthy of two separate payments for two separate transactions. Although Mr. Hollnagel challenges Mr. Olds' credibility, it is not up to the Court to find him incredible. Moreover, the Court instructed the jury to view his testimony with "caution and great care." (R. 473, Jury Instruc. at 13.)

Defendant Hollnagel argues that he did not benefit from the payments to Mr. Olds as the financing for the US Airways deal became worse and worse for BCI as the deal progressed. (Supp. Mem. at 12.) The evidence described above, however, supported a finding that Mr. Hollnagel valued closing the deal above all else, and utilized Mr. Olds to accomplish that end. Such a conclusion is reasonable in part because Mr. Hollnagel's business relied on attracting

investors to invest in various aircraft.

The jury likely rejected the testimony of Defendant's expert, Quentin Brasie, in part because Defendant paid Mr. Braise $121,000 to testify as his expert. Additionally, Mr. Brasie never inspected anything except other people's reports. (Supp. Mem. at 15-16; Trial Tr. 7231:24-7232:1.) In addition to testifying that the structure of the Continental deal forced BCI to find less favorable financing than originally contemplated, Mr. Brasie testified that AAR would not have benefitted from a sale price any higher than the $15.4 million which BCI paid. (Trial Tr. 7279:11-7280:10.) Specifically, Mr. Brasie testified that AAR had an agreement with ICON Capital "through which *any* residual value in the three aircraft over $13.775 million went directly to ICON." (Trial Tr. 7274:18-7275:2.) The Court cannot assess the credibility of Mr. Brasie.

Even if the jury accepted Mr. Brasie's testimony, it still reasonably could have concluded that Mr. Hollnagel had the intent to defraud AAR. The fact that AAR's collateral agreements – about which Mr. Hollnagel may not have been aware – may have prevented Mr. Hollnagel from succeeding in depriving AAR of funds because the funds would have gone to ICON does not undercut Mr. Hollnagel's intent to defraud. *See, e.g., U.S. v. Aslan,* 644 F.3d 526, 545 (7th Cir. 2011) ("The wire fraud statute punishes the scheme, not its success. The fraud is therefore complete once a defendant with the requisite intent has used the wires in furtherance of a scheme to defraud, whether or not the defendant actually collects any money or property from the victim of the scheme.") (citing *Pasquantino v. U.S.*, 544 U.S. 349, 371, 125 S. Ct. 1766, 161 L. Ed. 2d 619 (2005); *U.S. v. Lorefice*, 192 F.3d 647, 655-56 (7th Cir. 1999); *U.S. v. Coffman,* 94 F.3d 330, 333 (7th Cir. 1996); *U.S. v. Strozier,* 981 F.2d 281, 285 (7th Cir. 1992)). Indeed, the Court

instructed the jury that "[t]he wire fraud statute can be violated whether or not there is any loss or damage to the victim of the crime or gain to the defendant." (Jury Instruc. at 26; Trial Tr. 7977:15-17.)

Defendant Hollnagel's citation to *United States v. Ballard*, 663 F.2d 534 (5th Cir. 1981), to establish that he could not have intended to deprive AAR of money because of his agreement with ICON is unavailing. (Supp. Mem. at 16.) First, *Ballard*, which is not binding on the Court, was an honest services fraud case involving kickbacks, and, therefore, fundamentally differs from the circumstances of this case. Second, Defendant Hollnagel concedes that in *Ballard* the Fifth Circuit reversed the wire fraud convictions because the price controls in effect, which capped the profits that the victims of the scheme would have received even if there were no kickbacks, made the disclosure of the kickbacks immaterial. (Supp. Mem. at 16 (citing *Ballard*, 663 F.2d at 641-42).) Here, however, as explained further below, the jury heard testimony from Mr. Storch that at least he, a decision-maker at AAR on the relevant transactions, would have found it material that Mr. Hollnagel paid Mr. Olds to "shepherd" the deals. Indeed, he specifically testified that he would not have approved the deals if he had known this information. (Trial Tr. 5448:3-15.) Viewing the evidence in the light most favorable to the government, the jury had more than sufficient evidence to find the misrepresentation material.

Defendant Hollnagel's reliance on *United States v. Ashman,* 979 F.2d 469, 479 (7th Cir. 1993), is equally unhelpful because, unlike the victims in *Ashman*, AAR had an opportunity to obtain a better price for the aircrafts. (Supp. Mem. at 16-17.) As discussed above, Mr. Olds testified that he believed AAR left money on the table – at least the amount Mr. Hollnagel paid him – and Mr. Storch believed that Hollnagel would have paid more for the planes based on his

payments to Mr. Olds. (Trial Tr. 5448:12-5449:12.) Although Defendant Hollnagel correctly notes that "speculation is not a substitute for proof beyond a reasonable doubt," based on the evidence before it, the jury reasonably could have inferred that Mr. Hollnagel intended to defraud AAR of money or property, via Mr. Olds, even if AAR in fact lost no money or property. (Supp. Mem. at 18.)

**B.     The Jury Convicted Defendant Hollnagel of Depriving AAR of Money or Property, Not Honest Services Fraud**

Defendant Hollnagel argues that the jury improperly convicted him of an uncharged honest serviced fraud, rather than a scheme to defraud AAR of money or property, because the government lacked evidence of Defendant Hollnagel's intent. (Supp. Mem. at 19.) This argument fails because, as discussed above, there was sufficient evidence for the jury to find intent. Moreover, Defendant Hollnagel bases his argument entirely on quotations from the government's opening and closing statements. The Court, however, instructed the jury that the attorneys' opening and closing statements were not evidence. (Trial Tr. 12:10-13; 7562:22-25.) The Court presumes that a jury follows its instructions. *Sorich v. U.S.,* 709 F.3d 670, 678 (7th Cir. 2013) (citing *Christmas v. City of Chi.*, 682 F.3d 632, 641 (7th Cir. 2012)).

Contrary to Defendant Hollnagel's contention, the government did not present a theory that "any payment a contracting party makes to a counter-party's employee *necessarily* constitutes pecuniary fraud," but, rather, offered evidence that Mr. Hollnagel intended to deprive AAR of money or property by funneling money to Mr. Olds rather than utilizing those funds while negotiating with AAR in the US Airways and Continental transactions. (Supp. Mem. at 21, 24.) Indeed, portions of the government's opening statement – which Defendant does not cite – explicitly set out the government's theory regarding the money and property of which Mr.

14

Hollnagel intended to deprive AAR. The government stated, for example:

> AAR was also cheated out of money that's represented by the hundreds of thousands of dollars that Hollnagel paid in bribes to Olds. You see, because while Olds is putting money in his own pocket, there's still money on the table – the bargaining table – between BCI and AAR that is lost as a result of the money that is going into Olds' pocket as a result of these bribes.

(Trial Tr. 22:14-20.) Notably, the government did not merely argue that Mr. Olds violated his duty of loyalty to AAR by accepting a kickback or bribe, but instead contended that Mr. Olds took money off the bargaining table that belonged to AAR. In fact, the Seventh Circuit in *U.S. v. Holzer*, to which Defendant cites, differentiated the case before it from a case where a defendant "diverted to his own pocket money intended for his employer." 840 F.2d 1343, 1348 (7th Cir. 1998 (cited by Defendants at Supp. Mem. at 25).) Here, the jury could have reasonably concluded that Mr. Hollnagel paid Mr. Olds to complete the transactions at the prices which Mr. Hollnagel wanted, rather than at prices utilizing the funds that Mr. Hollnagel paid Mr. Olds.

Moreover, unlike *McNally v. U.S.*, 483 U.S. 350, 360 (1987), the indictment charged Defendants specifically with a scheme to defraud AAR of money or property, not honest services, and the Court instructed the jury accordingly. Specifically, the Court instructed the jury that "[a] scheme to defraud is a scheme that is intended to deceive or cheat another or to obtain money or property or cause the potential loss of money or property to another . . ." (Jury Instruc. at 22; *see also* Trial Tr. 7976:11-15.) As a result, here, unlike in *Magnuson v. U.S*, relied upon by Defendant Hollnagel, "it is [not] wholly unrealistic to believe that the jury either found or was required to find a deprivation of money or property before rendering guilty verdicts." 861 F.2d 166, 168 (7th Cir. 1998).

**C.    The Government Sufficiently Proved that Defendant Hollnagel Made Material Misrepresentations or Omissions to AAR**

"A scheme to defraud requires the making of a false statement or material misrepresentation, or the concealment of a material fact." *Sheneman*, 682 F.3d at 628-29 (citing *U.S. v. Powell*, 576 F.3d 482, 491-92 (7th Cir. 2009)) (internal quotation marks omitted). Defendant Hollnagel argues that the government failed to prove this essential element.  (Supp. Mem. at 26.)  The evidence showed, however, that, prior to the sale of the US Airways Planes, Defendant Hollnagel signed a purchase agreement containing misrepresentations.  Specifically, the purchase agreement stated that no "person acting on such party's behalf is entitled to any brokerage fee . . . or commission" in connection with the transaction.[7]  (Gx Olds 17, Sec. 6.1; Gx Olds 18, Sec. 6.1.)  As explained above, the evidence showed that Mr. Hollnagel had promised to pay (and did pay) Mr. Olds $250,000 in connection with the transaction.  Viewing this evidence in the light most favorable to the government, a rational jury could view the plain language of the purchase agreement as encompassing the prohibited payments which Mr. Hollnagel obligated himself to pay Mr. Olds in connection with the transactions.  Indeed, Defendant Hollnagel concedes that "given how BCI characterized its payments to Mr. Olds in its own records, a rational juror could have concluded that the fees Mr. Olds received were akin to brokers' fees, in contravention of this provision in the purchase agreement."  (Supp. Mem. at 28 (internal citations omitted).)

---

[7] In his Reply, Mr. Hollnagel argues that the "four corners of the [purchase agreement]" do not support a conclusion that this sentence related to the type of relationship Mr. Hollnagel and Mr. Olds had.  (Reply at 10.)  Defendant Hollnagel, however, cites no testimony or evidence from the trial regarding such an interpretation of the purchase agreements.  Rather than attempting to interpret the provision, the Court must evaluate whether there was no evidence at trial to support the contrary interpretation by the jury that this provision constituted a misrepresentation about Mr. Hollnagel's payments to Mr. Olds.

Defendant Hollnagel misguidedly argues that "[t]his provision could not be the material misrepresentation supporting a conviction on Count One [because] . . . [t]he government's theory was that Mr. Olds and Mr. Hollnagel omitted to tell AAR about the payments, not that Mr. Hollnagel misrepresented whether brokers were used in the US Airways transaction." (Sum. Mem. at 28.) As previously explained, however, the government's theory was that Mr. Hollnagel paid Mr. Olds money – regardless of whether it is labeled a bribe, a broker's fee, or a commission – to obtain his help to shepherd and close the US Airways and Continental transactions.

Defendant Hollnagel also argues that there was "no evidence whatsoever that this provision, found under 'Miscellaneous' provisions at the end of the purchase agreement was material to AAR's decision to purchase the US Airways [P]lanes, or the price at which the purchase was made." (Supp. Mem. at 29.) At a minimum, this argument misinterprets the law regarding "material" misrepresentations and disregards testimony from Mr. Olds and Mr. Storch. Under the law, "[a] false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed. . . The statement need not actually affect the decision." *U.S. v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012) (citing *U.S. v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010)); *see also Neder v. U.S.,* 527 U.S. 1, 16, 119 S. Ct. 1827, 1837 (1999); *U.S. v. Jackson*, 546 F.3d 801, 816 (7th Cir. 2008) (finding that because "[the victim] ultimately did not actually rely on the defendants' representations . . . does not render their statements immaterial."). The Court instructed the jury consistent with the law. (Jury Instruc. at 24.) Whether or not AAR actually relied upon the misrepresentation in the "Miscellaneous" provision, therefore, is not determinative. What

matters is whether this misrepresentation had the capability of influencing the decision-makers at AAR.

