| | | |
|---|---|---|
| UNITES STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 CR 195 -1, 3 |
| BRIAN HOLLNAGEL and | ) | |
| BCI AIRCRAFT LEASING, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On March 14, 2012, a jury convicted Defendants BCI Aircraft Leasing, Inc. ("BCI") and

Brian Hollnagel ("Mr. Hollnagel") (collectively, "Defendants") of wire fraud and obstruction of

justice – Counts One, Two, Three, Four, Five, Six, and Twelve of the Second Superseding

Indictment.  The Second Superseding Indictment included a claim for forfeiture under 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The government and Defendants disagree about how

much money Defendants must forfeit in connection with their convictions.  The Court conducted

a hearing on forfeiture and the appropriate loss amount, which included four witnesses and

numerous exhibits containing thousands of pages.  For the reasons explained below, the Court

concludes that no funds are subject to forfeiture.

## BACKGROUND

Mr. Hollnagel is the owner, president, and chief executive officer of BCI.  Defendants'

convictions stem from loans and investments they obtained in conjunction with BCI's business

of buying, selling, and leasing commercial airplanes.  In addition to obstruction of justice, the

jury convicted Defendants of a scheme to defraud investors, financial institutions, and others. Specifically, as detailed in the Court's Opinion denying Defendant's motion for judgment of acquittal and motion for new trial, incorporated here by reference (R. 595, Op.), the evidence at trial showed that Defendants made misrepresentations to financial institutions and investors to obtain funding for BCI's operations, and failed to invest certain investors' money in the specific limited liability company and/or aircraft purportedly associated with their investment. The deal Defendants offered to investors consisted generally of the following: (1) investors would invest in airplanes via an investment LLC based on the promise that BCI would purchase particular planes on lease to airlines; (2) BCI would pay investors a monthly preferred return; and (3) BCI would pay investors a share of the profits from the sale of the airplanes. (Op. at 31.) The government proved at trial that Defendants defrauded investors by raising funds for investment LLCs where: (1) BCI never purchased the planes, or (2) the investors never held any interest in the planes. (*Id.* at 31-32.) The Court discusses facts regarding each particular investment below as they pertain to the forfeiture calculation.

## ANALYSIS

28 U.S.C. § 2461(c), together with 18 U.S.C. § 981(a)(1)(C), allows for criminal forfeiture under the mail and wire fraud statutes. *See U.S. v. Venturella*, 585 F.3d 1013, 1016 (7th Cir. 2009); *see also U.S. v. Black*, 526 F. Supp. 2d 870, 877-78 (N.D. Ill. 2007) (collecting cases). Pursuant to 18 U.S.C. § 981(a)(1)(C), the government can seek forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to Defendants' wire fraud. Here, the government has alleged that the "interests subject to forfeiture . . . include but are not limited to . . . all proceeds from the in excess of $10 million raised and caused to be raised by defendant BCI from investors." (R. 370, Indict. at 47-48.) Defendants contend,

however, that there is nothing to forfeit because they did not retain any profits from the fraud, in part because Defendants returned each investor's original investment, and made additional monthly distributions to the investors.

## I.     The Applicable Meaning of "Proceeds"

Because Section 981(a)(1)(C) states that property which "constitutes or is derived from proceeds traceable to" the fraud is subject to forfeiture, the Court must apply one of the definitions of "proceeds" contained in Section 981(a)(2). The Court previously addressed this issue in a July 16, 2013 order, after reviewing briefing by the parties, and concluded that the definition of "proceeds" contained in Section 981(a)(2)(B) applies here.

### A.     Section 981(a)(2)(B) Applies

As the Court explained in its previous order, the definition of "proceeds" contained in Section 981(a)(2)(A) ("Provision A") applies to cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes." 18 U.S.C. § 981(a)(2)(A). Provision A "encompasses inherently unlawful activities, such as robbery, that are not captured by the words 'illegal goods' or 'illegal services.'" [1] (R. 597 at 2) (citing *U.S. v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012); *U.S. v. Nacchio*, 573 F.3d 1062, 1088–89 (10th Cir. 2009); *In re 650 Fifth Ave. & Related Prop.*, 777 F. Supp. 2d 529, 550–51 (S.D.N.Y. 2011); *U.S. v. Kalish*, No. 06–cr–656, 2009 WL 130215, at *6–7 (S.D.N.Y. Jan. 13, 2009)); *see also U.S. v. Contorinis*, 692 F.3d 136, 145 n. 3; *U.S. v. Exec. Recycling, Inc.,* — F. Supp. 2d. —, No. 11-cr-003760WJM, 2013 WL 3010821, at *17-18 (D. Colo. Jun. 17, 2013)). By comparison, Section 981(a)(2)(B) ("Provision B") applies to cases "involving lawful goods or lawful services that are sold or provided in an illegal manner." 18 U.S.C. § 981(a)(2)(B). Consequently, the Court previously held that Provision B provides the applicable definition of "proceeds" in this case because

---

[1] The Seventh Circuit has not addressed this issue.

Defendant's fraudulent financing scheme was not an inherently unlawful activity, but rather involved lawful goods or services sold or provided in an illegal manner.[2]  (*Id*. at 3 (citing *Mahaffy*, 693 F.3d at 138 ("the proper measure of forfeiture. . . is net, not gross gain")); *see also Nacchio*, 573 3d. at 1088-89 (requiring the defendant to forfeit the net profits rather than the gross proceeds of his insider trading offenses); *Exec. Recycling*, 2013 WL 3010821 at *18 (applying Provision B because the predicate act – electronics recycling – was not inherently unlawful, rather the defendants conducted their recycling business in an unlawful manner "by misrepresenting to customers where and how their electronic materials would be handled and failing to obtain the required export documentation")).

Because Provision B applies here, "'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods and services."  18 U.S.C. § 981(a)(2)(B).  The government bears the burden of establishing the property subject to forfeiture by a preponderance of the evidence.  *See U.S. v. Funds in the Amount of 574,840*, No. 12-3568, 2013 WL 2507635, at *4 (7th Cir. Jun. 11, 2013) ("The burden of proof is on the government to establish, by a preponderance of the evidence, that the property is subject to forfeiture.") (citing 18 U.S.C. § 983(c)(1)) (*U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005); *U.S. v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508-09 (5th Cir. 2008)); *U.S. v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010); *see also* Seventh Circuit Pattern Crim. Jury Instrs. at 264, 18 U.S.C. §981(a)(1)(C) Forfeiture (stating that the government must prove each element by a preponderance of the evidence).  Provision B, however, requires Defendants to prove any direct costs warranting a reduction of the forfeiture amount.  *See* 18 U.S.C. § 981(a)(2)(B).

---

[2] 18 U.S.C. § 981(a)(2)(C) – rather than Section 981(a)(2)(A) or Section 981(a)(2)(B) – applies to the loan that Defendants obtained from Bridgeview bank, as discussed below in Section II(A).