As explained above, Mr. Storch, a decision-maker at AAR, testified that he would not have approved the sale of the US Airways Planes had he known that Mr. Hollnagel had agreed to pay Mr. Olds if the deal closed. (Trial Tr. 5448-49.) Mr. Storch's testimony not only assisted the jury in determining what influence such a misrepresentation would have had on AAR, but Mr. Storch provided direct testimony as to how this information would have affected AAR. The evidence, therefore, supported the materiality of the misrepresentations to AAR.

Moreover, even if the jury did not find that this provision of the purchase agreement was a sufficient misrepresentation, it is within reason for the jury to have concluded that Mr. Hollnagel omitted material information, namely that he was paying an AAR employee regarding the transaction. As the Court instructed the jury, "a materially false or fraudulent pretense, representation, or promise may be accomplished by an omission or concealment of material information." (Jury Instruc. at 22; Trial Tr. 7976:16-18.) Defendant Hollnagel spends pages in his brief arguing that Mr. Hollnagel's omissions or concealment cannot constitute fraud because neither Mr. Olds nor Mr. Hollnagel had a duty to inform AAR of their relationship and payment agreement. (Supp. Mem. at 26-28.) He fails to cite, however, any case law requiring a duty to exist in order for an omission to constitute a material omission. Indeed, no such absolute requirement exists. *See, e.g., U.S. v. Palumbo Bros., Inc*., 145 F.3d 850, 868 (7th Cir. 1998) ("We also have determined that the omission or concealment of material information, even when a statute or regulation does not impose a duty to disclose, constitutes mail fraud."); *Emery v. Am. Gen. Fin., Inc.,* 71 F.3d 1343, 1346-47 (7th Cir. 1995) (finding "that omissions or concealment

of material information can constitute fraud cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation.") (quoting *U.S. v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985)). Rather, whether a failure to disclose is "fraudulent" depends on context." *Emery*, 71 F.3d at 1347 (citing *U.S. v. Biesiadecki*, 933 F.2d 539, 542-43 (7th Cir. 1991); *see, e.g., Powell*, 576 F.3d at 491 (finding material misrepresentations and omissions included failure to disclose the "whole story" about a transaction, including that defendants would pocket proceeds from the re-sale of the property they bought from victim for significantly less, in part because victim said he would not have completed the transaction if she knew of one of the omissions). The context here – which included concealment, as explained below, a larger scheme to defraud, a business transaction, and repeated interactions between Mr. Hollnagel and Mr. Olds – supported a conclusion that Mr. Hollnagel fraudulently omitted material information to AAR during their business dealings. Moreover, the evidence showed that Mr. Hollnagel's omission regarding his payments to Mr. Olds was material to AAR's decision to proceed with the transactions, as specifically noted by Mr. Storch.

The evidence also supported the conclusion that Mr. Hollnagel attempted to conceal his payments to Mr. Olds. Indeed, the jury may have viewed Defendant Hollnagel's inclusion of the above provision in the purchase agreement as an attempt to conceal the payments, which, notably, Mr. Hollnagel sent to a shell company that Mr. Olds created called Mercury Air Corp. (Trial Tr. 341:13-342:1; Gx Olds 33); *see Powell*, 576 F.3d at 491 (finding that "a failure to disclose information may constitute fraud if the omission is accompanied by acts of concealment.") (quotation omitted). Furthermore, Mr. Olds even admitted that Mercury Air

19

Corp. became merely a "shell to receive bribe payments from BCI and Brian Hollnagel." (Trial. Tr. at 250-51.) Although there was no direct evidence that Mr. Hollnagel knew that Mercury Air Corp. was a shell, the jury may have made a reasonable inference regarding Mr. Hollnagel's knowledge because Mr. Hollnagel would have known the players in the industry, and thus would have known whether Mercury Air Corp. did legitimate business. Defendant Hollnagel wanted the jury to believe that he paid Mr. Olds via Mercury Air Corp. because Mr. Olds acted as a professional consultant for Mr. Hollnagel, rather than as a complicit bribee. The Court, however, will not second-guess the jury's weighing of the evidence because they could have rationally concluded that Mr. Hollnagel's failure to disclose the payments constituted a material omission in the context of his previous dealings with Mr. Olds and repeated payments to him. Viewing the evidence in the light most favorable to the government, the government submitted more than ample evidence at trial to support the wire fraud charge in Count One.

## II.     The Evidence Supported the Jury's Verdict on Counts Two through Four Against Defendants Hollnagel and BCI[8]

The jury convicted Defendants Hollnagel and BCI on Counts Two through Six of the indictment, which charged them with a scheme to defraud "investors, financial institutions, and others." As discussed above, to establish wire fraud under Section 1343, the government had to prove that (1) Defendants participated in a scheme to defraud; (2) Defendants had the intent to defraud; and (3) Defendants used interstate wires in furtherance of the fraud. *Sheneman*, 682 F.3d at 628. Defendants argue that the evidence adduced at trial did not show that Counts Two

---

[8] In addition to the arguments addressed in Section II, which apply to Counts Five and Six as well as Counts Two through Four, Defendants also argue that the evidence did not show that Defendants made the wirings alleged in Counts Five and Six in furtherance of the scheme to defraud. The Court addresses the latter argument in Section III.

through Six constituted a single scheme to defraud and did not establish that Defendants had the requisite fraudulent intent.

Notably, as discussed below, Defendants repeatedly make two misguided arguments in an attempt to undercut the jury's convictions on Counts Two through Six. First, Defendants argue that the jury could not have found intent to defraud, or a fraudulent scheme, because the government did now show that any investor or bank lost any money or property. As detailed below, however, the law does not require any loss to occur to sustain a conviction. Second, Defendants rely heavily on the notion that the investment and loan documents at issue gave Defendants authority or discretion to make the allocations or distributions that they made. Defendants fail to recognize that the representations in these documents do not preclude the possibility that Defendants made representations, outside of the documents, to the investors about what they would do with that authorization or discretion. The Court addresses the sufficiency of the evidence supporting Counts Two through Six below.

### A. The Government Adduced Sufficient Evidence of a Single Scheme as Alleged in Count Two

Defendants claim that "no rational juror weighing the evidence introduced on the Count Two scheme could conclude that it was a single scheme . . . [because] [t]he only unifying thread in Count Two is that the alleged 'scheme' was to raise, and either retain or use, money." (Supp. Mem. at 31-32.) Defendants further argue that the variance between the allegations of a single scheme and the proof at trial prejudiced them. (Supp. Mem. at 31.) There was no prejudicial variance, however, between the indictment and the evidence adduced at trial.

### 1. There Was No Variance

A variance arises "when the facts proved at trial differ from those alleged in the indictment." *U.S. v. Scheuneman*, 712 F.3d 372, 378 (7th Cir. 2013) (quoting *U.S. v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009)). Defendants argue that the government cannot aggregate numerous acts together into a single scheme connected only by Defendants' universal involvement and the fact that Defendants committed each action to raise, retain or use money. (Supp. Mem. at 31-32; Reply at 34.) Specifically, Defendants contend that the allegation relating to Coast is a "stand-alone allegation more along the lines of an uncharged and time-barred honest services fraud." (*Id*. at 32.) Defendants further argue that the allegations relating to Coast, Bridgeview Bank, and AAR are disconnected schemes, each utilizing different means and with different victims. (*Id*. at 32-34.) According to Defendants, the "remainder of the alleged scheme was a full scale assault on BCI's business practices – including entirely lawful conduct – from its commingled bank account, insufficiently documented substitution of aircraft, shareholder loans, LLCs that were 'under water,' oversubscription, and so on." (*Id*. at 35). Defendants asserted that these various actions, which could all be considered "accounting failures," are dissimilar and are unrelated to the allegations relating to Defendants' conduct with Coast, Bridgeview Bank, and AAR. (*Id*.) As explained in the Court's prior ruling regarding Defendants' claim that the indictment was duplictous, however, a scheme to defraud may be carried out through many different means. (R. 275 at 17 citing *U.S. v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006)).

Here, the fraudulent conduct included in Count Two involved the same parties and had a "sufficiently close nexus with one another" to be "fairly characterized as one scheme." *U.S. v.*

*Zeidman*, 540 F.2d 314, 317 (7th Cir. 1976) (citing *U.S. v. Palladino*, 475 F.2d 65, 74-75 (1st Cir. 1973)).  As the Court previously explained, "Defendants here all possessed the same goal—to obtain financing for BCI and to enrich themselves.  Furthermore, the counts simply charge that Defendants carried out their scheme to defraud through various means, namely, misrepresentations and misappropriations, bribes, and concealment."  (R. 275 at 18.)  The evidence at trial was consistent with the allegations in the Second Superseding Indictment that Defendants carried out the scheme to defraud through these various means to obtain funds for themselves.  Furthermore, Defendants fail to explain how the facts proved at trial vary from the those alleged in Count Two, and instead merely rehash their pre-trial argument that Count Two alleges multiple, independent schemes rather than one scheme to defraud.

### 2.        Even If There Were Variance, It Was Not Fatal

Even assuming, *arguendo*, that the government's proof at trial varied from that charged in Count Two, Defendants have not established any prejudice or harm the Defendants experienced based on the alleged variance.  "A variance is fatal only when the defendant is prejudiced in her defense because she cannot anticipate from the indictment what evidence will be presented against her or she is exposed to double jeopardy."  *U.S. v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) (citing *U.S. v. Ratliff–White*, 493 F.3d 812, 820 (7th Cir. 2007)).

As explained above, Count Two charged Defendants with a single fraudulent financing scheme, that included multiple acts over many years, and the government submitted evidence to the jury on such a scheme.  Defendants, therefore, had the ability to prepare for trial on the government's allegations, particularly in light of the Court's previous ruling on Defendants' motion claiming the indictment was duplicitous which put Defendants on notice regarding the

scope of the charged scheme.

Defendants analogize their case to a 1946 case, *Kotteakos v. U.S.*, 328 U.S. 750, 766-67 (1946), where the Supreme Court found that the proof at trial established multiple conspiracies, rather than one cohesive conspiracy as charged. (Supp. Mem. at 36-37.) In *Kotteakos*, the indictment charged numerous defendants, who each participated in separate conspiracies, in one count, thereby alleging one unified conspiracy based on the participation of one defendant in all of the separate conspiracies. As a result, the Supreme Court found that the defendants faced a prejudicial burden in preparing for trial as they had to prepare defenses to numerous separate schemes to which they had no connection. *Id.* at 766-67. The trial judge in *Kotteakos* also gave the jury a misleading jury instruction, confusing the proof necessary to establish that the defendants participated in a single conspiracy. *Id.* at 767. Furthermore, the Supreme Court explained that the problem was "not merely one of variance between indictment and proof . . . but [was] also essentially one of proper joinder." *Id.* at 774.

Notably, the crux of the *Kotteakos* case was the breadth of the alleged conspiracy, which initially included thirty-two defendants, and the imputation of guilt from one defendant to the group as a whole. Here, the two Defendants, who are actually one entity, were tried along with one Co-Defendant – Mr. Papayanis – and did not face the same burdens and prejudice as the defendants in *Kotteakos*, who, as Defendants note, had the obligation of "looking out for and securing safeguard against evidence affecting other defendants." (Supp. Mem. at 37 (citing *Kotteakos*, 328 U.S. at 767).) Rather, here, Defendants participated in every facet of the charged scheme. Defendants offer no examples or explanations of how the alleged variance prejudicially burdened their ability to prepare a defense.