## B. The Parties' Interpretations of Provision B

The government and Defendants offer wholly divergent theories on how to calculate the proceeds subject to forfeiture pursuant to Provision B. The government contends that the "lawful goods or lawful services" which Defendants "sold or provided in an illegal manner" are the "securities that purportedly offered ownership of LLCs that owned aircraft, when in fact such securities offerings were fraudulent." (R. 601, Amend. Mot. at 3.) Under the government's theory, the only direct costs which the Court should deduct are commissions which BCI paid to Robert Carlsson and others to raise funds from investors. (*Id.* at 4.) As a result, the government claims that Defendants should forfeit "all of the fraudulently-raised investor proceeds of $27,406,368, minus the $1,876,178 in commissions paid to raise the funds, and the assets that can be traced to those proceeds," totaling $76,612,704.[3] (Amend Mot. at 2-3; Gx Net Proceeds.) According to the government, "distributions to investors were not direct costs of fraudulently raising the financing, but instead were sent to lull the investors into falsely believing that they owed a tangible investment that was secure." (Amend. Mot. at 5.)

Defendants argue that BCI has no net profits after paying investors and its costs, and therefore, has nothing to forfeit. (R. 580, Resp. at 15.) According to Defendants, the "security" which constitutes the lawful good or service which Defendants provided was

> an investment that came with a bundle of attributes, including *arguendo* that the LLC owned a direct interest in one or more particular aircraft and that rent payments would support distributions every month, but also including the promise that monthly distributions would be paid, that capital would be returned, that BCI would manage the investments as it saw fit in order to generate those returns, that investors would have no personal liability for financing, maintenance costs and the like, and that BCI could sell or exchange the aircraft if it thought it appropriate to do so.

---

[3] The government's motion for forfeiture seeks $76,612,706, but the exhibit the government presented during the hearing delineating each item subject to forfeiture (Gx Net Proceeds) contained a total of $76,612,704. During the hearing, the government stated that the amounts reflected on Gx Net Proceeds were the relevant figures.

(R. 602, Amend. Resp. at 3.)  Defendants argue that the direct costs of providing these securities include the "costs of operation, financing and disposition of aircraft," as well as the payments BCI made to the investors in the form of monthly distributions or a repurchase of their capital. (*Id.* at 2, 4.)  Defendants' calculus results in direct costs that are greater than the receipts BCI received relating to these investments.  As a result, Defendants argue that there are no proceeds subject to forfeiture.

The Court agrees with Defendants that, pursuant to Provision B, the relevant "proceeds" here are the net profits which Defendants obtained from the investment transactions at issue, which include costs beyond just the commissions related to the acquisition of the investor capital.  Indeed, forfeiture, as a general matter, is a gain-based analysis, which "seeks to disgorge any profits that the offender realized from his illegal activity."  *U.S. v. Webber*, 536 F.3d 584, 603 (7th Cir. 2008); *see also U.S. v. Segal*, 495 F.3d 826, 839 (7th Cir. 2007); *U.S. v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003); *U.S. v. Emerson*, 128 F.3d 557, 567 (7th Cir. 1997).  Further, the text of Provision B defines proceeds in terms of net gain to a defendant by deducting direct costs incurred.  *See* 18 U.S.C. § 981(a)(2)(B); *see also U.S. v. Contorinis*, 692 F.3d 136, 146-47 (2d Cir. 2012).  Provision A, in contrast, defines proceeds as "property of any kind obtained directly or indirectly as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and *is not limited to the net gain or profit realized from the offense*."  18 U.S.C. § 981(a)(2)(A) (emphasis added).  Provision B does not include such language.  *See* 18 U.S.C. § 981(a)(2)(B).  Notably, the Supreme Court has stated that the meaning of proceeds in Provision B is "profits" rather than receipts.  *U.S. v. Santos*, 553 U.S. 507, 512, 128 S. Ct. 2020, 2024 (2008).  The question becomes what amount of profits BCI made from the transactions at issue.

## II.      Applying Provision B to the Transactions at Issue Here

Contrary to the government's contention, because Provision B defines proceeds as profits rather than receipts, it is not appropriate to calculate proceeds here based on a snapshot in time of the moment at which BCI obtained money from investors.  The government's calculation of proceeds, therefore, misguidedly includes only the amount of money that each investor invested with BCI and the costs BCI paid to obtain those investments, namely commissions, rather than considering the entire duration of each transaction, including the amounts repaid to investors. The government's calculation also includes additional assets which it claims can be traced to those proceeds (the "Additions").  (Amend Mot. at 2-3; Gx Net Proceeds.)

To adequately calculate proceeds, the government needed to analyze each investment transaction from – to borrow a phrase from the government – "womb to tomb," which Defendants attempted to do.  Without such a comprehensive analysis, the government's calculation does not capture the entirety of the transactions at issue.  Indeed, the government did not charge Defendants with static conduct.  Rather, the government charged – and proved – a fraudulent financing scheme that included conduct over many years, beginning with misrepresentations that occurred at the time when Defendants obtained funds from investors and continuing as Defendants misled investors every month regarding where their distributions came from and whether the LLCs had acquired certain aircraft.  (*See* Op.)  Consequently, as explained further below, the government's calculation of proceeds for each transaction based on limited snapshots in time is improperly limited.[4]

---

[4] The government's forfeiture calculations were a moving target up and through the forfeiture hearing.  The government submitted its initial motion for forfeiture on January 25, 2013.  (R. 554.)  Defendants responded on April 10, 2013.  (R. 580.)  Based on the Court's ruling that Provision B provides the applicable definition of proceeds here, the Court directed the government to file an amended motion for forfeiture, which it filed on July 26, 2013.  (R. 601.)  The government's amended motion offered some different calculations and figures than the original motion.  Defendants responded to the amended motion on August 2, 2013.  (R. 602.)  In addition, the government presented a chart during the forfeiture hearing – Gx Net Proceeds – which included figures substantially

Although Defendants provided the Court with a purportedly complete "womb to tomb" analysis of the transactions, Defendants contend that the Court need not delve into each line item of their analysis, nor reach the Additions which the government proffers. Specifically, Defendants contend that, if the Court accepts that the distributions to investors and the return of their capital contributions – both of which are not disputed – are direct costs, its analysis can end there because those costs are greater than the receipts – namely the investor contributions – which the government proved.[5] The Court agrees. Defendants have undisputedly returned to each investor all of his or her capital – plus distributions – and, therefore, can deduct as costs more money than the government has proven Defendants obtained as receipts.[6]

The government contends that the Court should not deduct the funds returned to the investors because the return of the investors' contributions was "restitution" by Defendants after they learned of the criminal investigation in March 2007. (Amend. Mot. at 5.) The forfeiture statute at issue, however, does not view this timing as material. Rather, Provision B allows Defendants to deduct any and all direct costs "incurred in providing the goods or services." 18 U.S.C. §981(a)(2)(B). Indeed, as discussed above, Provision B targets the profits that Defendants enjoyed, not net gains or intended losses. Defendants returned the investors'

---

similar to, although not identical to, those in its amended motion. After multiple days of testimony, the Court set a date, a week later, for oral argument. Before arguing, the government attempted to change its analysis and calculations again. Specifically, the government sought to elicit more testimony and to proffer new forfeiture calculations. The Court declined to allow the government to move the target yet again, and instead heard argument on the briefing, testimony, and exhibits previously submitted.