24

Defendants also argue, without explanation, that "[t]he sheer number of schemes shoehorned into Counts Two through Six also improperly increased the 'likelihood of jury confusion,' another indicator of prejudice." (Supp. Mem. at 37 (citing *U.S. v. Bustamonte*, 493 F.3d 879, 887 (7th Cir. 2007).) Specifically, Defendants do not articulate what issues may have caused jury confusion or why a rational jury could not determine "the existence of at least one of the false or fraudulent pretenses, representations, or promises charged in the portion of the Indictment describing the scheme" based on the presentation of multiple pretenses, representations, or promises involving Defendants. *See, e.g, U.S. v. Quintanilla*, 1469, 1481 (7th Cir. 1993) ("It is well settled that, even if the evidence presented at trial arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable juror could have found beyond a reasonable doubt the single conspiracy charged in the indictment.").

The only specific prejudice Defendants note in their memorandum is that the alleged "aggregation of several distinct schemes into a single overarching 'scheme' allowed the jury to convict Brian Hollnagel and BCI without finding that the particular wires charged in the indictment were connected to any fraud scheme the just may have found existed." (Supp. Mem. at 37.) This argument is misguided.

First, the Second Superseding Indictment charged one specific wire transfer in each count. The jury, therefore, must have found sufficient evidence of each wire transfer in order to convict Defendants on each count.

Second, Defendants' fear that the jury improperly "mixed and matched together" the wire transfers with different parts of the scheme contradicts the explicit instructions the Court gave

the jury. (Supp. Mem. at 37.) Because the jury convicted the Defendants on Counts Two through Six, it concluded that a scheme to defraud existed, the confines of which they determined based on the evidence and which included at least one of, but possibly all of, the acts in furtherance of the scheme. The Court presumes, therefore, that the jury followed its instructions and concluded that Defendants used each alleged wire transfer to carry out the scheme. *See Sorich*, 709 F.3d at 677 ("we presume that a jury follows its instructions"). Furthermore, as explained in part in Section III, the evidence supported the jury's finding.

Defendants also contend that the alleged variance created a risk that Defendants could be prosecuted twice for the same offense. (Sum. Mem. at 38.) According to Defendants, it is impossible to know what conduct the jury found to constitute the scheme because the Court did not instruct the jury that it must unanimously find at least one part of the alleged scheme. (*Id.*) Such an instruction, however, was not necessary. Before trial, Defendants objected to the government's proposed jury instruction number twenty-seven and attempted to add language requiring the jury to unanimously agree regarding which materially false or fraudulent pretense, representation, promise, or material omission each defendant made. (R. 353.) After the parties briefed the issue, the Court rejected Defendants' argument. (R. 427.) Indeed, the Ninth Circuit has stated that Defendants' "argument is foreclosed by a long line of cases; the jury need not be unanimous on the particular false promise." *U.S. v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007) (citing *U.S. Woods*, 335 F.3d 993, 998-99 (9th Cir. 2003) ("Under the mail fraud statute the government is not required to prove any particular false statement was made.")). The Comment for the draft July 2011 Seventh Circuit Jury instruction 4.04, which Defendants cited in their objection, does not alter the Court's analysis. In that comment, the Committee explained that a

court must require unanimity on each *element* of an offense, but not on the *means* by which the defendant committed the element. Furthermore, the Committee elaborated:

> The Committee notes that it is common for mail, wire, and bank fraud charges to include allegations regarding multiple false statements, promises, or representations. Since *Richardson*, the Seventh Circuit has not spoken on the issue of whether, in a case, unanimity on the particular false statement, promise, or representation is required. Though *it is likely that these constitute allegations regarding a means, not an element, of the offense (the element being the existence of a scheme, not the particulars how the scheme was executed)*, the Committee takes no definitive position on the point.

(emphasis added). The Seventh Circuit recently explained that:

> Specific unanimity instructions . . . are necessary only when there is a significant risk that the jury would return a guilty verdict even if there were less than unanimity with regard to one or more *elements* of the crime. There was not a significant risk here, given the weight of the evidence of both *elements* (if they are indeed *elements* and not *means*).

*U.S. v. Schiro,* 679 F.3d 521, 533 (7th Cir. 2012).

Here, there was no significant risk that the jury would return a guilty verdict with less than unanimity as to the elements of the offense, specifically the element that Defendants used a fraudulent misrepresentation or pretense. Indeed, the Court instructed the jury that the government needed to prove each element of each particular count against each particular Defendant beyond a reasonable doubt in order to return a guilty verdict. (Jury Instruc. at 21; Trial Tr. 7981:17-1782:1.) The Court also gave the jury the general unanimity instruction. (Jury Instruc. at 47; Trial Tr. 7989:12-13.) As a result, there was no prejudicial variance regarding Counts Two through Six.

### B. The Evidence Supported the Convictions on Counts Two Through Six

Defendants argue that the evidence at trial did not show that they intended to defraud investors, banks, or anyone else, as required for a conviction on Counts Two through Six. (Supp. Mem. at 38.) Specifically, Defendants argue that the government blurred the line

between Defendants, who claim they paid investors everything they were entitled to, and Jason Hyatt, who stole money from investors, a crime for which he pled guilty. (Supp. Mem. at 39.) As explained below, however, viewing the evidence in the light most favorable to the government, there was sufficient evidence to support a rational jury's guilty verdict on Counts Two through Four.

### 1. Intent to Defraud Bridgeview Bank[9]

The government presented evidence of four false representations in loan documents that Defendants submitted to Bridgeview Bank in connection with a $2.85 million loan in 2004. (Resp. at 21-22.) Specifically, in the loan documents Defendants falsely represented:

- that BCI held 100% of the membership interest in BCI Investment 2002-1;

- that BCI had pledged the pledgor's membership interest in BCI Investment 2002-1, which was 100% of the total membership interest in BCI 2002- 1;

- that BCI would pay to Bridgeview Bank all funds available to BCI Investment 2002-1, and not commingle its assets; and

- that Defendants would not take investors into BCI Investment 2002-1 without prior notice to, and approval from, Bridgeview Bank.

(Resp. at 22; Gx KLM Loan 2; Trial Tr. 1385:13-1386:20,1422.) Defendants do not dispute that Mr. Hollnagel signed the loan documents containing the first two false statements. Rather, Defendants contend that "[w]hat the government never proved is that Defendants made intentionally false statements to Bridgeview, and the circumstances negated any rational inference that Defendants acted with requisite intent to defraud." (Supp. Mem. at 42.)

---

[9] Because the jury did not need to find sufficient evidence of every aspect of the alleged scheme to defraud to convict Defendants on Counts Two through Four, the Court will not address those aspects of Counts Two through Four which the evidence may not have supported, such as the allegations regarding Coast and Beal Bank.

Defendants argue that there was no rational reason for them to lie to Bridgeview, as "Bridgeview was eager to lend money to BCI" and Mr. Hollnagel would be risking his own money if Defendants made false representations to Bridgeview. (Supp. Mem. at 42-43.) Neither of these arguments, however, preclude a reasonable conclusion by the jury that Defendants took steps to secure loans with Bridgeview Bank.

First, Bridgeview Bank's desire to work with BCI is not mutually exclusive with a desire by Defendants to obtain loans from Bridgeview. Based on the evidence, a rational jury could have inferred that Defendants, who had significant long-term debt obligations in 2004,[10] made false statements in the loan documents in order to secure financing. Indeed, the inference that Defendants took whatever action was necessary to secure financing is consistent with the rest of the scheme to defraud which centered around obtaining financing. Defendants, for example, continued to raise money from investors for the KLM transaction after obtaining the loan, without giving notice to Bridgeview Bank, as promised. (Resp. at 23; Gx KLM Chart 1.) The jury reasonably concluded, therefore, that Defendants made misrepresentations to Bridgeview to ensure Bridgeview executed the loan. This conclusion also supports a finding that Defendants had the intent to defraud Bridgeview. *See Jackson*, 540 F.3d at 594 ("Falsifying information on loan documents is circumstantial evidence of intent to defraud.").

Second, although it is true that Mr. Hollnagel personally indemnified Bridgeview against any fraud or misrepresentation, pursuant to a Validity and Indemnification Agreement, this personal pledge does not necessarily undermine an inference that Mr. Hollnagel intended to mislead Bridgeview to obtain financing. (Trial Tr. 2397:6-8, 2397:16-24; Gx KLM Loan 2 at

---

[10] BCI's 2004 financial statement reflected long-term debt of $419,533,128. (Supp. Mem. at 41-42 (citing DX 3012 at BBG-BCI005478 n. 8).)

BBG-BCI042194-97.)  The jury could have concluded that someone willing to make misrepresentations, would be willing to risk that those misrepresentations would never be discovered and he would never be liable.  Although Defendants offer a reasonable alternative interpretation of Mr. Hollnagel's behavior, the Court must view the evidence in the light most favorable to the government.

In addition, Defendants argue that there was no evidence that Mr. Hollnagel participated in drafting or reviewing the loan documents containing the misstatements and therefore, even though the statements were false, he did not intentionally falsify the documents.  (Supp. Mem. at 44.)  Mr. Hollnagel signed the documents, however, at least ten times.  (Gx KLM Loan 2.)  Although there was no direct evidence that Mr. Hollnagel read and processed each term, it was reasonable for the jury to infer, based, in part, on their common sense, that the company's owner, president and chief executive officer – who was very hands-on in running the company – would affix his signature onto loan documents after understanding their contents.  Furthermore, there was no evidence to support the contrary inference – that Mr. Hollnagel did not know the contents of the document he signed – such as testimony that he had a practice of signing documents without reading them.  As a result, Defendants have not met their "onerous burden" of showing that the record is "devoid of evidence from which a reasonable jury" could have concluded that Defendants intended to include misrepresentations in the documents.  *U.S. v. Vallone*, 698 F.3d 416, 486 (7th Cir. 2012).

Defendants also attempt to undermine the jury's conclusion by pointing to a red-line correction by someone at BCI of a line in a commitment letter issued to BCI and subsequently sent to a Bridgeview loan officer (the "Red-Lined Commitment Letter").  Specifically,

Defendants try to show that BCI attempted to use the Red-Lined Commitment Letter to correct a misrepresentation that appeared in the Bridgeview Bank loan documents. According to Defendants, this attempted-correction indicates that they would not have intentionally made the misrepresentations in the loan documents. The red-line correction, however, was not part of the loan documents itself and only dealt with one specific issue – that BCI would only pledge the borrower's membership interest in BCI Investment 2002-1, rather than 100 % of the total membership. (Supp. Mem. at 45.) This correction, therefore, does not "negat[e] any inference that the mistake in the other document was intentional." (Supp. Mem. at 45.) Furthermore, different individuals at BCI may have prepared the two documents – the Red-Lined Commitment Letter and the Bridgeview Bank loan – with different intentions. Mr. Hollnagel also signed the loan documents after Defendants sent the Red-Lined Commitment Letter, which he did not author, correct, or perhaps ever review. (Gx KLM Loan 2.) Viewed in the light most favorable to the government, the evidence was sufficient for the jury to draw the conclusion that Mr. Hollnagel and BCI intended to defraud Bridgeview Bank by making false misrepresentations to obtain a loan.

### 2. Intent to Defraud Investors

The deal Defendants offered to investors consisted generally of the following: (1) investors would invest in an airplane with BCI, which would purchase planes on lease to airlines; (2) BCI would pay investors a monthly preferred return; and (3) BCI would pay investors 50% of the profits from the sale of the airplane. (Supp. Mem. at 49; Resp. at 19.) The government presented evidence that Defendants defrauded investors by raising funds for investment LLCs where: (1) BCI never purchased the planes, or (2) the investors never held any interest in the

planes. (Resp. at 19.) The evidence, viewed in the light most favorable to the government, sufficiently supported a finding that Defendants intended to defraud the investors.

Defendants, both at trial and in their briefs, argued that there was no scheme to defraud because the investors did not lose any money but instead received all of the money to which their agreement with BCI entitled them. As explained above, however, this argument is misguided because a scheme to defraud can exist even if no victim actually suffered any loss of money or property. *See, e.g., Aslan,* 644 F.3d at 545. What matters is whether Defendants intended to defraud the investors.