[5] Notably, that there is a dearth of caselaw analyzing and applying Section 981(a)(2)(B)'s definition of proceeds. The Court is hesitant, however, to map caselaw from other definitions of "proceeds" from other statutes onto Section 981(a)(2)(B). The Seventh Circuit, for example, in *Segal*, in dicta, seemed to reject a defendant's argument in a RICO case that the district court should decrease his forfeiture amount because he paid the money back. 495 F.3d at 839. In *Segal*, however, the Seventh Circuit analyzed forfeiture under 18 U.S.C. § 1963, not Section 981(a)(2)(B). In that case, the Seventh Circuit also noted that the defendant had not personally paid back the money at issue, unlike here. As discussed further below, Defendants' repayment of funds to investors is relevant to the Court's forfeiture calculation here based on Section 981(a)(2)(B)'s definition of proceeds and the scope of the transactions at issue.

[6] The government conceded that it does not contest any of Defendants' calculations regarding the amount of distributions paid to investors or the amount of capital returned. (Tran. at 793 ln. 2 – 794 ln. 1.)

investments over time while running BCI. In addition, Defendants returned some of the funds at issue here before they learned on the investigation.

Furthermore, the government's reliance on *U.S. v. Emerson*, 128 F.3d 557 (7th Cir. 1997), to support its contention that Defendants' repayment of investors "was after-the-fact restitution, not a 'direct cost' incurred" is misguided.[7] (Amend. Mot. at 5.) First, these payments to investors were part of the transactions with these investors for purposes of the forfeiture analysis. Indeed, as discussed below, Defendants promised that they would pay the investors distributions and return their capital, and they undisputedly did. Although Defendants did not pay all of the investors *in the manner* in which they promised because the funds did not stem from rental payments on particular aircraft as Defendants had represented, Defendants still incurred the cost of paying the investors as promised. These payments, therefore, constitute a deductible cost of the fraudulent transactions. Second, in *Emerson*, the Seventh Circuit addressed the issue of whether a district court can "reduce the amount of restitution by the value of the forfeited property." 128 F.3d at 566. Here, the government has not sought restitution and has conceded that restitution is not appropriate because Defendants repaid all of the money. *Emerson*, therefore, is inapposite to the forfeiture question here.

Moreover, as explained below regarding each transaction, even if the Court analyzed the transactions further than Defendants contend is needed, namely by considering the Additions the government seeks and other evidence adduced at the hearing, the result would be the same – no funds subject to forfeiture. The Court addresses each transaction in turn.

---

[7] On August 23, 2013 – the day after the Court heard closing arguments on the forfeiture issue – the government, without leave of the Court, filed a supplement to its amended motion for forfeiture. (R. 615.) In this supplement, the government (1) provided additional authority to support its position that Defendants' return of the investors' capital was restitution that "cannot be offset against or deducted from the forfeiture of those funds that had vested in the government at the time of the commission of the fraud"; and (2) submitted yet another new calculation for the amount of proceeds it seeks relating to the SAS transaction. Even if the Court considered this untimely supplemental filing, the outcome would be the same for the reasons addressed in this section and in Section II(C) regarding the SAS transaction.

### A.     BCI 2002-1, LLC - KLM/Bridgeview Bank

The government seeks forfeiture of $7,852,882 related to fraud inflicted upon BCI 2002-1, LLC investors, known as the KLM transaction. (Gx Net Proceeds; Amend. Mot. at 6.) As part of this forfeiture amount, the government seeks both the $2,850,000 of loan proceeds Defendants received from Bridgeview Bank and the $5,645,000 that Defendants raised from BCI 2002-1, LLC investors. (Amend. Mot. at 7.) Specifically, Defendants raised $4,950,000 from BCI 2002-1, LLC investors before BCI obtained the loan from Bridgeview Bank. The evidence at trial showed that BCI pledged the BCI 2002-1, LLC's investors' interests to Bridgeview as collateral to obtain a $2,850,000 loan for BCI's own benefit. Defendants raised an additional $695,000 after obtaining the Bridgeview loan. Contrary to the government's contention, Defendants need not forfeit any of these funds.

### 1.     The Bridgeview Bank Loan Proceeds

As a threshold matter, the government did not include the Bridgeview Bank loan proceeds in its forfeiture allegations in the Second Superseding Indictment. (R. 370 at 47-48.) In the forfeiture count, the government stated that interests subject to forfeiture "include but are not limited to:" (1) payments made and caused to be made by Mr. Hollnagel to defendant Hatamyar; and (2) "all proceeds from the in excess of $10 million raised and caused to be raised by defendant BCI from investors." (*Id.*) The government did not reference Bridgeview Bank specifically, nor any proceeds from any loans generally. It is questionable whether the government's broad "include but are not limited to" language put Defendants on sufficient notice of the government's intent to forfeit the loan proceeds, particularly when the government delineated two other specific types of proceeds not related in any way to banks or loans.

Furthermore, Section 1981(a)(2)(C) directly addresses forfeiture of loan proceeds, stating:

> In cases involving fraud in the process of obtaining a loan or extension of credit, the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim.

18 U.S.C. §981(a)(2)(C). Here, it is undisputed that BCI repaid Bridgeview Bank the entire amount of the loan. (*See, e.g.,* Amend. Mot. at 8.) The government, however, argues that the Court should not deduct this repayment from the forfeiture because the "'the victim' in this case was not the bank but the investors who were defrauded by the defendants who pledged the investors' interests in the LLC as collateral for the loan without ever disclosing that fact or obtaining their permission to do so." (*Id*.) This argument does not establish that these "victims" suffered any financial loss or that the loans were not repaid in full. At most, it is an argument that Defendants misled investors, not that the investor-victims suffered a loss as required by Section 981(a)(2)(C). The Court, therefore, will deduct Defendants' repayment of the full loan amount from Bridgeview Bank, which means the forfeiture regarding the Bridgeview Bank loan proceeds is $0.