Defendants argue that the jury should have interpreted the evidence as demonstrating that "BCI had insufficient controls, systems, and manpower to run its complex business," rather than an intent to defraud. (Supp. Mem. at 50.) The Court's "job, however, is not to reweigh the evidence nor second-guess the jury's credibility determinations" based on an alternative theory of the case. *U.S. v. White,* 698 F.3d 1005, 1013 (7th Cir. 2012). Rather, the Court must "view the evidence in the light most favorable to the government and ask whether any rational jury could have found the essential elements of the charged crime beyond a reasonable doubt." *Id.* The Court addresses the evidence relating to each investment in turn.

### a. SAS Transaction - BCI 2003-2, LLC

In 2003, BCI issued investment invitations for BCI Investment 2003-2, offering an opportunity to invest in BCI's acquisition of a 737-400 on lease to SAS Airlines. (Supp. Mem. at 50.) As part of that deal, Defendants agreed to pay investors a distribution from the net lease payment – also called the free cash flow – which was the difference between the lease payment from SAS Airlines and the debt payment to the lender. (Trial Tr. 2544:15-2445:1.) Defendants,

however, never purchased the SAS aircraft. BCI did not inform the BCI Investment 2003-2 investors that it did not purchase the SAS aircraft, unless they specifically asked. (Trial Tr. 1181:8-18, 1265:16-24, 1295:19-23.) Instead, Defendants paid BCI Investment 2003-2 investors from other funds. (Trial. Tr. 2567:16-2568:12.) Mr. Hollnagel did not even inform Jay Johnson, the principal of BCI's largest investor, Hyatt Johnson Capital, that BCI had failed to purchase the SAS plane until years later during an August 29, 2007 phone call. (Trial Tr. 2776:18-22; 2780:3-2781-5.)

BCI's financial records from Fifth Third Bank established that BCI paid the BCI Investment 2003-2 investors from the BCI 2003-1 SAS fund ("SAS Fund") – the fund into which those investors' funds had originally been deposited – rather than from any net lease payments. (DX 3235; Gx SAS Chart 1.) In total, the BCI Investment 2003-2 investors had deposited $3,803,000 into the SAS Fund. (Resp. at 20.) In addition to paying the investors $515,924 from the SAS Fund, as if it were a monthly distribution based on the net lease payments from the SAS aircraft, BCI used money from the SAS Fund to make $1,500,000 in payments to Wells Fargo Bank to purchase an interest for BCI in an aircraft on lease to Air France. (Resp. at 20; Gx SAS Chart 1.) There was no evidence that BCI substituted this Air France plane for the SAS plane or that the BCI Investment 2003-2 investors benefitted from the Air France purchase.

Notably, during the August 29, 2007 call with Mr. Johnson, Mr. Hollnagel claimed that BCI substituted a different aircraft for the SAS plane which it never purchased, but Mr. Johnson testified that Mr. Hollnagel could not recall the particular plane allegedly substituted when Mr. Johnson pressed him. (Trial Tr. 2780-81.) The jury could reasonably have inferred that Mr. Hollnagel purposefully misrepresented that he had substituted a different aircraft to conceal his

previous misrepresentations, particularly since BCI had not been forthcoming about never purchasing the SAS aircraft in the first place. The Court will not second-guess the credibility determination the jury made regarding Mr. Johnson's testimony, which Defendants argue should not be trusted since it "evolved" from his grand jury testimony. (Supp. Mem. at 52.) Moreover, the Court presumes that the jury followed its instruction to consider Mr. Johnson's testimony "with caution and great care." (Jury Instruc. at 13.)

Defendants also claim that the financial evidence regarding the accounts from which Defendants took money to pay distributions does not support fraud because BCI treated its investors' money as "fungible," and made distributions and allocations that "bore no relationship to the account into which the case had originally been deposited." (Supp. Mem. at 51 (citing Gx QuickBooks 64; Trial Tr. 6983:4-6984:3, 6984:22-6985:22).) Indeed, Special Agent Berwick specifically testified that BCI would sometimes make distributions from accounts distinct from those into which its investors' initial investment were received. (Trial Tr. 6956:13-24.) The SAS Fund, for example, included funds from unrelated sources, such as deposits from the HJ A3 2003 fund intended for Airpost. (Trial Tr. 6968:16-6969:11.) Although Defendants offer an explanation for why Defendants' financial records do not align with the representations they made to investors – namely sloppy business practices – the jury reasonably could have rejected their explanation. Indeed, the jury could have instead evaluated this evidence in light of the other evidence supporting the greater scheme and concluded that BCI intentionally gave BCI Investment 2003-2 investors distributions from the SAS Fund – unrelated to their investment – so that BCI could use the investors' money to purchase a plane for its own benefit. In other words, the jury could have concluded that Defendants created the illusion of a distribution to

mislead the investors into believing that they had purchased the SAS plane while simultaneously funneling the investors' money for Defendants' own use. Investor Czajka even testified that it would have been material to him to know that BCI generated his returns from BCI's other activities, rather than the aircraft in which he thought he had an interest, because he would effectively have been an unsecured equity investor. (Trial Tr. 1295:24-1296:5.)

Defendants also contend that the payments to the BCI Investment 2003-2 investors amounted to a loan from BCI, in accordance with the terms of the agreement, rather than an attempt by Defendants to lull investors. (Supp. Mem. at 53.) There was no evidence presented at trial, however, to support this alternate theory. The jury, therefore, had sufficient grounds to find that Mr. Hollnagel intended to defraud BCI Investment 2003-2 investors, at a minimum, by misrepresenting how BCI would use their investment and how BCI would compensate them – two major components of the investment deal.

### b. BCI Prime Investment 2004-5, LLC and 2004-6, LLC

In 2004, Defendants sought investors (the "2004 Prime Investors") for BCI Prime Investment 2004-5, LLC ("Prime 2004-5") and BCI Prime Investment 2004-6, LLC ("Prime 2004-6") (collectively, the "2004 Prime Investments") for two aircraft on lease to US Airways. (Supp. Mem. at 54; Resp. at 23.) The evidence adduced at trial showed that Defendants intended to defraud 2004 Prime Investors by making multiple misrepresentations regarding, among other things, the status of their investments and the source of distributions paid to them.

Much like with BCI Investment 2003-2, Defendants failed to purchase the planes associated with the 2004 Prime Investments and instead used the 2004 Prime Investors' money to purchase aircraft owned exclusively by BCI. Defendants attempt to justify their actions by

discussing the money that the 2004 Prime Investors did receive and by disparaging the diligence done by investors, such as Mr. Strokirk. (Supp. Mem. at 54-62.) Specifically, Defendants contend that Mr. Strokirk simply did not have a proper understanding of the deal by his own failings, not based on any misrepresentations on their part.[11] (*Id*.) Defendants' argument misses the mark, however, as Defendants did not use the investors' money in the manner that they said they would. Instead, they left investors in a precarious position with no contractual rights to any aircraft. Defendants attempt to justify their actions by pointing to the investor agreements' provisions which gave Defendants broad powers to manage the investments, and the fact that Defendants did pay investors. As stated above, however, a scheme to defraud need not result in an actual loss to warrant conviction. *See Aslan,* 644 F.3d at 545. If BCI's cash flow from other investments had not allowed for the distributions which the investors' enjoyed, they would have been sitting with a worthless investment and no rights as Defendants funneled their funds for their own purposes, without notice to or protection of the investors.

Specifically, Defendants raised funds from investors for Prime 2004-5 for the purchase of an aircraft on lease to US Airways. The Prime 2004-5 investment summary stated that Defendants would close the deal on the aircraft on or before July 17, 2004. (Trial Tr. 1568:7-20; Gx Strokirk 2 at ST-BCI000286.) On July 21, 2004, Defendants caused BCI 2004-5, LLC, an entity separate and distinct from Prime 2004-5, to acquire an interest in a different aircraft on lease to US Airways, bearing tail number N427US. (Gx 2004-5 Sum. Chart 2.) BCI Investment 2004-5, LLC wholly owned BCI 2004-5, LLC. (Gx Chart Prime 2004-5.) As a result, Prime

---

[11] Notably, Defendants take seemingly contradictory positions – arguing that the investors were highly sophisticated and knowledgeable on one hand, and yet, on the other, capable of having significant misunderstandings about the nature of the deal without any misrepresentations by Defendants. (*See* Supp. Mem. at 49, 61-62.)

2004-5 did not acquire any holding interest in any US Airways aircraft, including N427US. (Trial Tr. 3941:10-16.) Prime 2004-5's lack of ownership interest contradicted what Mr. Hollnagel told investor Strokirk during a telephone conversation in which Mr. Hollnagel encouraged Mr. Strokirk to invest in Prime 2004-5. During that call, Mr. Hollnagel indicated that Mr. Strokrik would hold a direct interest in the aircraft. (Trial Tr. 1569-71.) Moreover, Defendants concede that when BCI sold N427US, the aircraft allegedly associated with Prime 2004-5, they did not inform all of the Prime 2004-5 investors of the sale and did not provide those investors with the 10% investment "bump" to which the sale entitled them. (Supp. Mem. at 56.)

Similarly, in or around late summer 2004, Defendants raised money for Prime 2004-6. (Resp. at 25.) Investor Strokirk, for example, received an invitation to participate with BCI in the acquisition of a Boeing 737 aircraft on lease to US Airways. (Trial Tr. 1593:3-13, 1595:21-1596:25; Gx Storkirk 6.) The investment summary Defendants gave to Mr. Strokirk stated that, should they not conclude the transaction on or before the end of September, Defendants would immediately return the investments to investors by November 15, 2004, along with documentation terminating the offering. (Trial Tr. 1602:19-25; Gx Strokirk Gx 7 at ST-BCI000141.) Defendants did not close on the aircraft by September 30, 2004, yet did not inform investors of that fact or return their funds. (Trial Tr. 1603:6-15.) Rather, on or about December 10, 2004, Defendants caused BCI 2004-6, LLC, an entity separate and distinct from Prime 2004-6, to acquire an interest in an aircraft on lease to US Airways, bearing tail number N433US. (Gx Itochu 1; Gx Chart Prime 2004-6.) As a result, the Prime 2004-6 investors did not acquire any interest in N422US, or any other aircraft. (*See, e.g.,* Gx DM2.)

In December 28, 2004, Defendants sold the N433US and N427US aircrafts, to the joint venture between AAR and Goldman Sachs. (Gx 2004-5 Summary Chart 1; 2004-6 Summary Chart 1.) Mr. Strokirk testified that Defendants never told him that BCI did not purchase any US Airways aircraft – allegedly tied to Prime 2004-6 – until December 2004, or that they sold it shortly thereafter. (Trial Tr. 1603:6-15.) Defendants, nonetheless, issued distributions to Mr. Strokirk prior to December 2004, both on his investments in Prime 2004-5 and Prime 2004-6, even though Prime 2004-5 and Prime 2004-6 did not own any interest in any lease payments from any aircrafts from which such distributions could stem. (Trial Tr. 1603-1604.) As a result, the Prime 2004-6 and Prime 2004-5 investors were not invested in any entity that had a legal interest in any aircraft. Defendants, however, sent a letter to the Prime 2004-5 and Prime 2004-6 investors, including Mr. Strokirk, in April 25, 2005 representing that Defendants had invested their money in a different aircraft which created their monthly distributions. (Gx Strokirk 13.)