### 2. The BCI 2002-1, LLC Investors' Capital Contributions

To support forfeiture of the investor capital contributions from BCI 2002-1, LLC under Provision B, the government offers a different – and yet unavailing – argument from that which it proved at trial. Specifically, the government now argues that Defendants should forfeit the $4,950,000 which Defendants obtained from BCI 2002-1, LLC investors and then pledged to Bridgeview Bank to obtain a loan because Defendants effectively "converted" those investor funds "by using the investors' interests in the LLC as collateral for an undisclosed loan that benefitted only [Defendants]." (Amend. Mot. at 8.) The government, however, offered no such

"conversion" theory previously. Rather, at trial the government proved that Defendants did not disclose to those investors that they had pledged their interest to Bridgeview and may, therefore, have placed the investors at risk if Bridgeview had attempted to collect on the loan or if Defendants had defaulted. Although it was not necessary at trial for the government to prove that Defendants' fraud on the investors resulted in an actual loss to support a conviction for mail fraud, here, Defendants need to establish that Defendants profited from the fraudulently-obtained funds. The government has not met its burden regarding the $4,950,000 invested in BCI 2002-1, LLC, particularly in light of the fact that Defendants undisputedly returned all of the investors' capital.

Additionally, the government further argues that Defendants should forfeit the $695,000 they received from investors after obtaining the Bridgeview loan because "Defendants, among other things, were forbidden from admitting new members to the LLC after the loan was obtained." (Amend. Mot. at 9.) This argument that Defendants violated their agreement with Bridgeview Bank by adding additional members to BCI 2002-1, LLC without Bridgeview Bank's consent reflects a fraud on Bridgeview Bank, not on those new investors. The $695,000, therefore, is also not forfeitable.

**B.      BCI 2003-1, LLC – British Airways Transaction**

The government seeks forfeiture of $1,200,000 relating to BCI 2003-1, LLC, the British Airways transaction. (Gx Net Proceeds; Amend. Mot. at 6.) The fraud perpetrated against these investors was that Defendants never purchased the British Airways aircraft which they informed these investors they would purchase. Instead, it is undisputed that two third-parties paid BCI $599,995 to step into BCI's position in the pending deal with British Airways to purchase these aircraft. (R. 580, Orig. Resp. at 22.) Despite never purchasing these planes, BCI paid the BCI

2003-1, LLC investors monthly distributions totaling $591,498 and eventually repurchased their entire membership interests. (*Id*; Dx Forf 02.)

Defendants do not dispute that they received $1,200,000 in capital contributions for this transaction. (*See* Dx Forf 02.) Rather, Defendants contend that the Court should deduct from Defendants' receipts the $2,074,529 in expenses related to this investment transaction. (*Id*.) Those expenses include the monthly distributions which BCI undisputedly paid to the investors and BCI's return of the investors' capital, which the government does not dispute. (*Id*.; Amend. Resp. at 8.)

As explained by Defendants' witness, Monica Millan,[8] during the forfeiture hearing, Defendants' direct costs calculation includes $283,031 in transaction costs, such as commissions paid to Robert Carlsson and S. Arne Carlsson. (*Id*.; Amend. Resp. at 8.) Ms. Millan provided backup documentation from business records and bank statements to support her contention that Defendants paid these commissions in connection with the British Airways transaction. The government, however, elicited testimony from Ms. Millan that she may have erred by including S. Arne Carlsson's commission payments in these costs, as the documents seem to show that these commissions related to a different British Airways transaction that occurred later in time. (Tran. at 415 lns. 4-11; 416 lns. 13-19.) Specifically, BCI paid S. Arne Carlsson $35,000 on July 5, 2005 even though the British Airways transaction relevant to the BCI 2003-1, LLC investors might have already terminated at that point in time – since BCI had sold its position in that deal – and BCI had another transaction regarding different British Airways planes in the works. (Dx Forf 03.1, Tab 3 at FORF-000001793.) Ms. Millan could not conclusively say that the $35,000

---

[8] Ms. Millan is a lawyer who has worked for many years with BCI and who reviewed BCI's records, bank records, documents produced in the case, and Quickbooks reports that Martin Collier – BCI's Chief Financial Officer – ran at her request.

related to a commission for the British Airways aircraft associated with the BCI 2003-1, LLC investors.

The Court need not resolve whether Ms. Millan erred by including S. Arne Carlsson's commissions in her calculation because utilizing only the undisputed expense calculations – $591,498 of distributions to investors and $1,200,000 of returned investor capital – Defendants' direct expenses for this transaction are greater than the $1,200,000 in investor capital the government seeks.

Notably, Defendants included as an additional receipt the $599,995 payment which they received when they sold their interest in the British Airways deal to the two third-parties. If the Court considered this a receipt, even though the government did not include it in its calculus, the result would be the same. The undisputed expenses as well as the transaction costs, which Ms. Millan explained and documented, offset this amount. (Dx Forf 02.) Defendants, therefore, have met their burden of demonstrating, by a preponderance of the evidence, direct costs to an extent greater than the funds sought by the government. As a result, Defendants have no funds to forfeit regarding the British Airways transaction.

### C.     BCI 2003-2, LLC – SAS

In 2003, BCI invited investors to invest in BCI's acquisition of a 737-400 aircraft on lease to SAS Airlines. (Op. at 32.) Defendants agreed to pay these investors a distribution from the net lease payment from this plane – also called the free cash flow – which represented the difference between the lease payment from SAS Airlines and the debt payment to the lender. (*Id.*) Defendants raised $1,350,000 of investor capital for this investment known as BCI 2003-2, LLC. (Gx Net Proceeds; Dx Forf 3.1.) Defendants paid distributions to these investors as promised, yet they never acquired the SAS aircraft which was supposed to serve as the source for

those distributions.  (*Id.*)  Defendants also, undisputedly, repaid each BCI 2003-2, LLC investor its entire capital contribution in addition to these distributions.

The government seeks forfeiture of $21,197,690[9] related to this investment transaction involving the BCI 2003-2, LLC investors.  (Gx Net Proceeds.)  This amount represents the $1,350,000 of investor capital which Defendants received from BCI 2003-2, LLC investors, less $110,500 in commissions related to the acquisition of those funds as direct costs, plus $19,958,191 of net profits Defendants allegedly derived from the investor capital.  (Gx Net Proceeds; Amend. Mot. at 6.)  Specifically, the government contends that Defendants profited from the BCI 2003-2, LLC investors' funds by using those funds to purchase three aircraft on lease to Air France (the "Three AF Planes") rather than the SAS aircraft as promised.  There was no evidence that BCI substituted one of the Three AF Planes for the SAS plane or that the BCI 2003-2, LLC investors had any interest in any of these Three AF Planes.

The Court disagrees with the government's calculation because (1) the government did not deduct the costs, other than commissions, related to this transaction, such as the distributions to investors, and (2) the government has not proven that Defendants derived the $19,958,191 from the BCI 2003-2, LLC investors' funds.  In sum, Defendants do not have any profits from this transaction.