Notably, Defendants' practice of issuing distributions from un-affiliated funds, rather than providing investors with a distribution from the lease of an aircraft as agreed, was potentially problematic based on Defendants' cashflow. Specifically, Defendants received a maximum of approximately $40,000 per month for thirteen US Airways planes, which included the two aircraft allegedly associated with Prime 2004-5 and 2004-6, under the Beal Bank loan. (Gx Stipulation Facts ¶ 3; Gx 2004-05(07).) The evidence showed, however, that BCI paid out more than $100,000 per month in distributions to Prime A-K, HJ USA 2004 and HJ USA 2005, Prime 2004-5, and Prime 2004-5. (Gx US Air 1.) Indeed, Mr. Hollnagel previously testified on July 18, 2007 in connection with an investigation and a lawsuit brought by the Securities and Exchange Commission that he did not believe the cash flow from the US Airways aircraft was

large enough to cover the distributions to just Prime 2004-5 and Prime 2004-6. (Trial Tr. 6563:10-11.) Additionally, the jury heard testimony from Deloitte auditor Nicole Bilicki that BCI did not have enough cash to pay off all of the investors who had invested in the various BCI LLCs. (Trial Tr. 6208:4-16.) Although Defendants argue that Ms. Bilicki was not in a position to opine on BCI's ability to pay its obligations to investors, the jury may have credited her testimony to the extent that she, as an auditor, reviewed BCI's finances. (Supp. Mem. at 88.) The jury, therefore, rationally could have concluded that Defendants intentionally paid investors with their own money or the money of other investors, rather than distributions or income associated with any beneficial interest in any aircraft – despite representations to the contrary – and that Defendants put investors' funds at risk because they had insufficient cash on hand.

At trial, Defendants argued that the terms of the investment agreements provided Defendants with powers and flexibility as manager, and justified Defendants actions under these powers. The jury, however, rejected this argument and found that Defendants acted fraudulently. Defendants specifically pointed to certain "salient" terms in the investment documents, such as provisions giving BCI the right to substitute for initially targeted Aircraft other Aircraft that it deemed in the LLC's best interest. (Gx Czajka 19 at GJD3-BCI000124.) The documents defined "Aircraft" not as the physical airplane itself, but as "certain limited rights to an obligations arising from certain cash distributions and residual asset values acquired by the Company in certain or substituted aircraft . . ." (*Id*. at 134.) Even though the agreements did not entitle Prime 2004-6 and Prime 2004-5 investors to interest in the metal of an aircraft, the jury may have reasonably concluded that the agreements did entitle them to "certain rights" which included the purchase of some aircraft, even if a substitute aircraft, which they owned. The jury

also could have reasonably concluded that the representations that Defendants made outside of the agreement – such as during conversations or in the initial investment invitation – indicated that investors were participating in the acquisition of actual aircraft. Rather, Defendants purchased aircraft in which its own limited liability companies held the ownership interest – not Prime 2004-6 or Prime 2004-5. Indeed, T.D. Butzbaugh, BCI's general counsel, testified that Prime 2004-6 and Prime 2004-5 "didn't own anything." (Trial Tr. 3941:14-16, 3963:18-21.) Dean Matt, a former BCI employee, informed investor Czajka that "there was no collateral at all in the US Air transaction." (Trial Tr. 1198:22-1199:11.)

Defendants argue that "there was no evidence that Defendants intended anything other than for the Prime 2004-5 and 2004-6 investors to receive the same economic benefits they had enjoyed prior to the sale of the original aircraft." (Supp. Mem. at 58.) The evidence, however, showed that Defendants purchased the aircraft with limited liability companies other than Prime 2004-5 and 2004-6 and therefore did not secure the Prime 2004-5 and 2004-6 investor's investments with ownership interests. Defendants argued at trial that they merely "substituted" the aircraft, purchased by BCI LLC's rather than Prime 2004-5 and 2004-6, in accordance with the Prime 2004-5 and 2004-6 agreements, yet they offered no evidence of this substitution. Additionally, the evidence showed that Defendants did not communicate this purported substitution to investors, either at all or until months later. Although Defendants downplay this lack of communication, stating that "without question . . . BCI's communication with the Prime 2004-5 and 2004-6 investors should have been better," the jury may have interpreted this lack of communication as concealment.

Indeed, Defendants argue that the numerous "lapses" regarding financing, accounting, or paperwork evidence a "young company with an inexperienced leader, who often let problems fester to the point where they became far more difficult to solve." (Supp. Mem. at 59.) The jury, however, did not need to accept this innocuous interpretation of the evidence, and rationally could have concluded that Defendants intended to defraud investors by utilizing their funds to buy aircraft that BCI LLC's owned, particularly because Defendants did not communicate its actions to investors. Furthermore, the evidence established that this information was material to investors who selected this particular investment rather than investing elsewhere. Notably, Mr. Strokirk testified that having an ownership interest in the aircraft was important to him because it meant that he had a security for his investment. (Trial Tr. 1551:18-1552:6.)

Furthermore, there was sufficient evidence that Mr. Hollnagel falsely informed Prime 2004-5 and 2004-6 investors that Defendants had reinvested their capital into another aircraft. Specifically, Mr. Hollnagel sent letters to the Prime 2004-5 investors stating that Defendants had reinvested their capital in "another identical aircraft, a 1989 Boeing 737-400, also on lease to US Airways, bearing registration mark N423US." (Gx Strokirk 16 at 2.) In its agreement with Beal Bank, however, BCI agreed that it could not sell any of its interests in such aircraft N423US without proving notice to Beal Bank. (Gx Stipulation Facts.) Mr. Hollnagel even previously testified, before the SEC, that Beal Bank loan documents contained specific prohibitions that BCI could not give outside investors an interest in these aircraft. (Trial Tr. 6576:15-20.) The evidence at trial, therefore, supported a finding that Defendants made multiple false representations to the Prime 2004-5 and 2004-6 investors.

### c.     KLM Transaction - BCI Investment 2002-1

In 2002, Defendants began raising funds to purchase aircraft for BCI Investment 2002-1, LLC. As part of this campaign, Mr. Hollnagel met with investor Strokirk. (Trial Tr. 1540:17-1541:15.) Mr. Hollnagel represented to Mr. Strokirk that Defendants would pay distributions to investors from the net lease payments from four aircraft on lease to KLM aircraft (the "KLM Planes"). (Trial Tr. 1554:6-14.) Mr. Hollnagel also told Mr. Strokirk that investors in BCI Investment 2002-1 would have an ownership interest in the entity that owned the KLM Planes. (Trial Tr. 1550:5-1552:6; Gx Strokirk KLM 5.)

BCI used the membership interest in the BCI Investment 2002-1 to obtain a loan from Bridgeview Bank for $2.85 million. (Gx KLM Loan 2.) Defendants placed the loan proceeds into a non-commingled bank account at Bridgeview Bank. (Gx KLM Refi 1.) Defendants then used the loan proceeds to, among other things, invest $3,075,000 in Jet Global to benefit BCI. (Gx KLM Refi 1.) None of the proceeds went to any KLM investor. Defendants also did not inform any of the investors that they pledged 100% of the membership interest in the BCI Investment 2002-1 LLC as collateral for a loan that singularly benefitted BCI. Specifically, Mr. Strokirk testified that Defendants never informed him that they had pledged 100% of the membership interest. He further testified that he would have wanted to know this fact. (Trial Tr. 1554:15-1556:6.) Additionally, Mr. Strokirk testified that he would have sued Defendants to get his money back, had he have known, and that he would not have continued to invest in BCI's investment LLCs. (Trial Tr. 1555:21-1556-6.) Similarly, investor Czajka testified that he would have wanted to know that BCI had further encumbered the KLM aircraft because the Bridgeview Bank loan would have had an impact on the residual value to which he and the other investors

were entitled.  (Trial Tr. 1246:10-1247:18.)

Defendants contend that they did not compromise the investors' interests because (1) the KLM aircraft eventually were "under water," so they did not have any residual value; and (2) even if they had sold the aircraft with a residual value, the KLM lease income served as the main collateral for the Bridgeview Bank loan, and the loan was scheduled to be (and was) paid off before the KLM leases expired.  (Supp. Mem. at 63 (citing Trial Tr. 2358:5-8, 2360:22-2361:21).)  These arguments, however, require speculation as to what might or might not have happened with the loans, and rely on the unforeseen circumstance that the KLM aircraft lost value.  Defendants did not know these circumstances when they invited investors to invest.  The investors likely anticipated, or at least hoped for, a sale of an aircraft where they would receive any residual value, rather than having rights to an encumbered asset.  Defendants' reliance once again on the success of the alleged scheme and the actual loss to investors is, as discussed above, misplaced.  Furthermore, although, as Defendants note, "[i]t is not a crime to fail to tell an investor something he might have 'wanted to know' in the absence of a duty to do so," it is a crime to commit a "wilful act . . . with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another."  (Supp. Mem. at 64); *Sheneman,* 682 F.3d at 629.  There was sufficient evidence at trial for the jury to conclude that Defendants deceived or cheated the investors regarding the KLM transaction for their own financial gain.

### d.    The Thirteen Aircraft Transaction

In 2004 and 2005, Defendants raised funds from three separate investor groups – BCI Prime Investment 2004-A-K, LLC ("Prime A-K"),  HJ USA 2004, LLC ("HJ 2004"), and HJ

USA 2005, LLC ("HJ 2005") – for the purchase of thirteen aircraft on lease to US Airways.

In the Prime A-K offering materials, Defendants identified eleven aircraft which Defendants would acquire: N404US, N405US, N417US, N418US, N421US, N422US, N423US, N424US, N529AU, N530AU, and N531AU (collectively, the "US Airways 11"). (Gx A-K 2 at USDOJ06447.) According to the offering materials, Defendants would pay investors distributions based on the difference between the lease payment and the debt payment, on the first day of the month, "consistent with the limited liability company's receipt of rents from US Airways." (Gx A-K 2 at USDOJ064396.) Additionally, the materials stated that Defendants would terminate the offering and return investors' money if they did not acquire the aircraft by February 28, 2005. (Gx A-K 2 at USDOJ064397.) Much like the transactions discussed above, Defendants did not acquire the aircraft by February 28, 2005, and yet they did not return the investors' money. In fact, Prime A-K never acquired a direct interest in any aircraft or entity that had a beneficial interest in any aircraft. (DM 2 at DT-DM-0016.) Defendants, however, paid distributions to the Prime A-K investors as if their investment vehicle was actually producing income. (Trial Tr. 898:20-24.) As discussed above with the KLM, SAS, and Prime transactions, this evidence, when viewed in the light most favorable to the government, the evidence supported a conclusion that Defendants were not paying investors distributions from the free cash flow of any aircraft in which they held an interest. Rather, Defendants were either repaying investors with the investors' own money or with the money invested by others, in similar fraudulent deals, who then received distributions based on the money of other investors

The government also introduced sufficient evidence that Defendants knew that Prime A-K did not exist and did not have any assets capable of producing distributions. Mr. Butzbaugh,

BCI's general counsel, drafted a memorandum to Mr. Hollnagel on August 24, 2005 stating that the Blake and Erma Chanslor Trusts had signed documents to invest in Prime A-K, but instead Defendants placed their funds into Prime 2004-6. (Gx. DM 2 at DT-DM-0016.) That memorandum further stated that Defendants never formed Prime A-K and it that did not exist. (*Id*.) Mr. Hollnagel received this memorandum and discussed it with BCI employee John Vandermeulen in November or December 2005. (Trial Tr. 4093:12-18, 4094:11-4095:13.) Notably, Mr. Hollnagel specifically discussed with Mr. Vandermeulen the fact that Prime A-K did not exist. (Trial Tr. 4094:18-4095:2.)