### 1.    Deducting Direct Costs Results in No Proceeds

The government's profit calculation is not accurate because it does not account for all of the costs associated with the purchase of the Thee AF Planes.  Its calculation, for example, does not include closing costs, attorney's fees, or the purchase price of the planes.  (*See, e.g.,* Tran. at 76 lns. 21-25; 90 ln. 25- 91 ln. 6; 94 ln. 25 – 95 ln. 22.)  Additionally, the government does not include other direct costs related to these planes, such as the undisputed distributions paid to the

---

[9] The government's amended motion for forfeiture seeks one dollar more – $21,197,691.  (Amend Mot. at 6.)

investors and the return of the investors' capital. By comparison, Ms. Millan appropriately accounted for these various costs in her forfeiture calculation.

Ms. Millan testified, for example, that in making her calculations she reviewed source documents, such as settlement agreements and checks, as well as a schedule Mr. Collier created for his testimony as a 30(b)(6) corporate representative in a case brought by the Securities and Exchange Commission. (Dx Forf 3.1; Tran. at 240-245; 257 at 10-22; Dx Forf 3.1, Tab 08 at FORF-000002419-2619.) Based on this review, she determined that Defendants paid the BCI 2003-2, LLC investors $418,042 in distributions,[10] and returned all $1,350,000 of their capital. (*Id*.) Defendants also admitted these source documents, such as the Wells Fargo statements related to each of the Three AF Planes, as exhibits at the hearing. (*See, e.g.,* Dx Forf 3.1 at Tab 2 at FORF-000001996.) The Court has reviewed these documents and they support Ms. Millan's calculations. The government did not offer any documents or evidence to contradict Ms. Millan's cost calculations. Furthermore, during closing arguments, the government stated that it does not contest any of Defendants' calculations regarding distributions paid to the investors or the amount of capital returned. (Tran. at 793 ln. 2 – 794 ln. 1.)

As discussed above, if the Court deducted only the return of the investors' capital, the distributions to investors, and the commissions paid to raise the capital – all of which are undisputed – from the $1,3500,00 that the government has proven was "acquired through the illegal transactions resulting in the forfeiture," a net negative amount remains. Deducting the other costs which Ms. Millan established by a preponderance of the evidence only reduces that number further. As a result, there are no "proceeds" to forfeit pursuant to Provision B.

---

[10] Defendants backed-out of its distribution calculation those distributions given to the HJ A3 2003 investors. (Tran. at 257 ln. 24 – 258 ln. 9.)

### 2. Purported Profits from the Air France Planes

The government also seeks forfeiture of $19,958,190 as property "derived from proceeds traceable to" the fraud on the BCI 2003-2 LLC investors. 18 U.S.C. §981(a)(1)(C). Specifically, in its motion and during the hearing, the government contended that Defendants acquired $46,414,396 in profits by using the BCI 2003-2, LLC investors' funds to purchase for BCI's own benefit the Three AF Planes. (Amend. Mot. at 10-11.) The government argued that Defendants used $1,500,000 of investor funds from the BCI 2003-1 SAS account, along with $2,000,000 of BCI's funds to purchase the Three AF Planes, meaning that investors' funds constituted 43% of the purchase money. (*Id.* at 11.) As a result, the government argued that 43% of the profits from the Three AF Planes – $19,958,190 – derived from the proceeds of Defendants' fraud, and are, therefore, forfeitable. (*Id.*) The evidence, however, does not support this calculation.

First, during closing arguments, the government was "willing to concede" that its calculation of the Air France profits "is probably not supported by the documents that we have seen through the defense at the last hearing." (Tran. at 770 lns. 7-12.) In fact, the government conceded that the Air France profits "number is probably far less" than the approximately $46 million dollar figure it had been utilizing. (*Id.*) The Court agrees because the government's calculation does not adequately represent the complete transaction at issue and the documents did not support it.

Indeed, the government's profit calculation was a mere snapshot in time, ending in December 2010. (Tran. at 82 at 8-10; 94 lns. 4-7.) The government used this particular timeframe in an attempt to recreate calculations consistent with profit numbers referenced by Defendants' counsel during their opening statement at trial, even though such counsel statements do not constitute evidence. (*See, e.g.,* Tran. at 24 ln. 20 – 26 ln. 17; 27 lns. 18-20; 80 lns. 15-17.)

As a result, the government's calculation does not account for the ultimate disposition of the Three AF Planes, including whether they were sold for a profit or a loss. (Tran. 82 ln. 23 – 84 ln. 4; 94 lns. 14-23.)

Furthermore, the Quickbooks reports upon which the government based its calculations did not include all of the relevant data. Significantly, the government was not even sure whether the Quickbook reports recorded data on a cash basis or an accrual basis.[11] (Tran. at 84 ln. 20 – 85 ln. 6.) The chart which the government created from the Quickbooks reports also did not differentiate between principal and interest payments on the loans for the Three AF Planes. In addition, although the chart purportedly represents "profits," it does not deduct any expenses related to the purchase of the planes, as noted above. The government also could not explain whether rental income from the Three AF planes went directly to the bank to pay the loan rather than into Defendants' pocket, even though Defendants financed almost 100% of the planes. (Tran. at 92 ln. 3-13.)

Second, the government failed to demonstrate by a preponderance of the evidence that Defendants utilized the BCI 2003-2, LLC investors' funds to purchase the Three AF Planes because Defendants purchased the Three AF Planes with funds from a comingled account. Indeed, Defendants put the BCI 2003-2, LLC investors' funds into a bank account which included money from other investors. (R. 580-15, Ex. 14; Dx 3235.) Specifically, BCI put money from HJ A3 2003 into the BCI 2003-1 SAS bank account along with the BCI 2003-2, LLC funds.[12] (Id.) There is no evidence that Defendants used BCI 2003-2, LLC investors'

---

[11] One of the differences between an analysis on a cash basis and one done on an accrual basis is that an accrual basis analysis records income or expenses at the time they are accrued rather than the time that the money has gone in or out. (Tran. at 86 lns. 12-23.)

[12] Notably, the name of this fund – BCI 2003-1 SAS – does not match the name of the investor LLC – BCI 2003-2, LLC.

funds – rather than HJ A3 2003 funds – to purchase the Three AF Planes. Notably, the government conceded that it had concluded that BCI used BCI 2003-2 LLC funds for the purchase in part because it was unable to find documentation allocating the HJ A3 2003 funds to the Three AF Planes, or any other plane. (Tran. at 74 lns. 13-22.) As a result, the government failed to engage in a sufficient tracing analysis to prove by a preponderance of the evidence that Defendants utilized the BCI 2003-2, LLC investors' funds to purchase the Three AF Planes, particularly in light of the fact that the account contained sufficient non-tainted funds to cover most if not all of the purchase price of the planes. *See, e.g., Black*, 526 F. Supp. 2d at 889-90. Additionally, it is undisputed that Defendants only raised $1,350,000 of investor capital from BCI 2003-2, LLC investors. There is no evidence explaining why the government seeks to attribute to BCI 2003-2, LLC all $1,500,000 which Defendants removed from the co-mingled BCI 2003-1 SAS account to purchase the Three AF Planes when BCI 2003-2, LLC investors only contributed $1,3500,00 in capital. This evidence does not meet the government's burden.