Additionally, while raising funds for Prime A-K, Defendants simultaneously raised funds from Hyatt Johnson Capital for the same eleven aircraft on lease to US Airways – the US Airways 11. Jay Johnson testified that, at Mr. Hollnagel's invitation, he began raising funds for HJ US 2004 for the purchase of the US Airways 11 in or around the fall of 2004. (Trial Tr. 2615:4-13.) Defendants did not inform Mr. Johnson that they were also raising funds for Prime A-K to purchase the same US Airways 11. (Trial Tr. 2643:6-2646:12.) To the contrary, Mr. Hollnagel misled Mr. Johnson, telling him that if Hyatt Johnson Capital invested $900,000 in the transaction that BCI and Hyatt Johnson would be the only investors in the purchase of the US Airways 11. (Trial Tr. 2621:5-12.) Specifically, Mr. Johnson testified that Defendants conveyed that information to him both verbally and in writing. (Trial Tr. 2621:13-14.) The jury rationally could have concluded that this misrepresentation was material because both Mr. Johnson and Frank Meyer, an investor, testified that the deal was attractive, in part, because the deal was exclusively between BCI and Hyatt Johnson Capital. (Trial. Tr. 2646:5-12; Supp. Mem. at 59.) Indeed, HJ USA 2004 raised $1,175,00 from investors for the US Airways 11 deal. (Trial Tr.

2639:6-12.)   As with the deals previously discussed, Mr. Hollnagel informed Mr. Johnson that the distributions to investors would come from the free cash flow – the difference between the lease payments from US Airways and the debt payment to the bank.  (Trial Tr. 2646:18-20.)

Mr. Hollnagel made further misrepresentations to Mr. Johnson during a conversation in an airport terminal in Baltimore, Maryland in approximately 2005.  (Trial Tr. 2665:3-21.) Specifically, Mr. Hollnagel told Mr. Johnson that Defendants wanted to hold onto the US Airways 11 rather than selling off three or four planes, as the market for aircraft continued to appreciate.  (Trial Tr. 2666:1-18.)  Mr. Hollnagel, however, knew that Defendants had sold the US Airways 11 to Prime A-K investors as well.  Indeed, Defendants acknowledge that Mr. Johnson's testimony supported a finding that Defendants fraudulently represented that the US Airways 11 was "exclusive."  (Supp. Mem. at 70, n. 32.)  They attempt to undermine this testimony, however, by attacking Mr. Johnson's credibility.  Specifically, they note that Mr. Johnson's grand jury testimony referenced conversations between himself and Mr. Hyatt, not Mr. Hollnagel, yet at trial, Mr. Johnson testified regarding conversations with Mr. Hollnagel. (*Id*.)  The Court, however, will not re-weigh evidence or second guess the jury's credibility determinations.  *U.S. v. White*, 698 F.3d 1005, 1013 (7th Cir. 2012).

### e.      Hyatt Johnson Continental 2005, LLC[12]

The government adduced sufficient evidence at trial to support its theory that Defendants made misrepresentations to the Hyatt Johnson investors that they would receive proceeds from the refinancing of the three Continental Planes.  Neither the Hyatt Johnson Continental 2005

---

[12] Defendants argue that the evidence relating to a spare engine did not support a conclusion that Defendants defrauded investors.  (Supp. Mem. at 71.)  The government, however, does not address these arguments or this evidence in its brief.  The Court, therefore, does not address those arguments here.

fund nor investors received any of the proceeds from BCI's refinancing of the Continental Planes on or about July 21, 2006. (Gx. Conti Refi 01; Gx Conti Refi 02; Conti Refi 03; DM 62; DM 63.) Mr. Hollnagel, however, had made specific representations to Mr. Johnson and Mr. Meyers, a Hyatt Johnson investor, that the Hyatt Johnson investors would receive proceeds from the planned refinance of the Continental Planes. Specifically, Mr. Hollnagel represented to Mr. Johnson that BCI planned to refinance the planes after it obtained new leases and would distribute the equity from the refinance to the investors. (Trial Tr. 2696:15-2697:25.) After hearing these representations, Mr. Johnson raised $4,801,020 for Hyatt Johnson Continental 2005, LLC to invest with BCI in the three Continental Planes. (Trial Tr. 2691:19-20, Gx Johnson 38.) Mr. Hollnagel made a similar misrepresentation to investor Meyer, telling him that BCI planned to refinance the Continental Planes and anticipated that the refinance would generate a significant amount of cash. (Trial Tr. 2709:18-2710:6.) Defendants received approximately $6.9 million in refinance proceeds, which they deposited into BCI's Bridgeview Bank account rather than distributing to investors – contrary to the representations they had made to Mr. Johnson and Mr. Meyer. (Gx Cont Refi01; Gx Cont Refi02; Gx Cont Refi03; Trial Tr. 6803:12-18.) According to Defendants, they merely "exercise[d] their discretion not to distribute the refinance proceeds to investors." (Supp. Mem. at 74.)

Defendants attempt to justify these misrepresentations by again claiming that BCI, as manager, had the authority to distribute these proceeds as it saw fit. (Supp. Mem. at 72.) This argument, however, does not undercut the reasonableness of a jury finding that Mr. Hollnagel misrepresented how BCI, as manager, would distribute those proceeds. It is true that the investment agreement does not specifically require BCI to distribute the proceeds to the Hyatt

Johnson investors.  As discussed above, however, those investors relied upon the oral representations that Mr. Hollnagel himself made.  Indeed, Defendants ignore the statements Mr. Hollnagel made and focus entirely on the language of the agreement, arguing that Mr. Johnson gave "illogical" testimony that he expected BCI to refinance the Continental Planes and then distribute the proceeds to the Hyatt Johnson investors.  (Supp. Mem. at 74.)  It is not "illogical," however, for an investor to believe and rely upon the representations that the owner, president, and chief executive officer makes regarding how the company will use the discretion allocated to it in the investment documents.

### 3.     BCI's Business Practices Support a Finding of Fraudulent Intent

Dean Matt testified that, at least as of Spring of 2006, Mr. Hollnagel knew that: (1) certain investment LLCs did not have an interest in any aircraft because either BCI never purchased an aircraft for that LLC or BCI sold the aircraft and failed to replace it (Trial Tr. 4610-13); (2) BCI had oversubscribed certain transactions, meaning it raised more equity than it had offered to investors (Trial Tr. 4610-13); and (3) BCI had treated distributions as "loans" from BCI rather than paying investors from net lease payments as promised (Trial Tr. 461-44).  Mr. Matt also testified that, despite knowing these practices, including that certain LLCs lacked associated aircraft, Mr. Hollnagel and Mr. Papayanis refused to move investors from LLCs lacking aircraft to BCI's wholly-owned, profitable Air France deals.  (Trial Tr. 4642:8-12; Gx SAS Chart 1.)  Although, as Defendants note, moving investors from one deal to another  "was an entirely voluntary process," the jury may have inferred a fraudulent intent on the part of Defendants who, at a minimum, chose not to make such a voluntary move which would have given investors an interest more akin to that previously promised to them.  (Reply at 32.)

Additionally, Defendants do not dispute that BCI oversubscribed numerous deals, but instead attempt to argue that no fraud existed because all the investors received their appropriate monthly preferred return. (Supp. Mem. at 81.) As discussed numerous times above, the fact that no investor actually lost money is not determinative. Additionally, the fact that most of the transactions at issue did not result in a calculation of the investor's economic benefit (*i.e.* the 50/50 share of residual between investors and BCI) also does not save Defendants. (Supp. Mem. at 81.) Such evidence simply means that the investors *fortunately* did not lose money to which they may have been entitled. Indeed, even though only two transactions resulted in the calculation of investor benefits and investors in those transactions received the funds to which the transaction entitled them, the jury may reasonably have inferred that Defendants intentionally oversubscribed these investments since they did it repeatedly and misrepresented the level of subscription to investors.

### 4.     Defendants Did Not Establish Good Faith

The Court instructed the jury that, if a defendant acted in good faith, then he lacked the intent to defraud required to prove wire fraud. (Jury Instruc. at 31; Trial Tr. 7979:16-18.) Specifically, the Court instructed the jury that "[a] defendant acted in good faith if, at the time, he honestly believed the truthfulness or validity of what the government had charged as being materially false and fraudulent pretenses, representations, promises and material omissions. (*Id*; Trial Tr: 7979:18-22.) To establish good faith, Defendants rely heavily upon testimony indicating that at some point Mr. Hollnagel attempted to rectify some of the BCI's "sins of the past." (Supp. Mem. at 90.) Good faith, however, does not involve post-offense attempts to right already committed wrongs. Rather, good faith looks to a defendant's belief at "the time" at

which the defendant made the fraudulent misrepresentations. (*See, e.g.,* Jury Instruc. at 31;) *see also U.S. v. Lillie,* 669 F. Supp. 2d 903, 907 (N.D. Ill. 2009) ("It is well-established that if a person obtains money through fraud, his intent to return the money or otherwise make the victim whole is not a defense, and has no bearing on whether he acted with intent to defraud." (citing *U.S. v. Radziszewski*, 474 F.3d 480, 485 (7th Cir. 2007)). Moreover, as discussed above, although Defendants did take some steps to correct some issues, such as accounting issues, Defendants did not rectify all of the alleged misrepresentations they made to investors regarding what ownership interest they would have in aircraft or from where their distributions came. Furthermore, the Court cannot re-weigh this evidence presented to the jury.

Defendants also point to emails from Mr. Hollnagel discussing the possibility of putting investment documents on the internet for investors to access or proposing certain equity allocations. (Supp. Mem. at 91.) There is no evidence, however, that Mr. Hollnagel actually followed through with these proposals. The jury decided what weight to give these few, potentially ambiguous emails in light of the other evidence and Mr. Hollnagel's other actions. Indeed, the jury could rationally have concluded that Mr. Hollnagel's actions spoke louder than these few words.

Defendants also again misguidedly argue that "the fact that the government abandoned efforts to prove actual investor losses or bank losses speaks profoundly to Mr. Hollnagel's good faith." (Supp. Mem. at 92.) As noted many times in this opinion, the government did not need to prove actual losses to prevail. Indeed, the jury, presumed to have followed the Court's instructions, convicted Mr. Hollnagel by concluding that he had the intent to defraud, not that he actually defrauded any investor or bank. Viewing the evidence in the light most favorable to the

government, there was more than sufficient evidence to support this finding.

## III.     The Evidence Supported Conviction of Defendants Hollnagel and BCI on Counts Five and Six

In 2007, in connection with a complaint filed by the SEC in the Northern District of Illinois, Judge Bucklo ordered BCI to provide an immediate accounting of the LLCs in which investor Strokirk continued to hold equity.  (Gx Stipulation Facts ¶ 2.)  In accordance with this court order, BCI submitted accountings to the SEC via email.  (*Id*.; Gx Accountings 1; Gx Accountings 2.)  These accountings specifically related to Prime 2004-5 and Prime 2004-6.  (*Id*; Trial Tr. at 6621.)  Counts Five and Six of the Renumbered Indictment charged the transmission of those accountings as wires in furtherance of the fraudulent financing scheme articulated in Count Two.  In addition to the arguments addressed in Section II regarding Counts Five and Six, Defendants argue that the evidence did not support the conclusion that Mr. Hollnagel knew that the accountings contained false information or that Defendants transmitted these accountings to carry out the scheme to defraud.

As detailed below in Section IV, the government identified eight false statements contained in the accountings submitted to the SEC.  (Resp. at 44-45.)  The relevant inquiry here, however, is whether Defendants wired the accountings in furtherance of the scheme to defraud, not whether the accountings themselves contained misrepresentations.  *See Sheneman*, 682 F.3d at 629-30.   Indeed, the Court instructed the jury that "an item communicated interstate need not itself contain a fraudulent representation or promise or request for money, it must carry out or attempt to carry out the scheme."  (Jury Instruc. at 28; Trial Tr. 7978:11-14.)  The issue, therefore, is whether the evidence at trial sufficiently supported the jury's verdict that the accountings furthered the scheme to defraud or were incidental to an essential part of the

scheme.  (Jury Instruc. at 28; Trial Tr. 7977:22-24.)  Viewing the evidence in the light most favorable to the government, the evidence supported conviction on Counts Five and Six.