The government, therefore, has not proven that Defendants have any funds to forfeit from this transaction after deducting the direct costs which Defendants established from the receipts the government proved.[13]

### D. BCI Prime Investment 2004-5, LLC, BCI Prime Investment 2004-5, LLC and the 13 Aircraft Transaction

In 2004, Defendants sought investors for two investments – BCI Prime Investment 2004-5, LLC and BCI Prime Investment 2004-5, LLC (collectively, the "Prime Investments") – related to two aircraft on lease to US Airways. (Op. at 35.) Defendants defrauded the investors in the Prime Investments (the "Prime Investors") by failing to purchase the specific US Airways planes

---

[13] Defendants' calculations actually result in a net profit for Defendants of $3,069,010. (DX Forf 03.1.) The government, however, did not prove any receipts or traceable proceeds beyond the $1,350,000 in investor capital.

as represented. Instead Defendants purchased different aircraft for their own benefit, in which the Prime Investors had no direct interest. (*Id*. at 35-36.) Defendants did not inform the Prime Investors that they had not purchased the aircraft as expected, but nonetheless paid the Prime Investors distributions as if the planes had been purchased. (*Id*. at 37-38.)

The government now seeks $9,772,944 related to the Prime Investments. (Gx Net Proceeds.) The government's amended forfeiture motion sought $10,278,944 because the government did not deduct any commissions as direct costs in connection with these investments. (Amend. Mot. at 12-13.) The government now concedes that Defendants paid $506,000 in commissions.[14] (Gx Net Proceeds.) Defendants also claim as direct costs the commissions paid to Robert Carlsson, Derek Osero, Steven Trabish, Christopher Keller, and Tria Mintz, as well as other expenses and costs related to these investments.[15] (Amend. Resp. at 9.)

### 1. The Prime Investors' and 13 Aircraft Transaction Investors' Capital Contributions

The government's current forfeiture calculation includes $6,586,368 of investor capital – $3,836,368 from Prime 2004-5 investors and $2,750,000 from Prime 2004-6 investors. (Gx Net Proceeds.) These figures differ from the amounts of investor capital proffered in the government's original motion for forfeiture. Specifically, the government has increased this number by $1,821,368. (Compare Mot. at 14 with Amend. Mot. at 12.) The government, however, has not offered any explanation for this change either in its amended motion or during the forfeiture hearing. The government may have re-allocated certain investor funds from the 13 aircraft transaction because, in its amended motion, the government decreased the amount of

---

[14] The parties agree that this amount does not include the money paid to Brian Olds, which was a bribe rather than a commission. (Amend. Mot. at 12; DX Forf 06; DX Forf 07.)

[15] Ms. Millan did not include commissions paid to Mr. Hyatt in her calculation because there was not sufficient documentation showing that they corresponded with this transaction. Instead, she allocated those commissions as direct costs for the 13 aircraft transaction . (Tran. at 298 ln. 19 – 20 ln. 4.)

investor capital for that transaction by almost the same amount which it increased the capital contribution for the Prime Transactions. Specifically, the government decreased the amount which Defendants raised for the 13 aircraft transaction by $1,846,368, from $6,821,368 to $4,975,000. (Compare Mot. at 14 with Amend. Mot. at 13.) This explanation, however, leaves $25,000 unaccounted for.

To further complicate matters, in Defendants' response, they noted that the government re-allocated certain investors' funds in its amended motion, but they did not contest the government's new figures nor respond with new calculations of their own. (Amend. Resp. at 8-9.) Defendants also did not present evidence or argument at the hearing based on these new figures. Instead, Ms. Millan testified that she could not comment on the investor capital contribution figures for the Prime Investments or the 13 aircraft transaction contained in Gx Net Proceeds – which were the same figures contained in the government's amended motion – because she based her calculations on the figures the government proffered in January. (*See, e.g.*, Tran. at 302 ln. 9 – 303 ln. 9.)

It is inconsequential, however, whether the Court utilizes the government's previous figures or current figures because Defendants do not dispute either amount, and the government does not dispute that Defendants paid back every penny to the investors, plus paid out distributions and commissions.[16] The direct costs, therefore, are greater than the proven receipts – namely the amount of investor capital – for the Prime Investments and the 13 aircraft transaction. As a result, the evidence does not show any proceeds subject to forfeiture for the

---

[16] The government elicited some testimony that BCI had not repaid the Hyatt Johnson investors in cash. (Tran. at 167 lns. 12-14.) The evidence showed, however, that BCI repaid the Hyatt Johnson investors via a note and with planes. (*See, e.g.*, Tran. at 319 ln. 16 – 323 ln. 4.) Additionally, during closing argument the government conceded that it was not disputing any of the amounts Defendants distributed to or returned to investors. (Tran. at 793 ln. 2 – 794 ln. 1.)

Prime Transactions and the 13 aircraft transaction because Defendants did not maintain any profits.

### 2. The Government Has Not Proven Any Additions

The government has not argued any Additions related to the 13 aircraft transaction. The government, therefore, has not proven that there are any funds related to the 13 aircraft transaction to forfeit.

In addition, the government has not met its burden of proving the Additions it seeks regarding Prime Investments. Specifically, the government has not established that Defendants enjoyed $3,692,576 in profits from the sale of the two aircraft they purchased for their own benefit with the Prime Investors' funds. (Gx Net Proceeds; Amend. Mot. at 12.) Indeed, the government's "profit" figures are the "upfront profit to BCI" rather than the total profit at the close of the transactions. (*Id*; Tran. at 41 lns. 19-21.) As a result, this "profit" calculation does not include BCI's sale of the aircraft to AAR. (GX 2004-5 Sum Chart 3; GX 2004-6 Sum Chart 3.) The government's calculation also does not account for the 50/50 profit split to which the investors agreed, but rather allocates 100% of the purported profits to BCI. (*Id*; *see, e.g.,* Gx Strokirk 03 at ST-BCI000278; Trial Tran. at 1534 lns. 7-14; 1534 at lns. 1-6.) The government, therefore, has not met its burden of showing any property subject to forfeiture regarding the Prime Investments or the 13 aircraft transaction.