### A.  Legal Standard for Determining Whether Wiring Carried Out the Scheme or Was Incidental to an Essential Part of the Scheme

Defendants attempt to raise the evidentiary bar arguing that, because Judge Bucklo "compelled" the accountings, the government needed to prove that the wiring of the accountings was "important to the successful execution of the fraud" because Judge Bucklo ordered BCI to create the accountings and disseminate them to the SEC.  (Supp. Mem. at 98 (citing *Parr v. U.S.*, 363 U.S. 370, 80 S. Ct. 1171, 4 L. Ed. 2d 1277 (1960); *U.S. v. Green*, 786 F.2d 247, 250 (7th Cir. 1986).)  The standard articulated by more recent cases, and prescribed by the Seventh Circuit Pattern Criminal Jury Instructions, requires only that Defendants used the wires to "carry out" the scheme or that the wires "were incidental to an essential part of the scheme."  *See, e.g., Schmuck v. U.S.*, 489 U.S. 705, 712-24, 109 S. Ct. 1443, 104 L. Ed. 2d 734 (1989) ("To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme."); *Sheneman*, 682 F.3d at 629 ("The use of the wires need not be an essential element of the scheme; it is enough if the use is 'incidental to an essential part of the scheme' or 'a step in the plot.'") (citations omitted).  Indeed, the Supreme Court distinguished *Parr* in *Schmuck*, finding that one of the schemes at issue in *Parr* included the mailing of tax documents, which the defendants "would have [] made regardless of the defendants' fraudulent scheme." *Schmuck*, 489 U.S. at 713, n. 7.  Here, Defendants did transmit the accountings to the SEC pursuant to a court mandate, but that mandate arose as a result of an SEC investigation into some of the conduct at issue in this case.  Unlike the tax forms in *Parr*, therefore, which "were the direct product of the school district's state constitutional duty to levy taxes," the wirings here did

not arise from a pre-existing duty. *Id*. Rather, Defendants' scheme to defraud led to an investigation which resulted in the wiring of these accountings. The fact that Defendants also sent an accounting to investor Strokirk – which he could not confirm was the same accounting given to the SEC as he did not know who created it or why – or that Defendants may have created an accounting for their investors at some point, does not create the same type of legal duty present in *Parr*. (Trial Tr. 1736:18-19, 1751:13-1752:6, 1789:22-1790:4.) This case, therefore, is different than *Parr*. The Court properly instructed the jury that the government needed to prove that the accountings "were used to carry out the scheme, or were incidental to an essential part of the scheme." (Jury Instruc. at 28.) Even if this higher standard applied, the outcome of this motion would not change.

### B. The Evidence Showed That the Wirings Carried Out or Were Incidental to an Essential Part of the Scheme

It is well settled that "mailings which occur after the defendant has obtained the victims' money are in furtherance of the scheme if they facilitate concealment or postpone investigation of the scheme." *U.S. v. Lack*, 129 F.3d 403, 408 (7th Cir. 1997); *see also U.S. v. Lane*, 474 U.S. 438, 453 (1986); *U.S. v. Masten*, 170 F.3d 790, 796 (7th Cir. 1999). The government submitted sufficient evidence that the wiring of the fraudulent accountings to the SEC furthered the fraud because Defendants concealed – or at least attempted to conceal – the scheme. Indeed, as explained further in Section IV, the evidence showed that Defendants submitted the false statements contained in the accountings to Judge Bucklo and the SEC with the purpose of obstructing the SEC's investigation into BCI's fraudulent activities.

Defendants argue that these accountings did not "further" the scheme because the "transactions at issues were years old" and "BCI was no longer raising money from investors."

(Reply at 39.)  These arguments fail to recognize that these accountings could further the scheme by concealing it.  Moreover, when Defendants submitted the accountings to Judge Bucklo and the SEC in September 2007, however, Defendants had not yet repaid investor Strokirk.  (Trial Tr. 1803:1-9; 6556:13-17.)  Indeed, in July 2007, Mr. Hollnagel informed the SEC that Defendants still needed to provide investors, including Mr. Strokirk, with an accounting.  (Trial Tr. 6555:4-23, 6556:15-21.)  The scheme, therefore, was not entirely in the past like Defendants contend.

As discussed below in Section IV, Defendants knew that the accountings contained false statements about Prime 2004-5 and 2004-6.  The evidence showed, for example, that Defendants knew that certain investors – including the Chanslors – had been allocated to Prime 2004-5 and Prime 2004-6 rather than Prime A-K, which did not exist.  As detailed in Section II, Defendants also knew that investors in Prime 2004-5 and Prime 2004-6 had been promised interest in certain aircraft, yet they never obtained any such interest.  Because the accountings related to these issues regarding Prime 2004-5 and Prime 2004-6, the false statements in the accountings assisted Defendants in maintaining an air of legitimacy and concealing their raudulent actions.  *See, e.g., Lane*, 474 U.S. at 453 (finding that mailings satisfied the "in furtherance" requirement because the mailings lulled the victim insurance company into a false sense of security by giving it the impression that defendants' claims were legitimate); *U.S. v. Fernandez,* 282 F.3d 500, 508 (7th Cir. 2002) (finding that notifications that defendants sent to bidders "were not merely ancillary to the execution of the fraud, rather, each of these letters furthered defendants' scheme by falsely portraying to anyone who examined [defendant's] that the bids submitted were legitimate, thereby concealing the true nature of the scheme."); *U.S. v. Masten,* 170 F.3d 790, 796 (7th Cir.

1999) (finding mailings to an investor served to assure him that his money was properly invested, thereby giving "an air of legitimacy to [the defendant's] scheme and thus postpon[ing] investigation of the scheme"); *Ashman*, 979 F.2d at 483 (finding that "concealment-in this case, the appearance of legitimate trading-formed a vital part of the instant defendants' ongoing scheme. The mailing and wiring aided that concealment"). Indeed, in order to avoid detection or rousing suspicion by investors or the SEC – particularly after learning that the SEC was specifically investigating BCI's conduct regarding Prime 2004-5 and 2004-6 as explained in Section IV – Defendants needed to falsify these accountings. *See, e.g., Lack*, 129 F.3d at 409 (finding that a bank's mailing of monthly account statements to defendant furthered fraudulent scheme in part because defendant needed to avoid rousing suspicion with its customers or the bank in order to continue the scheme); *U.S. v. Laurenzana*, 113 F.3d 689, 694-95 (7th Cir. 1997) (finding that voluntary mailings made during ongoing fraudulent check-writing scheme that informed recipients of the checks and the State's Attorneys' office that defendant did not write the checks as they had been stolen was incident to keeping prosecuting authorities away). In other words, the accountings "facilitat[ed] concealment of the scheme," which constitutes "furtherance" of the scheme. *Lane*, 474 U.S. at 453. Here, therefore, the government submitted more than sufficient evidence for a rational juror to conclude that the government proved each of the essential elements beyond a reasonable doubt on Counts Five and Six.

## IV.     The Evidence Supported a Verdict of Guilty for Defendants on Count Seven

Count Seven of the Renumbered Indictment charged Defendants with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), based on their submission of the allegedly false accountings – referenced in Counts Five and Six – which Defendants emailed to the SEC in

accordance with Judge Bucklo's order in a civil case filed by the SEC against Defendants alleging various violations of financial securities laws. Specifically, the government charged Defendants with falsely representing (1) the total amount of investor funds invested in Prime 2004-5 and Prime 2004-6, and (2) that a new aircraft had been substituted into the investment in or about June 2005.

Section 1512(c) provides:

Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). The government, therefore, needed to prove that Defendants obstructed an "official proceeding." *See, e.g., U.S. v. Burge*, 711 F.3d 803, 808 (7th Cir. 2013). Here, the alleged "official proceeding" was an SEC investigation of BCI in 2007. The Court instructed the jury that the government needed to prove that Defendants submitted at least one of the accountings for the purpose of obstructing or attempting to obstruct the SEC's investigation. (Jury Instruc. at 37; Trial Tr. 7983:2-7.) The Court also instructed the jury that Defendants must have acted corruptly, meaning "with the purpose of wrongfully impeding the due administration of justice." (Jury Instruc. 37-38; Trial Tr. 7982:18-20.) Following these instructions, the jury convicted Defendants on Count Seven. *See Sorich*, 709 F.3d at 677. Defendants, however, argue that there was not sufficient evidence for the jury to conclude: (1) that the accountings were false; (2) that Mr. Hollnagel, or anyone else acting on behalf of BCI, acted with a corrupt intent; or (3) how the accountings could have obstructed, influenced or impeded the SEC's 2007

investigation.  (Supp. Mem. at 100.)  There was sufficient evidence, however, when viewed in

the light most favorable to the government, that (1) Defendants knew of the SEC's investigation;

(2) Defendants in particular, knew that the SEC was investigating Prime 2004-5 and 2004-6; and

(3) Defendants made false statements in the accountings about Prime 2004-5 and 2004-6.  Such

evidence supports a finding of corrupt intent and a conviction under Count Seven.

### A.     False Statements in the Accountings

According to the government, the accounting for Prime 2004-5 submitted on September

6, 2007 included the following falsities:

- It falsely showed investments by G.B. Chanslor of $1,700,000, which were actually made in Prime 2004-6;

- It falsely showed investments by Smith Trust of $1,000,000, but the Smith Trust actually invested $2,721,367.5;

- It did not show that the investment was oversubscribed.  The equity to be raised per the private investment invitation was $2,403,400, but the actual equity raised was $5,536,367.54; and

- It showed brokers and legal fees of $445,479, which were payments that were actually bribes paid to Brian Olds and Mercury Air Group of $347,500.

(Resp. at 44.)  According to the government, the Prime 2004-6 accounting submitted on

September 6, 2007 was false in the following respects:

- It falsely showed that investments from the G. Chanslor Trust and the E. Chanslor Trust of $1,000,000 each, which were actually to have been made in Prime A-K, which was never formed;

- It omitted an investment by G.B. Chanslor of $1,700,000, which was wrongly shown in the accounting for Prime 2004-5;

- It did not make clear that the investment was oversubscribed.  The equity to be raised per the private investment invitation was $2,500,000, but the actual equity raised was $6,090,000; and

- It showed brokers and legal fees of $109,985, which included payments that were actually bribes paid to Brian Olds and Mercury Air Group of $62,500.

(*Id*. at 44-45.)  Additionally, Defendants provided an amended accounting for Prime 2004-5 on September 17, 2007, which "falsely showed the substitution of an aircraft, tail number N424US." (*Id*. at 45.)

Notably, Defendants do not directly dispute that the accountings contained these false statements, but instead argue that the jury lacked sufficient evidence to determine that Agent Turlington's analysis of the accountings was "right" and Defendants' accountings were "wrong." (Supp. Mem. at 101.)  Defendants further argue that there was no evidence regarding what Judge Bucklo meant when she ordered BCI  "to provide an immediate accounting of the LLCs in which investor John Strokirk continued to hold equity," or how Defendants interpreted her order.  (*Id*. at 101-02.)  Defendants argue that, because of these perceived evidentiary gaps, the government did not establish that the accountings contained false statements.  These arguments are misguided.  First, the Court will not re-weigh Agent Turlington's testimony about the falsity of the accountings or assess the credibility of Agent Turlington.  Second, Defendants arguments do not undermine a finding that the accountings contained false statements but instead relate to whether Defendants acted with corrupt intent – whether they knew the statements were false and were intended to obstruct justice.  As discussed below, there was sufficient evidence of corrupt itnent.