### E. BCI Investment Prime 2004-7, LLC and Hyatt Johnson Continental LLC – Continental Transaction

The government seeks $14,120,280 in connection with the Continental transaction involving BCI Investment Prime 2004-7, LLC ("BCI 2004-7") and Hyatt Johnson Continental LLC ("HJ Continental"). (Gx Net Proceeds; Amend. Mot. at 7, 15.) Specifically, Defendants raised $600,000 from BCI 2004-7 investors and $4,700,000 from HJ Continental investors to

purchase from AAR Corp. three aircraft on lease to Continental Airlines. (Gx Net Proceeds; Op. at 46-48.) Defendants fraudulently represented to the HJ Continental investors that they would receive proceeds from the refinancing of the three Continental planes. (Op. at 46-47.) When Defendants refinanced those planes, however, Defendants kept the $6,949,989 they received from the refinance rather than distribute those funds to the investors. (*Id*; Amend. Mot. at 15.) The government also argues that Defendants represented that the investment included a spare engine worth in excess of $1,000,000, yet sold that engine and kept the $1,239,791 in proceeds for themselves. (Amend. Mot. at 15.) It further contends that Defendants wrongfully retained security deposits of $1,146,644 associated with the three Continental planes. (*Id*.) As a result, the government argues that Defendants should forfeit the $5,300,000 they received from investors, less commissions of $525,000, as well as the $9,345,781 they received from the refinance, engine sale, and the security deposit for a total of $14,120,280. (*Id*.) The Court disagrees.

### 1. The Spare Engine and Security Deposit

As a threshold matter, the evidence at trial did not show that Defendants represented to investors that they had an interest in a spare engine. Indeed, the offering memorandum for this investment defined the LLC and the aircraft as three planes with no engine specifically included. (Dx 3028 at HJE00000313-000006, HJE00000313-000007.) There was no additional evidence presented during the forfeiture hearing to establish such an interest.

There also was no evidence at trial regarding any "security deposit" that netted BCI $1,146,644, and the government did not describe this purported "security deposit" in its amended motion. (Amend. Mot. at 15.) Notably, during the forfeiture hearing, the government referred to these payments as both a security deposit and a settlement payment. (*See, e.g.,* Tran. 32 at 11-

13; Gx Net Proceeds.)  Specifically, the government described the "security deposit or settlement" as "[m]oney returned by Continental as negotiated by Mr. VanDerMeulen" relating to the return conditions of the Continental aircraft.  (Tran. at 46 lns. 11-16.)  The government's witnesses did not expound upon this explanation.  The government also conceded that it determined the amount Defendants received from the "security deposit or settlement" by reviewing working papers – Gx DT 112213 and Gx DT 23754 – from Deloitte & Touche, the accounting firm BCI hired.  (Tran. at 46 ln. 21- 47 ln. 2.)  The government did not know who created the working papers upon which it relied, or what documents the author consulted, and, therefore, could not vouch for their accuracy.  (Tran. at 130 lns. 12-24.)  The government also did not do any work on its own to determine how much of this money BCI received.  (Tran. at 46 lns. 17-19.)  Further, the government did not know whether this payment reflected a security deposit or a settlement.  (Tran. at 130 ln. 21 – 131 ln. 6.)  Furthermore, it is unclear if these funds were in fact a security deposit, how BCI would have treated or used such deposit.  (Tran. at 131 lns. 7-19.)  The government, therefore, has not met its burden of establishing that the money it received by selling the spare engine or from the "security deposit or settlement" is subject to forfeiture.

### 2.      Investor Capital

The government also has not met its burden regarding the investor capital which BCI received from the BCI 2004-7 investors.  The evidence at trial did not show that Defendants made misrepresentations to all of the investors associated with the Continental transaction that they each would receive proceeds from any refinance of the aircraft.  Rather, the evidence showed that Defendants told the HJ Continental investors – not Mr. Furr, Mr. Reinhard, or Mr. Rollar – that they would reap the benefits of the forthcoming refinancing.  (Op. at 46-48.)

Indeed, even the government's amended motion states that Defendants made such misrepresentations to the "Hyatt Johnson Capital investors," without mention of such representations to other investors. (Amend. Mot at 14.) The $600,000 from the non-HJ Continental investors, therefore, is not subject to forfeiture because the government has not sufficiently linked it to Defendants' fraudulent conduct. Indeed, unlike the defendants in *U.S. v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) – cited by the government – the evidence did not show that Defendants "routinely made" the same false promises to each of the investors, thereby allowing the Court to infer that Defendants made the same statements to the non-HJ Continental investors as to the HJ Continental investors. The Court, therefore, cannot presume that Defendants made misrepresentations to the non-HJ Continental investors regarding the refinance.

Furthermore, it is undisputed that Defendants returned all of the investors' capital. Defendants, therefore, do not have any investor proceeds from the BCI 2004-7 investors to forfeit.

### 3. Refinancing Proceeds

The government claims that Defendants should forfeit the proceeds they received from refinancing the leases on the Continental planes because those funds are traceable to Defendants' fraud since Defendants never would have bought the planes – and thus never would have refinanced them – without obtaining the investors' funds in the first place. (Amend. Mot. at 15.) The government, however, cannot trace all $6,949,345 of refinancing proceeds to the HJ Continental investors' contributions because other investors invested in the Continental transaction as well, and, as explained above, the government did not present evidence that Defendants made misrepresentations to the non-HJ Continental investors about receiving any refinancing proceeds.

Furthermore, the government failed to prove by a preponderance of the evidence that Defendants promised the HJ Continental investors *all* of the proceeds from any refinance. Indeed, Mr. Johnson's testimony at trial indicates that Mr. Hollnagel merely represented that Defendants would return the investors' equity once it refinanced the planes – not that Defendants would provide investors with *all* of the proceeds of the refinance as the government contends. (Trial Tr. 2697 lns. 5-18.) The evidence, therefore, does not support the government's contention that Defendants should have given the HJ Continental investors all $6.9 million they received from the refinancing rather than a $4,700,000[17] cut commensurate with their contribution.[18] Furthermore, as noted above, it is undisputed that Defendants ultimately repurchased the HJ Continental investors' equity as part of the 2007 global settlement with Hyatt Johnson Capital, even though they did not immediately repurchase this equity after obtaining the refinancing proceeds. (Amend. Resp. at 38; Dx Forf 04.) As a result, the government has not established that Defendants have any funds related to the Continental transaction subject to forfeiture.

### F.     The 26 Aircraft Transaction

The government seeks $17,585,969 relating to Defendants' misrepresentations about an investment in 26 aircraft on lease to Delta (the "26 Aircraft"). (Gx Net Proceeds; Amend. Mot. at 15-16.) Defendants raised $2,250,000 from investors to purchase the 26 Aircraft – $1,500,000 from Brown Advisory and $750,000 from Hyatt Johnson Capital investors. (*Id.*) The

---

[17] Gx Net Proceeds indicates that HJ Continental contributed $4,700,000, although the government's amended motion stated $4,800,000. This difference is immaterial for the Court's analysis.

[18] The Court also notes that the HJ Continental investors – and other Hyatt Johnson investors – interacted with BCI through Jay Johnson or Jason Hyatt. The evidence at trial and during the hearing indicated that Mr. Hyatt altered documents, such as subscription agreements, which BCI initially authored, before giving them to investors. The Court is skeptical of holding Defendants responsible for any of the transactions which involved Mr. Hyatt's representations to investors given the scope of Mr. Hyatt's criminal activity and the lack of connection between Ms. Hyatt's fraud and Defendants' fraud. *See also United States v. Hyatt*, No. 08 CR 469 at R. 68 (N.D. Ill, J. Kocoras)

government argues that Defendants defrauded these investors by treating their investment as a "debt" investment after telling them that it was an "equity" investment.  According to the government, Defendants also failed to distribute to the investors any profits from the eventual sale of the 26 Aircraft.  The government, therefore, seeks forfeiture of these funds plus an additional $15,335,969 – the purported net profits "after all the costs and expenses" from the sale of the 26 Aircraft.  (Amend. Mot. at 16.)