Moreover, there was sufficient evidence that the accountings did contain false statements.  Specifically, as discussed above, the evidence supported a finding that the Chanslors' funds were allocated to Prime 2004-5 and 2004-6 rather than Prime A-K, since Prime A-K did not exist.  (Gx. DM 2 at DT-DM-0016.)  As also discussed above, the evidence showed that Defendants

failed to substitute aircraft into Prime 2004-5 or Prime 2004-6, though indicated in the accountings that they had made substitutions. (*See* II(b)(2)(b) *supra*.) Indeed, Deloitte auditor Nicole Bilicki reviewed the trial balance sheets for Prime 2004-5 and 2004-6 and did not see any documentation of Defendants substituting aircraft into those LLCs. (Trial Tr. 6116:11-18, 6127:1-3.)

The evidence, viewed in the light most favorable to the government, also showed that Defendants knew that these statements were false. As discussed in Section II, Mr. Hollnagel knew that Defendants had never substituted aircraft into Prime 2004-5 or Prime 2004-6. Indeed, BCI's agreement with Beal Bank – of which Mr. Hollnagel was aware – prevented Defendants from making such a substitution without getting authorization from Beal Bank. (Gx Stipulation Facts.) In fact, during his testimony before the SEC, Mr. Hollnagel acknowledged that the agreement with Beal Bank contained specific prohibitions that BCI could not give outside investors an interest in the aircraft allegedly substituted. (Trial Tr. 6576:15-20.)

The jury also could have reasonably concluded that Mr. Hollnagel – a hands-on CEO and chairman – knew that BCI had not invested the Chanslors' or the Smiths' money as indicated in the accountings or substituted any aircraft into Prime 2004-6. As discussed above, Mr. Hollnagel received Mr. Butzbaugh's August 24, 2005 memorandum – that he discussed with Mr. Butzbaugh – which showed that BCI had placed the Chanslors into Prime 2004-6 because Prime A-K did not exist. (Gx. DM 2 at DT-DM-0016.) Additionally, Mr. Hollnagel signed Irma Chanslor's subscription agreement which stated that she was investing in Prime A-K, indicating that he knew her funds belonged in that LLC rather than Prime 2004-6. (GX Chanslor 4.) Indeed, the evidence showed that Mr. Hollnagel was actively involved with BCI's

business and investments.  Mr. Matt testified, for example, that he had a conversation with Mr. Hollnagel that was an "LLC-by-LLC look [ ] to see if any LLC had issues" with oversubscription, airplanes being sold, or investments without any underlying assets.  (Trial Tr. 4610:17-4613:9.)  The jury also may have inferred that Mr. Hollnagel knew where a huge investor like the Smith Family Trust – who invested more than $2.7 million – invested their funds, and therefore, knew that the allocation of the funds in the accounting was false.  (Gx Accountings 01; Tr. 6646:11-20.)

Defendants argue that – despite the evidence just discussed – the evidence did not support a finding that Defendants knew that the accountings were false in part because Mr. Hollnagel instructed Marty Collier, BCI's controller who prepared the accountings, "to get it right."  (Supp. Mem. at 93.)  To support this contention, Defendants cite to an email which Mr. Hollnagel sent to Mr. Collier in which Mr. Hollnagel told Mr. Collier to check all of the information to make sure the accountings were accurate.  (*Id*. (citing GX Accountings 3 at ZS0511-000058).)  The Court, however, will not second guess the weight which the jury gave to this singular email.  The jury reasonably could have credited the other evidence indicating that Mr. Hollnagel knew that the accountings were false, regardless of this directive to Mr. Collier. Indeed, Mr. Hollnagel sent this email to Mr. Collier after he knew the SEC was investigating BCI.  The jury, therefore, may reasonably have concluded that this email was an attempt by Mr. Hollnagel to create a papertrail contrary to his actual actions.  Furthermore, the evidence showed that Mr. Collier was aware of information contrary to that contained in the accountings, despite Mr. Hollnagel's email directing him to ensure accuracy.  Ms. Bilicki testified, for example, that she participated in a meeting in April of 2007 with Mr. Collier and Mr. Papayanis where Mr.

60

Papaynis explained that Prime A-K did not exist and needed to be created and that certain investors, like the Chanslors had been misallocated to Prime 2004-5 or Prime 2004-6 when they should have been in Prime A-K. (*See, e.g.,* Trial Tr. 6169:25-6170:16, 6189 11-20.) Viewing the evidence in the light most favorable to the government, the evidence sufficiently supported the conclusion that Defendants knew that the accountings contained false statements.

### B.    Corrupt Intent

Not only did the evidence show that Defendants knew the accountings contained false statements, it supported the conclusion that Defendants made these false statements with the purpose of impeding the SEC's 2007 investigation. As a threshold matter, the evidence showed that Mr. Hollnagel was aware of the SEC's investigation in the summer of 2007 – before Defendants submitted the accountings to Judge Bucklo and the SEC in September of 2007. First, in June of 2007, Mr. Hollnagel had a telephone call with Mr. Johnson to discuss an investigation by the SEC. (Trial Tr. at 2759.) This call occurred just two days after BCI received a subpoena from the SEC. (Trial Tr. 2759:15-17.) Second, Mr. Hollnagel authored a letter, which Mr. Johnson received, regarding the SEC's investigation. (Trial Tr. 2757:19-2758:1.) Third, in late July of 2007, Mr. Johnson told Mr. Hollnagel that federal agents had contacted investors about BCI. (Trial Tr. 2769:14-2770:16.) Fourth, Mr. Hollnagel testified before the SEC on July 17th and 18th, 2007. (Trial Tr. 6532-6574.) Defendants even concede that they are not arguing "that the government failed to prove that Mr. Hollnagel was aware of the SEC investigation." (Reply at 41.)

More importantly, the evidence showed that Mr. Hollnagel knew that the SEC was interested in Prime 2004-5 and Prime 2004-6 and the substitution of aircrafts related to those

entities.  The SEC specifically questioned Mr. Hollnagel about these issues in July 2007.  (Trial Tr. 6538-43, 6552-71.)  Notably, during Mr. Hollnagel's testimony before the SEC, he repeatedly stated that he believed BCI intended to substitute aircraft into Prime 2004-5 and 2004-6, but he could not state whether such substitutions had occurred – often citing his lack of knowledge of how such a transaction would be "booked" or appear in the accountings.  (*See, e.g.,* Trial Tr. 6552:21-6553:19; 6555:9-16, 6570-71.)  Defendants' false statements in the accountings for Prime 2004-5 and 2004-6, including the amount invested and substitution of aircraft, therefore directly related to what Defendants knew the SEC was investigating.  It was reasonable for the jury to infer that Defendants corruptly submitted false statements regarding precisely the conduct and investments about which the SEC previously had asked Mr. Hollnagel.

Defendants further argue that the "jury could not possible evaluate how the SEC's investigation might have been 'impeded'" because the "SEC did not request the accountings to further some investigative purpose of its own, and there was no evidence of how, if at all, the SEC used or even might have used them."  (Reply at 41.)  This argument fails for three reasons: (1) even though Judge Bucklo compelled Defendants to provide the accountings, Defendants sent the accountings directly to the SEC; (2) the government did not need to prove that the SEC used these accountings or that they actually obstructed their investigation; and (3) the evidence was sufficient for the jury to reasonably conclude that Defendants sent the false statements to the SEC with the purpose of impeding its investigation.

First, whether the SEC requested the accountings or Judge Bucklo ordered them in a separate proceeding – a lawsuit the SEC filed against Mr. Hollnagel and BCI – Defendants knew that the SEC would receive the accountings and in fact sent them directly to the SEC.  (GX

Accountings 1; GX Accountings 2.)  The jury reasonably could have concluded that Defendants included the false statements in the court-ordered accountings because the SEC would receive them.  This conclusion is reasonable because, as discussed above, Defendants knew that the SEC was investigating BCI, and in particular that it was investigating Prime 2004-5 and 2005-6 – the entities for which BCI prepared the accountings.

Second, Defendants' argument that the government "failed to prove how the submission of [the accountings] to the SEC could or did obstruct, impede, or influence the SEC's investigation in any way" is misguided.  (Supp. Mem. at 106; *see also* Reply at 40-41.) Defendants cite no caselaw from the Seventh Circuit to support the proposition that the government needed to prove that the accountings "could or did" obstruct, impede, or influence the SEC's investigation.  Rather, Defendants cite cases from other Circuits, which are not binding on this court, spanning from 1962 to 1990.  (*Id*. at 105-06.)  The applicable law, however, does not require the government to prove that Defendants succeeded in obstructing justice.  *See, e.g., U.S. v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) ("The relevant intention is directed at making the government's job harder in proving its case, not at actually succeeding in that effort."); *U.S. v. Buckley,* 192 F.3d 708, 710 (7th Cir. 1999) ("because the offense is one of attempting rather than of succeeding in obstructing justice, all that is required for a lie to be material is that it could, to some reasonable probability, affect the outcome of the process"); (*see also* Jury Instruc. at 35.)   Rather, the government needed to prove that Defendants had a willful, corrupt *mens rea* with a nexus to the SEC's investigation.  *Id*.  (citing *Arthur Andersen, LLP v. United States,* 544 U.S. 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005)); *U.S. v. Black,* 625 F.3d 386, 389 (7th Cir. 2010) ("the obstruction statute does not require proof of obstruction, as

distinct from intent to obstruct, in order to convict").

Third, there was sufficient evidence for the jury to have concluded that Defendants acted corruptly – with the purpose of impeding the SEC's investigation. As noted above, the false statements which Defendants made in the accountings related to issues which Defendants knew that the SEC's investigation covered, particularly with regard to substitution of an aircraft into Prime 2004-6 and allocation of investors into Prime 2004-5 and 2004-6. A reasonable jury could have concluded that Defendants made these false statements in the accountings – knowing the SEC would receive them and knowing the SEC was investigating Prime 2004-5 and 2004-6 – to mislead the SEC and impede the progress of their investigation into BCI's activities. The evidence, when viewed in the light most favorable to the government, was therefore sufficient to convict Defendants of obstruction of justice. The Court denies Defendants' motion for judgment of acquittal as to Count Seven.

## V.     Motion for a New Trial

To prevail on their motion, Defendants must show that the interests of justice required a new trial. *U.S. v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). Defendants argue that the evidence at trial "described honest mistakes and administrative errors, not fraud." (R. 531, Mot. New Tr. at 1.) Defendants do not offer any new argument to support this motion, but merely incorporated by reference the arguments made in their Supplemental Memorandum in Support of Motion for Judgment of Acquittal. (*Id*. at 1.) Unlike a motion for judgment of acquittal where the Court must view the evidence in the light most favorable to the government, when evaluating a Rule 33 motion for a new trial, the Court's "task is to determine whether the verdict is so contrary to the weight of evidence that a new trial is required in the interests of justice." *U.S. v. Chambers*, 642

F.3d 588, 592 (7th Cir. 2011).  For the reasons discussed above, the government adduced

sufficient evidence at trial of Defendants' intent to defraud AAR and investors, financial

institutions or others, and made material misrepresentations or omissions to justify convictions

on Counts One through Four.  Defendants have not noted any improprieties that occurred during

the trial, hoping instead that the Court will re-weigh the evidence in its favor.  The Court,

however, does not overturn a jury verdict in a criminal case lightly.  *U.S. v. Eberhart*, 388 F.3d

1043, 1048 (7th Cir. 2004).  The Court does not find any evidence indicating that anything

during the trial jeopardized Defendants' substantial rights and does not find that the jury's

verdict is so contrary to the weight of the evidence.  *Id*.  The Court, therefore, denies

Defendants' motion for a new trial.

**CONCLUSION**

Defendants seek to overturn the jury's convictions on Counts One through Seven of the

Renumbered Indictment (Counts One through Six and Twelve of the Second Superseding

Indictment).  The evidence adduced at trial, however, supported convictions on those counts.

The Court, therefore, denies Defendants' motion for judgment of acquittal.  The Court also

denies Defendants' motion for a new trial.

**DATED: July 1, 2013**

        **ENTERED**

        _____

        **AMY J. ST. EVE**

        **United States District Court Judge**