The government based its "net profits" calculation for the 26 Aircraft on 1) testimony which Mr. Hollnagel gave before the SEC – in 2007 – that BCI had over fifteen million dollars in profits from the sale of a fleet of an unspecified number of Delta aircraft; and 2) an unverified Quickbooks report – Gx QB 10-30-07 – that may include Delta planes other than the 26 Aircraft.  (*See, e.g.,* Tran. at 47 ln. 16 – 48 ln. 22; 48 lns. 3 – 50 ln. 3; 51 ln. 8 – 52 ln. 2.)  The government's reliance on Mr. Hollnagel's testimony is problematic for two reasons.  First, the government did not establish that Mr. Hollnagel's reference to a "fleet" of Delta planes netting $15 million for BCI in 2007 related to the 26 Aircraft rather than to other Delta planes owned by BCI.[19]  Second, Mr. Hollnagel testified in 2007 which was before Defendants disposed of all 26 Aircraft.  (*See, e.g.,* Tran. at 135 lns. 3-21.)  His testimony, therefore, cannot accurately reflect the final profits realized by Defendants.  The government's reliance on the Quickbooks report is also misguided because the government conceded that it did not know – and had not tried to determine – which Delta planes the Quickbooks report included, namely whether it included just the 26 Aircraft or some of the other Delta planes BCI owed.  (Tran. at 50 ln. 25 – 51 ln. 6.)  Ms. Millan testified that this Quickbooks report included costs and expenses for additional planes beyond the 26 Aircraft.  (Tran. at 284 ln. 22 – 285 ln. 3; 287 lns. 9-23; *see also* Dx Forf 05 at Tab 01.)

---

[19] According to both the government's witness and Ms. Millan, BCI owned 30 Delta aircraft.

The government's calculation is also flawed because it is not complete.  Indeed, its calculation reflects the status of the 26 Aircraft transaction only from August 2005 through October 2007.  The government's calculation also did not take into account the sales price of the aircraft or any expenses related to the sale of the aircraft or other transaction costs.  In fact, the government even conceded that its calculation was incomplete.  Specifically, the government's witness testified that to obtain a "net profits" figure, one would need to account for the sales price of the aircraft and any expenses related to the sale or the aircraft otherwise.  (Tran. at 142-143.)  The government, however, did not take these numbers into account in its calculation, because the witness "didn't think it was possible to separate that out."  (Tran. at 143 ln. 16-20.)

By comparison, Defendants proffered a more complete and accurate calculation of the net profits for the 26 Aircraft.  Indeed, Ms. Millan utilized source documents to identify which Delta planes were part of the 26 Aircraft transaction and to separate the relevant costs and expenses for those aircraft.  (Tran. at 284 ln. 22 – 285 ln. 3, 287 lns. 9-2; Dx Forf 05.)  Unlike the government, she included the various costs associated with the 26 Aircraft in her calculation. Defendants' calculation, for example, accounted for funds received from and costs associated with any sales of any of the 26 Aircraft that occurred as well as the transfer of some of the aircraft to Global Aircraft Solution at cost as part of a settlement.  (Tran. at 284 lns. 14-20.) Defendants' calculation also accounted for costs associated with the original acquisition of the aircraft at issue – a $22 million expense which the government's calculation did not include. (Amend. Resp. at 45-46;  Tran. at 290 lns. 19-25; Dx Forf 05 at Tab 03.)  Ms. Millan also, with the help of Mr. Collier, calculated the maintenance costs associated with these aircraft.  (Tran. at 291 lns. 2-25.)  She also included the legal expenses relevant to this transaction based on Gx QB

10-30-07, even though the government's exhibit underestimated the costs because it stopped in October of 2007. (Tran. at 292 ln. 6 – 293 ln. 12.)

Significantly, the only expense which the government directly questioned was Ms. Millan's calculation that Defendants paid $2,667,670 in transaction expenses for the 26 Aircraft. (Tran. at 502 ln. 4 – 505 ln. 6.) Specifically, the government questioned why Ms. Millan had not included as an exhibit the spreadsheet or worksheet she used to calculate this amount. (*Id.*) Ms. Millan, however, explained how she derived this amount from the government's exhibit Gx QB 10-30-07. (*Id.*) Ms. Millan's testimony regarding her approach to calculating these transaction costs was sound and credible, even without a worksheet showing each step of her work. The government did not offer any evidence to disprove or undercut Ms. Millan's transaction cost calculation. Ms. Millan's analysis of the 26 Aircraft transaction – which was supported by documents which the Court reviewed and which the government offered no evidence to refute – resulted in a net loss to Defendants of $1,482,724.[20] (Dx Forf 05.)

While Ms. Millan's analysis and calculations were imperfect, she established, by a preponderance of the evidence, sufficient costs to result in a net loss for Defendants for forfeiture purposes. Ms. Millan conceded on cross-examination, for example, that she may have erred by excluding $1.7 million that BCI received in a settlement with Global Aircraft Solutions regarding some Delta aircraft. (Tran. at 498 lns. 2-11.) This concession, however, does not undercut Ms. Millan's *cost* analysis, as this figure related to a potential receipt which BCI received. Ms. Millan similarly conceded that she erred by not including a September 20, 2007 $3,452,504.48 credit to BCI from a Delta Settlement, reflected in Gx QB 10-30-07, although she could not tell from that exhibit whether the sum related to the 26 Aircraft or other Delta planes. (Tran. at 499

---

[20] Notably, Ms. Millan's calculation did not count BCI's repayment to Hyatt Johnson Capital as a cost, even though BCI's settlement with Hyatt Johnson included cash and certain planes. (Tran. at 289.) Ms. Millan testified that, had she taken these payments into account, it would have resulted in an even larger loss. (Tran. at 290 lns. 8-13.)

ln. 18 – 500 ln. 5; 501 lns. 1-15.)   Notably, the government, which bears the burden of establishing any receipts, did not offer any testimony to establish that the settlement sum stemmed from the 26 Aircraft.  After deducting from the receipts the government did prove – the investors' capital – the direct costs which Defendants proved by a preponderance of the evidence, there are no funds subject to forfeiture regarding the 26 Aircraft transaction.

## CONCLUSION

For the foregoing reasons, the government has failed to establish that any funds are subject to forfeiture under Provision B.

**DATED: September 24, 2013**

**ENTERED**

**AMY J. ST. EVE**
**U.S. District Court Judge**